**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CARL CARVER, EDWARD C. DAY, DEBORAH
JEAN KENNY, LISA PARKER, LANDOL D.
FLETCHER, AND ALL OTHERS SIMILARLY
SITUATED,

                           Plaintiffs,

v.

THE BANK OF NEW YORK MELLON, BNY
MELLON, NATIONAL ASSOCIATION, and DOES
1-20,

                           Defendants.

**JURY TRIAL DEMANDED**

**Case No: 15-cv10180**

**CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ........................................................................... 1

II.     JURISDICTION AND VENUE ..................................................................... 3

III.    PARTIES ......................................................................................................... 4

        A.      Plaintiffs ............................................................................................. 4

        B.      Defendants ......................................................................................... 5

IV.     AMERICAN DEPOSITARY RECEIPTS AND FOREIGN CURRENCY
        TRANSACTIONS ......................................................................................... 7

        A.      American Depositary Receipts ......................................................... 7

        B.      How Defendants' Unlawful ADR FX Scheme Operated .................... 8

                a.  Dividends and Interest Payments to ERISA Holders of ADRs
                    are Plan Assets ......................................................................... 8

                b.  The FX Market and ADRs ......................................................... 9

                c.  Defendants Exercised Discretion with Plan Assets to Generate
                    Illegal Profits ........................................................................ 11

                d.  Defendants Committed a Prohibited Transaction with Each
                    ADR FX Transaction .............................................................. 13

V.      FACTUAL BACKGROUND OF THE ERISA PLANS AND
        PLAINTIFFS' CLAIMS ............................................................................. 16

        A.      The Plans and ADR FX ................................................................... 16

        B.      The Central States Plan and FX ..................................................... 17

        C.      Owens Corning Merged Retirement Plan ("Owens Corning Plan") ................. 19

        D.      The Verizon 401(k) Plan ................................................................. 20

E.      Defendants' Fiduciary Status ................................................................................ 21

VI.     PLAINTIFFS ARE ENTITLED TO ERISA'S FRAUD OR
        CONCEALMENT LIMITATIONS PERIOD ................................................................ 23

VII.    CLASS ALLEGATIONS ........................................................................................ 25

VIII.   CLAIMS FOR RELIEF .......................................................................................... 28

        COUNT I .......................................................................................................... 28

        COUNT II ......................................................................................................... 30

        COUNT III ........................................................................................................ 31

IX.     PRAYER FOR RELIEF ......................................................................................... 33

## I.   NATURE OF THE ACTION

1.      Plaintiff Carl Carver, Edward C. Day, L.D. Fletcher, Deborah Jean Kenny, and Lisa Parker bring this civil enforcement action pursuant to ERISA, 29 U.S.C. §1132(a)(2) and (a)(3) against the Bank of New York Mellon and BNY Mellon, National Association on behalf of four ERISA[1] employee benefit plans in which they are participants.  Those Plans are the Central States, Southeast and Southwest Areas Pension Plan ("Central States Plan"), the Owens Corning Merged Retirement Plan ("Owens Corning Plan"), and the Verizon Savings and Security Plan for Mid-Atlantic Associates ("Verizon 401(k) Plan") collectively ("Plaintiff Plans"). Plaintiffs also bring this action as a class action on behalf of a class (the "Class") of participants, beneficiaries, and named fiduciaries of similarly-situated employee benefit plans (collectively the "Plans"). The class period is from January 1, 1996 to the present time ("Class Period").  Plaintiffs seek to recover losses and obtain equitable relief to remedy Defendants' fiduciary breaches including their transactions prohibited by ERISA.

2.      Defendants' ERISA fiduciary duties, the "highest known to the law,"[2] required them to act prudently and solely in the interest of the Plans' participants and beneficiaries.

3.      Rather than fulfilling these duties, the Defendants enriched themselves at the expense of the retirement security of the Plaintiffs and the Class.

4.      Defendants appropriated excessive, unauthorized, and undisclosed markups[3] in the course of executing foreign exchange ("FX") transactions associated with the Plans' holding of

---

[1] The Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §1001, *et seq.*

[2] *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

[3] Markup is commonly used in the foreign currency transactions to mean either a markup or a markdown. Markup will be used in the Complaint to mean either or both, as the context requires.

1

American Depositary Receipts ("ADRs") issued by Defendants. Defendants' breach of their fiduciary duty when it conducted the FX transactions ("ADR FX") increased their revenues and profits by millions of dollars annually at the expense of Plaintiffs and the Class.

5.     Defendants charged excessive rates and markups on ADR FX transactions on ADRs they sponsored, via the following scheme. When Defendants priced ADR FX transactions for ERISA Plans (or for investment funds in which the Plans invested), they selected a price for their own benefit that was worse than what was available in the market or from Defendants. When they converted foreign dividends and interest for ADR assets of ERISA Plans into U.S. dollars, Defendants selected a transaction rate at or near the lowest rate at which the currency traded. This scheme increased Defendants' profits at the expense of their ERISA clients.

6.     Defendants' "spread" on ADR FX currency transactions with Plaintiff was many times greater than what was charged (and disclosed) for Defendants' spreads on the same currency pair for FX transactions in which Defendants' clients negotiated the FX transaction.

7.     The *Wall Street Journal* examined one trade of 8.1 million euros for dollars made by Bank of New York Mellon for a large pension fund. These FX transactions were priced by BNY in the same way that ADR FX transactions were priced. Defendants priced the FX transaction 1.3610. On that day, however, euro/dollar trades occurred between 1.3704 and 1.3604. Had the trade settled at the higher end of the range of the day, 1.3704, the pension fund would have gotten an extra $76,012. The *Wall Street Journal* analyzed over 9,400 trades processed over a decade and found that 58% of the currency trades were within the 10% of the day's range least favorable to the client.[4]

---

[4] Carrick Mollenkamp & Tom McGinty, Inside a Battle Over Forex, WALL STREET JOURNAL, May 23, 2011.

8.    Defendants generally kept their fictitious prices within the "range of the day," which helped prevent discovery of their acts. Defendants further concealed their breaches of duty and illegal transactions from their clients by failing to disclose the actual time of the transaction. Since currency prices change throughout the day, and Defendants never disclosed when a given FX transaction occurred, clients could not discover Defendants' improper practices and breaches of fiduciary duty. Defendants' actions ensured that the customers would not discover the excessive, unauthorized markups. Meanwhile, Defendants reaped windfall profits by selecting a rate at or near the worst rate of the day, from the customer's perspective, using a rate that was advantageous to Defendants.

9.    These allegations are based on counsel's investigation which included reviewing: Internal Revenue Service Forms 5500 filed with the U.S. Department of Labor ("DOL"), filings with the U.S. Securities and Exchange Commission, and other available documents. In addition, the allegations herein are based upon personal knowledge as to Plaintiffs and their own acts, and upon information and belief and the investigation of counsel as to all other matters.

## II.    JURISDICTION AND VENUE

10.    ERISA provides for exclusive federal jurisdiction over ERISA breach of fiduciary duty claims. 29 U.S.C. §1132(e)(1). The Plans are "employee benefit plans" within the meaning of ERISA, 29 U.S.C. §1002(3), and Plaintiffs are plan participants within the meaning of ERISA, 29 U.S.C. §1002(7). Plan participants are authorized to bring actions such as this to obtain appropriate relief for their plans. ERISA, 29 U.S.C. §1132(a)(2) and (3).

11.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question) and ERISA, 29 U.S.C. §1132(e)(1).

3

12.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b) and ERISA, 29 U.S.C. §1132(e)(2), because some or all of the fiduciary breaches for which relief is sought occurred in this district and the Defendants reside and may be found in this district.

### III.   PARTIES

**A.     Plaintiffs**

13.     Plaintiff **Carl Carver** is a participant in the Owens Corning Plan, an ERISA-covered plan. Mr. Carver began participating in the Plan shortly after he started working for Owens Corning in 1983. Mr. Carver resides in Aiken, South Carolina.

14.     Plaintiff **Edward C. Day** is a participant in the Owens Corning Plan. Mr. Day began participating in the Plan shortly after he started working for Owens Corning in 1979. Mr. Day resides in Saluda, South Carolina.

15.     Plaintiff **Landol D. Fletcher** is a participant in the Central States Plan, an ERISA-covered plan. Mr. Fletcher began participating in the Plan in approximately 1980.   Fletcher resides in Buford, South Carolina.

16.     Plaintiff **Deborah Jean Kenny** is a participant in both the Owens Corning Plan and the Central States Plan, which are ERISA-covered plans. Ms. Kenny began participating in the Owens Corning Plan shortly after she started working for Owens Corning in 1973. She stopped working for Owens Corning in 2000 but remains a participant in the Plan.  Kenny is also a participant in the Central States Plan. Kenny is currently receiving a pension from both the Owens Corning Plan and the Central States Plan.  Kenny resides in Warrenville, South Carolina.

17.     Plaintiff **Lisa Parker** is a participant in the Verizon 401(k) Plan, an ERISA-covered plan. Plaintiff Parker invested through her Plan account in various collective trusts, partnerships, other entities, and/or separate accounts that held foreign investments, including the Morgan Stanley International Fund; Pyramis Select International Equity Commingled Pool

4

Portfolio; Pyramis Select International Small Cap Commingled Pool; Marathon International Large Cap Equity Developed Fund; Mondrian International Large Cap Equity Emerging Markets Fund; Alliance Bernstein Emerging Markets Style Blend Equity Fund; Morgan Stanley Emerging Markets Fund; Genesis Emerging Markets Fund; The Boston Company Emerging Markets Funds; and portfolios, strategies, and collective investment funds, managed by Artio International Equity Fund, Capital Guardian, McKinley Capital Management, and Mellon Capital Management Corporation (including the Passive International Equity Fund). Plaintiff Parker is a resident of Dover, Delaware.

18.     The **Plaintiff Class** is limited to participants, beneficiaries, or named fiduciaries of ERISA-covered employee benefit plans. ERISA is the governing federal law for private sector employee benefit plans sponsored by employers, plans sponsored by labor unions, and plans sponsored by both labor unions and employers. 29 U.S.C. §1003(a).

**B.     Defendants**

19.     Non-defendant **The Bank of New York Mellon Corporation** ("BNY Mellon Corp.") is the parent of Defendants The Bank of New York Mellon and BNY Mellon, N.A., which are its two principal subsidiaries and sources of income. BNY Mellon Corp. is a Delaware corporation with headquarters at One Wall Street, New York, New York, 10286. BNY Mellon Corp. is the product of the July 1, 2007 merger (the "Merger") of The Bank of New York Company, Inc. and Mellon Financial Corporation ("Mellon"). Its website claims it had $27.9 trillion under custody or administration on September 30, 2012.

20.     Defendant **The Bank of New York Mellon** ("**BNYM**" or "**BNY Mellon**"), a New York state-chartered bank, is one of two principal bank subsidiaries of BNY Mellon Corp. It was formerly named "The Bank of New York". There is substantial overlap between BNY Mellon

Corp. and BNYM's leadership. For instance, the BNY Mellon Corp. 2010 10-K reported that every current executive officer of BNY Mellon Corp. also served as an officer of BNYM. According to the BNY Mellon Corp. 2010 10-K, BNYM "houses [BNY Mellon Corp.'s] institutional businesses, including Asset Servicing, Issuer Services, Treasury Services, Broker-Dealer and Advisor Services, and the bank-advised business of Asset Management."

21.     Defendant **BNY Mellon, National Association** ("**BNY Mellon, N.A.**") is a nationally-chartered bank that was formerly named Mellon Bank, N.A. BNY Mellon Corp. describes BNY Mellon, N.A. as one of its two principal subsidiaries. BNY Mellon, N.A. is based in Pittsburgh, Pennsylvania.

22.     Defendants **Does 1-20** are entities or individuals whose identities are not currently known to Plaintiffs but (i) are affiliates or employees of BNY Mellon Corp. or its affiliates, and (ii) that either provided FX services to the Plans pursuant to the FX scheme described below during the relevant period or are successors in interest to entities that provided such services.

23.     Unless otherwise specified or indicated by context, the term "Defendants" includes the above-named Defendants and their predecessors in interest, including pre-Merger predecessors in interest.

24.     Defendants possess information regarding which particular entities affiliated with BNY Mellon Corp. were responsible for which conduct with respect to the class. Plaintiffs expect to refine their allegations in this respect subsequent to discovery.

6

IV.    **AMERICAN DEPOSITARY RECEIPTS AND FOREIGN CURRENCY TRANSACTIONS**

A.    **American Depositary Receipts**

25.    In recent decades, ERISA employee benefit plans and other institutional investors have found it increasingly desirable to enter overseas securities markets and expand the global scope of their investment portfolios in search of diversification and greater returns.

26.    As an alternative to holding foreign securities, some investors such as ERISA Plans buy, sell, or hold American Depositary Receipts. ADRs represent a specified number of shares in a foreign corporation. First introduced in 1927, ADRs are typically issued after the "depositary" bank purchases foreign securities from the foreign "issuer" and places those securities in a "custodian" bank for safekeeping in the same country as the foreign issuer.  The depositary bank then issues ADRs in the U.S. based on those "immobilized" foreign shares.  The ADRs are traded on American markets just like shares of U.S. stocks.

27.    By investing in ADRs, U.S. investors can effectively invest overseas without having to exchange dollars for another currency to buy the foreign shares. Instead, the U.S. investor, such as the Plaintiff Plans, holds a U.S. security with all the protections afforded to U.S. shareholders.  The ADR price closely tracks the price of the underlying foreign security in its home market.[5]

---

[5] There are four types of ADRs. Level I ADRs do not raise capital in the U.S. for the foreign issuer and are traded over the counter.  Level II ADRs do not raise capital in the U.S. for the issuer and are listed and traded on a U.S. exchange such as the NYSE, AMEX, or the NASDAQ.  Level III ADRs do raise capital in the U.S. for the issuer and are listed and traded on a U.S. exchange. Private placement ADRs are limited to large institutional investors -- "Qualified Institutional Buyers" -- with at least $100 million in net worth, which includes many ERISA Plans. Some ADRs are sponsored by the foreign issuer, and others are not sponsored and can only be traded on the over the counter market.

28.     Currently more than 2,700 ADRs are available representing shares of companies located in more than 70 countries.[6]

29.     Banks typically charge their ADR investors fees for providing the ADR services. These fees for providing custody services, for the distribution of dividends, for voting shares, and for conducting the ADR FX.[7]

30.     On its website, BNYM lists ADRs that it sponsors that are traded on the NYSE, AMEX or NASDAQ.[8]   BNYM describes itself as the "leading depositary bank."[9]

**B.      How Defendants' Unlawful ADR FX Scheme Operated**

        a.  Dividends and Interest Payments to ERISA Holders of ADRs are Plan Assets

31.     Foreign issuers of securities for ADR holders held by custodial banks in the foreign country typically issue dividend and interest payments to shareholders. When issued, the payments are typically converted by the depositary bank into U.S. dollars for the holders of ADRs traded in the United States.

32.     In the case of Defendants, such dividends and interest payments, whether in foreign currency or after conversion to U.S. dollars, at all times belonged to the ADR Holder. When the ADR Holder was an ERISA Plan, the dividend and interest issued were at all times ERISA plan assets.[10]

---

[6] U.S. Securities and Exchange Commission, "Investor Bulletin: American Depositary Receipts" (available at http://www.sec.gov/investor/alerts/adr-bulletin.pdf) ("SEC Investor Bulletin").

[7] SEC Investor Bulletin.

[8] http://www.adrbnymellon.com/dr_directory.jsp

[9] http://www.adrbnymellon.com/files/PB19836.pdf

[10] 29 C.F.R. §2510-3-101.

33.     The ownership of those interest and dividend payments by the ADR Holder is also evident in a sample ADR contract, called the "Deposit Agreement", illustrated here as between Defendant Bank of New York, the foreign issuer Baidu.com, Inc., and holders of ADRs issued pursuant to the agreement. The sample Deposit Agreement is clear that the dividend and interest payments, as a component of the "deposited securities", are the property of each ADR holder:

> The term "Deposited Securities" as of any time shall mean Shares at such time deposited or deemed to be deposited under this Deposit Agreement and any and all other securities, property and cash received by the Depositary or the Custodian in respect thereof and at such time held hereunder, subject as to cash to the provisions of Section 4.5.[11]

Section 4.5 of this sample Deposit Agreement, attached as Appendix I, describes the conversion of the foreign currency to U.S. dollars.[12]

34.     Plaintiffs have identified other ADR agreements involving Defendant-issued ADRs with identical language.

### b.  The FX Market and ADRs

35.     When an foreign issuer whose securities underlie an ADR issues a dividend or makes an interest payment, the depositary bank converts the interest or dividend payment by conducting a FX transaction in the foreign currency market -- the ADR FX -- so that it can present the payment to the ADR holder in U.S. dollars.

---

[11] U.S. Securities and Exchange Commission, Form F-1 Registration Statement by Baidu.com, Inc, Exhibit 4.3, "Baidu.com, Inc. and the Bank of New York as Depositary and Owners and Beneficial Owners of American Depositary Receipts, Deposit Agreement, Dated as of , _____2005" Section 1.10 (filed July 12, 2005)  (available at http://www.sec.gov/Archives/edgar/data/1329099/000119312505140785/dex43.htm). To the extent Defendants or any of their predecessors in interest purport to disclaim liability for breach of fiduciary duty, ERISA provides that any such agreement or instrument is void as against public policy. 29 U.S.C. §1110.

[12] *Id.*, Section 4.5.

36.     The foreign currency market operates 24 hours a day throughout the week.  The FX market is the largest and most actively traded financial market in the world. The values of most currencies "float" against each other -- that is, the values vary based on factors ranging from supply and demand to political and economic trends.

37.     Global FX trading averaged $5.3 trillion per day in April 2013.[13]

38.     The FX market is actually two markets – the "interbank" market in which banks trade currencies with each other (i.e. the wholesale market), and a parallel market in which banks interact with non-bank clients such as private U.S. pension funds (i.e. the retail market). Trading in both markets is over-the-counter, meaning that it does not occur on a central exchange with records of all daily transactions and their prices.

39.     An FX "spot" transaction involves an agreement to exchange two currencies at a later date.  The exchange of currencies occurs typically two bank business days after the deal is priced at an exchange rate.[14]

40.     This Complaint involves FX spot transactions conducted by Defendants involving ERISA Plan assets in the retail FX market.

---

[13]  Bank for International Settlements, Triennial Central Bank Survey, Foreign exchange turnover in April 2013: preliminary global results at 3 (available at https://www.bis.org/publ/rpfx13fx.pdf).

[14] The primary exceptions involve transactions between the U.S. dollar and Canadian dollar and Mexican peso settle, i.e. the currencies are exchange the next business day after the deal is priced.

10

c.  Defendants Exercised Discretion with Plan Assets to Generate Illegal Profits

41.      Defendants' ADR FX pricing scheme violated ERISA and reaped Defendants millions of dollars in secret profits while minimizing the risks of detection by their ERISA Plan clients and other ADR investors.

42.     Over the Class Period, Defendants secretly and routinely set ADR FX rates that were worse for the ERISA Plans than rates that would have been agreed to at arm's-length for comparable transactions by Defendant or by other FX retail market providers.  For more than a decade Defendants did not reveal and concealed their ADR FX pricing methodology from ERISA Plans.

43.     Defendants exercised discretion and control over plan assets when they priced ADR FX in a secret scheme. Defendants set their own compensation when they secretly priced the ADR FX for their ERISA Plan clients. For these reasons, Defendants acted as ERISA fiduciaries in pricing ADR FX.[15] Their exercise of discretion and control over plan assets made Defendants' secret pricing scheme possible, which Defendants used to their advantage and to the disadvantage of the Plans.

44.     An ERISA fiduciary must discharge his duties with respect to a Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan. The fiduciary must act prudently and consistent with their duty of loyalty to the Plans and

---

[15] 29 U.S.C. §1002(21)(a).

11

the Plans' participants and beneficiaries.[16] Defendants violated their ERISA fiduciary duties by pricing ADR FX transactions in their own interest and against the ERISA Plans holding ADRs.

45.     ADRs are typically held by the Plan's ERISA custodian bank and the Plan's Trustee, and generally are reported as the Plan's ERISA assets on IRS Form 5500, which serves as the Annual Report of the Plan filed annually with the U.S. Department of Labor and the Internal Revenue Service, U. S. Department of the Treasury.

46.     Defendants exercised this discretion over Plan assets by systematically pricing ADRs at the rate that is at or near the worst rate for the ADR Holder. This price would reflect an excessive exchange rate to the buyer of U.S. dollars - the ADR Holder.

47.     By generally keeping the price charged to the Plans within the range of the day, Defendants ensured that their customers would not discover that the ADR FX transactions were not being provided at the rate available in an arms-length transaction.

48.     However, sometimes Defendants actually priced ADR FX outside the range of the day, to generate even higher illegal profits. This meant Defendants priced the transaction at a rate that was not even recorded on that trading day.

49.     Another aspect of the illegal pricing scheme was that Defendants secretly earned interest for their own accounts on the dividends and interest payments issued prior to transferring the payments to the ERISA Plans in U.S. dollars. Defendants earned such interest when the dividend on the underlying security for the ADR arrived at the bank a day or two earlier than usual, which is a day or two before Defendants would transfer the U.S. dollars to the ADR Holder. That currency was at all times the property of the ADR Holder. An ERISA fiduciary cannot cause a transaction that constitutes a direct or indirect lending of money or other

---

[16] 29 U.S.C. §1104(a)(1).

12

extension of credit between the plan and a party in interest,[17] nor can a party in interest knowingly participate in such a fiduciary breach.

50.   Defendants handsomely profited off their secret ADR-FX pricing scheme at the expense of ERISA ADR holders.

51.   When volatility in FX prices increased, such as during the 2008 financial crisis, the range of the day used in pricing ADR FX was larger, giving Defendants the opportunity to set their fictitious prices to generate even larger profits during periods of market volatility. Tellingly, BNYM's 2008 annual report noted that record FX revenues in part "reflect[] the benefit of increased market volatility."

52.   Perpetuation of Defendants' scheme and its attendant high-marginal revenue on ADR FX trades remained undetected by client because Defendants withheld critical information about the manner in which the trades were executed and priced from Clients.

d.  Defendants Committed a Prohibited Transaction with Each ADR FX Transaction

53.   Ordinarily, it would be illegal for a bank entity in Defendants' position to engage in FX transactions with its ERISA customers. In the terminology of ERISA, Defendants were a "party in interest" to the ERISA Plans because they provided FX services to the ERISA Plans. As a party in interest, Defendants cannot enter a transaction – such as an ADR FX transaction -- with those ERISA Plans because such a transaction is a *per se* "prohibited transaction" under ERISA.[18] Defendants can nonetheless avoid committing that *per se* violation when it enters an

---

[17] 29 U.S.C. §1106(a)(1)(B).  See also U.S. Department of Labor, Pension & Welfare Benefit Programs. OPINION 93-14 A, May 5, 1993.

[18] 29 U.S.C. §1106.

13

FX transaction with ERISA Plans if it can establish that the transaction meets an exemption to the prohibited transaction rules.[19]

54.     Specific statutory and a specific regulatory exemption to ERISA's prohibited transaction rules are available for banks that provide FX transaction services to ERISA Plans.[20] To qualify for either form of exemption, the bank, among other things, *has the burden* to establish that the terms of each FX transaction are "not less favorable" to the ERISA Plan than terms 1) generally available in comparable arm's length foreign exchange transactions between unrelated parties, and 2) afforded by the bank in comparable arm's length foreign exchange transactions between unrelated parties.[21]

55.     Defendants cannot establish that its ADR FX transactions during the Class Period met either of those prohibited transaction exemptions. Defendants provided the ERISA plans worse rates than they provided to others in comparable transactions, and worse rates than were available in the market in arms-length transactions.[22] Over the Class Period, Defendants routinely and intentionally provided ERISA Plans the worst rate of the day for ADR FX transactions, reaping excessive profits at the expense of ERISA Plans and their participants and beneficiaries in the tens of millions of dollars. Defendants concealed from ERISA Plans that

[19] 29 U.S.C. §1108.

[20] 63 FR 63503, U.S. Department of Labor Prohibited Transaction Exemption 98-54 (November 13, 1998) (hereafter "PTE 98-54"); 29 U.S.C.§1108((b)(18) (effective August 17, 2006). A third regulatory exemption related to FX transactions is not available to a bank unless it directly negotiates the terms of the FX transaction on the day of the transaction with an independent plan fiduciary.

[21] *Id.*

[22] ADR FX was not arms-length.  No ERISA Plan directed or negotiated ADR FX transactions with Defendants. Defendants unilaterally chose the ADR FX rates they charged, without involvement of the ERISA Plans.

there were better comparable FX rates available from Defendants and other banks and made

knowing omissions that prevented the Plans from discovering the breaches and prohibited

transactions.

56.     During the Class Period, certain non-ADR FX clients received preferential FX

rates and terms in the form of reduced basis point[23] markups compared to the ADR FX clients.

Defendants' ADR FX transactions were not performed at these preferential rates. Instead,

Defendants routinely performed ADR FX transactions at rates that, though they were generally

within the range of the day of FX prices at which the currency pair traded, provided Defendants

with an excess margin, and therefore profits, on the ADR FX transaction.

57.     Further, prior to August 17, 2006, Defendants were required to obtain, prior to

conducting any FX transactions for an ERISA Plan, a special written permission from an

independent fiduciary to the ERISA Plan, a "standing instruction", in order to meet the

applicable ERISA prohibited transaction exemption.[24] Defendants did not obtain such a standing

instruction from its ERISA Plan clients who held Defendant-sponsored ADRs.

58.     In addition, prior to August 17, 2006 Defendants were absolutely prohibited from

conducting FX transactions for ERISA Plans to which they were a party in interest that were

larger than $300,000. No exemption was available for such transactions from the *per se*

prohibited transaction rules prior to that date.[25] Plaintiffs suspect that Defendants violated the

---

[23] "Basis points" are one one-hundredth of a percentage point, i.e. there are 100 basis points in
one percent.

[24] PTE 98-54. A standing instruction would not have been required if the bank and an
independent plan fiduciary negotiated the FX price on a daily basis for each FX transaction.
ADR FX did not involve such daily negotiations.

[25] PTE 98-54.

prohibited transaction rules prior to that date by conducting ADR FX transactions greater than $300,000 in value.

## V. FACTUAL BACKGROUND OF THE ERISA PLANS AND PLAINTIFFS' CLAIMS

### A. The Plans and ADR FX

59. There are two basic types of ERISA-covered retirement plans—defined benefit plans and defined contribution plans. Defined benefit plans include traditional pension plans[26] in which the amount of benefit a participant receives is fixed; defined contribution plans are plans in which participants hold the assets of their own individual account, such as a 401(k) plan, in which participants may contribute a portion of their earnings to the account and at retirement receive the proceeds in a lump sum or periodic payments.

60. Defined benefit plans (and their investment managers on their behalf) regularly invest in ADRs. Similarly, defined contribution plans frequently include at least one, if not several, foreign investment options that include ADR holdings in order to increase diversification and take advantage of opportunities for higher returns. These ADR investments are made either directly or through participation in Separately Managed Accounts or Collective Investment Funds.[27]

61. Defendants executed ADR FX transactions for dozens of ADRs held by Plaintiff Plans during the Class Period. A sample of those ADR FX transaction is contained in Appendix

---

[26] There is a third type of ERISA Plan, technically known as a health and welfare benefit plan, but in common parlance known as health insurance plans and plans that provide death and disability benefits.

[27] "Separately Managed Account" refers to a professionally managed investment account offered by, e.g., a broker-dealer typically for a single high net worth individual or entity in which the entity directly owns the securities in the account. "Collective Investment Funds" refers to investment vehicles, other than mutual funds governed by the Investment Company Act of 1940, that are offered for investment to more than one large institutional investor. Such funds are typically offered by banks.

II. Based on this information, it is certain that Defendants engaged in similar fiduciary violations and prohibited transactions with other ERISA plans and ERISA plan assets.

**B.      The Central States Plan and FX**

62.      The Central States Plan in which Plaintiffs Landol D. Fletcher and Deborah Jean Kenny participate is an "employee pension benefit plan" under ERISA, 29 U.S.C. §1002(2)(A). It is a traditional defined benefit pension plan. The Plan's assets are held under the custody of the Defendants.

63.      The assets of the Central States Plan are the assets that Fletcher, Kenny and other Plan participants and beneficiaries must look to for assurance that their vested accrued retirement benefits will be paid as required by ERISA.

64.      The Central States Plan has experienced significant underfunding in recent years. In 2004 the Plan's Trustees froze or reduced certain benefits including reducing the benefit accrual rate from 2% of contributions to 1% of contributions; freezing certain early retirement benefits at their year-end 2003 levels; and eliminating retirement benefits for all employees who would seek to retire before age 57, these included benefits for which Plan participants and Plaintiffs Fletcher and Kenny had been eligible.

65.      In 2005, the Plan sought  relief from the Internal Revenue Service in the form of a request for 10-year amortization of the Plan's unfunded liabilities, which are long-term pension obligations that the Plan lacked assets to pay.

66.      In each of the Central States Plan years between 2008 and 2014, the Plan's actuary has certified the Plan's funding status was "critical", also referred to as being in the "red zone". "Critical" is the worst plan funding status possible under the varying funding status

17

categories under the Pension Protection Act of 2006. A crucial input used to determine "funding" status is the value of the Plan's funding, which requires valuation of the Plan's assets.

67.     In 2008, the Plan was unable to meet its amortization schedule, so it sought further relief from the IRS of its minimum funding percentage requirement. The IRS neither granted nor denied the request to lessen minimum funding requirements.

68.     The Central States Plan's trustees were required by ERISA to adopt a "rehabilitation plan" in 2008.  While the Central States rehabilitation Plan expects to forestall insolvency until 2021 or later, there is no reasonable prospect that its vested benefits will ever be fully funded. The Central States rehabilitation plan states that the "rehabilitation plan . . . is expected to last indefinitely."

69.     In the Central States Plan year ending December 31, 2011, the Plan again failed to meet its amortization schedule. The Plan did not seek or receive further relief from the IRS.

70.     The 2014 Annual Funding Notice states that on January 1, 2014 the Plan was 48.4% funded.  Based on its Form 5500s filed for years 1998 through 2015, the Plan has never been fully funded.

71.     On October 1, 2015, the Plan notified participants that it had sought approval from the U.S. Department of the Treasury of a "rescue plan" to reduce accrued and vested pension benefits substantially. The DOT has extended the comment period until February 1, 2016. If DOT approves the plan, all Plan participants will vote to approve the rescue plan, the government can override the negative vote and approve the "rescue plan."  If the "rescue plan" is implemented, Plaintiff Fletcher's projected monthly benefit will be reduced from $3,700.88 to $2,665.15. If the "rescue plan" is not implemented and the Plan is taken over by the Pension Benefit Guaranty Corporation, which insures private pension benefits, Fletcher's monthly benefit

18

will be reduced to $1,144.00.  A true and correct copy of the October 1, 2015 mailing to Fletcher is attached hereto as Appendix III.

72.    In other words, the Plan does not ever expect to fully pay its benefits to Plan participants such as Fletcher and Kenny.

73.    The Central States Plan held ADRs issued by Defendants during the Class Period (see Appendix II).

74.    Defendants and their predecessors in interest executed ADR FX trades for these ADRs held in the Plan's accounts, and/or Collective Investment Funds and Separately Managed Accounts which held Plan assets.

75.    As a direct consequence of the misconduct alleged herein, the Central States Plan suffered financial losses for which Fletcher and Kenny seek recovery on behalf of the Plan.

76.    As a result of these financial losses suffered by the Central States Plan,  Fletcher and Kenny suffered an injury in fact because the losses contributed to and increased the risk that they would receive  diminished benefits through the Plan.

**C.    Owens Corning Merged Retirement Plan ("Owens Corning Plan")**

77.     The Owens Corning Plan in which Plaintiff s Carl Carver, Edward Day, and Deborah Kenny participate is an "employee pension benefit plan" under ERISA, 29 U.S.C. §1002(2)(A). It is a traditional defined benefit pension plan.

78.    Based on its Form 5500s filed for years 1998 through 2014, the latest report available, the Plan has never been one hundred percent funded.  At the end of 2014 it was only 97.96% funded. The assets of the Owens Corning Plan, including ADRs sponsored by Defendants, are the assets that will pay the vested pension benefits of Carver, Day, and Kenny.

19

79.     The Owens Corning Plan held ADRs sponsored by Defendants during the Class Period (see Appendix II). Defendants and their predecessors in interest executed ADR FX trades for the Plan, and/or Separately Managed Accounts and Collective Investment Funds and Separately Managed Accounts which held these Owens Corning Plan ADR assets.

80.     As a direct consequence of the misconduct alleged herein, the Owens Corning Plan suffered financial losses and injury in fact for which Carver, Day and Kenny seek recovery on behalf of the Plan.

81.     As a result of these financial losses suffered by the Owens Corning Plan, Carver, Day and Kenny suffered injury in fact because the losses increased the risk that they will receive no or diminished pension benefits through the Plan.

**D.     The Verizon 401(k) Plan**

82.     The Verizon Savings and Security Plan for Mid-Atlantic Associates (the "Verizon 401(k) Plan") in which Plaintiff Lisa Parker participated is an "employee pension benefit plan" under ERISA, 29 U.S.C. §1002(2)(A). It is a defined contribution pension plan.

83.     The Verizon 401(k) Plan held its assets in two master trusts, the Bell Atlantic Master Trust, and the Verizon Savings Master Trust.

84.     The Verizon 401(k) Plan held ADRs sponsored by Defendants during the Class Period. Defendants and their predecessors in interest executed ADR FX trades for the Plan, the Plan's accounts, and/or Collective Investment Funds and Separately Managed Accounts in which the Plan invested.

85.     Parker invested in these investments held by the Verizon 401(k) Plan included the Collective Investment Funds and Separately Managed Accounts during the Class Period.

20

86.     During the Class Period  Parker invested in the Verizon 401(k) Plan Active
International Equity Fund, which is a fund of funds that includes investments in the Artio
International Equity Fund, McKinley Capital Management International Equity Fund, Morgan
Stanley International Fund, Pyramis Select International Equity Commingled Pool, Pyramis
Select International Small Cap Commingled Pool, Marathon International Large Cap Equity
Developed Fund, Mondrian International Large Cap Equity Developed Fund, and the Emerging
Markets Fund (which is in turn comprised of Genesis Emerging Markets Fund, Alliance
Bernstein Emerging Markets Style Blend Equity Fund, Morgan Stanley Emerging Markets Fund,
Dimensional Fund Advisor Emerging Markets Value Fund, and Capital Guardian Emerging
Markets Growth Fund and before May 30, 2008 Bank of New York Mellon's Emerging Markets
Value Equity Pooled Fund).

87.     Appendix II illustrates ADRs sponsored by Defendants which held as assets of the
Verizon 401(k) Plan during the Class Period. Defendants executed FX for these and additional
ADRs held in the Verizon 401(k) Plan in the Class Period, including ADRs held by Plaintiff Lisa
Parker in her Verizon 401(k) Plan account.

88.      As a direct consequence of the misconduct alleged herein, the Verizon 401(k)
Plan and Plaintiff Parker suffered financial losses and an injury in fact, for which Plaintiff Parker
seeks recovery on behalf of the Plan and all similarly situated plans.

**E.     Defendants' Fiduciary Status**

89.     Every ERISA plan must have one or more named fiduciaries to administer and
manage the plan. ERISA treats as fiduciaries, not only persons explicitly named as fiduciaries,
but any other person or entity which in fact performs fiduciary functions. Specifically, under
ERISA a person is a fiduciary "to the extent … he exercises any discretionary authority or

discretionary control respecting management of such plan or ***exercises any authority or control respecting management or disposition of its assets*** ….”[28] Thus, a person and an entity is an ERISA fiduciary if it exercises discretionary authority or control in managing the plan, or, if it exercises any authority or control (discretionary or not) respecting management or disposition of plan assets. Under ERISA, one can be a fiduciary whether or not one would qualify as an agent under the common law.

90.     An ERISA fiduciary is required to “discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and … for the exclusive purpose of … providing benefits to participants and beneficiaries and … defraying the reasonable expenses of administering the plan ….”[29] In common parlance, ERISA fiduciaries owe the duty of loyalty and of prudence.

91.     Here, Defendants and their predecessors in interest exercised discretionary authority and control over and management of plan assets because, through the ADR FX scheme described above, they determined the ADR FX rates the ERISA Plans would pay to Defendants -- FX rates at or near the worst rate of the day. In effect, the Defendants’ ADR group employees instructed Defendants’ FX traders to charge these rates to the Plans. Defendants set their own markups and compensation when conducting ADR FX transactions.

92.     Defendants did not disclose the ADR FX scheme as alleged herein to the Plans, intentionally concealing their scheme and making knowing omissions that would have allowed the Plans to discover the scheme.

---

[28] 29 U.S.C. §1002(21)(A)(i) (emphasis added).
[29] 29 U.S.C. §1104(a)(1)(A)(i), (ii).

93.     Defendants and their predecessors in interest are and were fiduciaries under ERISA to the extent they had discretionary authority or discretionary responsibility in the administration of such Plans, including their discretionary authority or discretionary responsibility regarding the execution of ADR FX transactions with assets of the Plans.

## VI.   PLAINTIFFS ARE ENTITLED TO ERISA'S FRAUD OR CONCEALMENT LIMITATIONS PERIOD

94.     ERISA's statute of limitations provision for fiduciary breach claims provides that "in the case of fraud or concealment, [an] action may be commenced not later than six years after the date of discovery of such breach or violation."[30]

95.     Defendants' ADR FX trading scheme, as described above, constitutes knowing concealment and knowing omissions sufficient to invoke ERISA's fraud or concealment limitations period.

96.     Defendants made knowing misrepresentation or omissions of material facts to induce Plaintiffs, the Plans, and Plan fiduciaries to act to their detriment; and engaged in acts to hinder the discovery of a breach of fiduciary duty and prohibited transactions.

97.     None of the named Plaintiffs in this action were aware of this scheme more than three years prior to filing this complaint. Defendants' unlawful ADR FX practices came to light to Plaintiffs' counsel on July 12, 2013.

98.     Defendants intentionally engaged in specific acts to conceal the scheme and made intentional omissions to the same end. For instance, though Defendants would price the vast percentage of ADR FX at or near the worse rate of the day for the ADR Holder, Defendants would intentionally and typically keep the price within the range of the day, so as not to create a

---

[30]  29 U.S.C. §1113.

red flag that would indicate to ADR owners that a manipulation occurred. Defendants would strategically price a few smaller ADR FX at an exchange rate falling within the day's mid-range.  This would make it more difficult for victimized ERISA Plans to learn of the ADR FX scheme. Because the mid-range ADR FX rates were smaller transactions, this strategy would only minimally reduce Defendants' illegal profit, while enhancing concealment, a bargain well worth the slight cost to Defendants.

99.    Defendants intentionally provided ADR holders no time stamp indicating when the ADR FX transactions occurred during the day.

100.    Defendants' deceptive conduct extended to virtually all of their clients who used their FX services "standing instructions" FX services, the division of Defendants that conducted the ADR FX.

101.    For instance, emails make clear that preventing clients from learning Defendants' pricing scheme was an explicit business strategy. On April 11, 2008 Antonio Garcia-Meitin of BNYM's Asset Servicing Global Management department sent an email on Defendants' standing instruction FX program, to others in this department titled "Transparency" stating:

> In general **transparency adversely impacts our revenue stream and any product to distribute fee information would hurt us** many times over in reduced revenue. Nothing like a rock and a hard place.

(Emphasis added.)  Another BNYM officer commented on the proposal for greater transparency in the FX program: "I do NOT like it. Once pricing spreads are disclosed it will be a race to how quickly clients work it down to zero."

102.    The concealment is evident in a letter from a BNYM employee to the Florida Attorney General, a redacted copy of which was obtained through an open records act request by the *Wall Street Journal* and made public in an article published on December 28, 2011. The

24

author, who during the Class Period had worked closely with Jorge Rodriguez, Managing

Director of BNYM, and Richard Mahoney, Executive Vice President of BNYM Global Markets,

which oversaw the bank's FX operations, said:

> I was also trained in committing fraud using various strategies [] to the bank's corporate foreign exchange clients....***I can tell you firsthand and without any hesitation that the fraud is prevalent throughout BNY Mellon's Foreign Exchange Group.*** I can also share with you that top management was aware of the fraud the entire time....BNY Mellon's foreign exchange group was very small. I was only 1 of 3 people in the entire bank who focused exclusively on the corporate client segment. ***We used the same systems and fraudulent strategies on the corporate clients as was used on the pension fund clients.***

(Emphasis added).

103.   Plaintiffs expect to uncover further evidence of Defendants' knowing concealment

and omissions in discovery.

## VII.   CLASS ALLEGATIONS

104.   **Class Definition**. Plaintiff brings this action as a class action pursuant to Federal

Rule of Civil Procedure 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) on behalf of the

following class:

> All participants, beneficiaries, and named fiduciaries of ERISA Plans which held as Plan assets ADRs issued by Defendants (or their affiliates or predecessors in interest) and for whom Defendants provided foreign currency exchange transactional services (including foreign currency transactional services provided to the Plans and Collective Investment Funds, Separately Managed Accounts, and other investment entities that held Plans' assets) related to those ADRs, at any time from January 1, 1996 to the present. (Excluded from the class are any officers, directors, affiliates, legal representatives, heirs, successors, subsidiaries, and/or assigns of the Defendants or any of their respective predecessors in interest or any entity in which any Defendant or any of their respective predecessors in interest have a controlling interest.)

Class treatment is appropriate in this case because it would promote judicial economy by

adjudicating Plaintiff's ERISA fiduciary breach and prohibited transaction claims with respect to

all class members.

25

105. **Numerosity**. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff and can only be ascertained through appropriate discovery, Plaintiff believes that hundreds of ERISA plans with hundreds of thousands of participants[31] throughout the United States sustained losses because of Defendants' unlawful FX scheme. Defendants have approximately $28 trillion in assets under custody, and claim to be the largest provider of investment services to U.S. public and private pension funds.

106. **Commonality.** The claims of Plaintiffs and all Class members originate from the same misconduct, breach of duties, and violations of ERISA perpetrated by Defendants with regard to their ADR FX trading scheme. The questions of law and fact common to the Class include, but are not limited to:

      a.    Whether Defendants breached their fiduciary duties of prudence and loyalty to Class members by using an ADR FX trading scheme to improperly markup ADR FX transactions for Plaintiff and the Class;

      b.    Whether Defendants' self-dealing ADR FX transactions constituted transactions prohibited by ERISA;

      c.    Whether Defendants are ERISA fiduciaries;

      d.    Whether Defendants' fiduciary breaches caused losses to the Plaintiff Plans, the Plaintiff and the Class; and

      e.    Whether Defendants' prohibited transactions caused losses to Plaintiff Plans, the Plaintiffs and the Class.

---

[31] In 2011 the Central States Plan had 411,238 participants, the Owens Corning Plan more than 7,000 participants, and the Verizon 401(k) Plan more than 27,800 participants.

107.   **Typicality.** Plaintiff's claims on behalf of her Plans are not only typical of, but the same as, claims that would be brought with respect to other Plans. Individual cases would require each class member to prove the same claims based upon the same conduct of the Defendants, using the same legal theories, and would be seeking the same relief.

108.   **Adequacy.** Plaintiff will fairly and adequately protect the interests of class members. Plaintiff has no interests antagonistic to, or in conflict with, those of the Class. Plaintiff will vigorously protect the interests of absent class members.

109.   Plaintiff has retained counsel who are competent and have extensive experience in class action, ERISA litigation and FX transactions. Plaintiff's counsel include the firms of McTigue Law LLP; Beins Axelrod, PC; and Sidney H. Kalban, Esq.

110.   **Rule 23(b)(1)(A) & (B) Requirements.** Class action status is warranted under Federal Rule of Civil Procedure 23(b)(1)(A) because prosecution of separate actions by Class members would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B), because prosecution of separate actions by class members would create a risk of adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

111.   **Rule 23(b)(2) Requirements.** Certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other equitable relief with respect to the Class as a whole. No plan-by-plan inquiry would be required to determine whether Defendants' breached their fiduciary duties.

27

112. **Rule 23(b)(3) Requirements.** In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to Class members predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VIII.  CLAIMS FOR RELIEF

### COUNT I

### Breach of Duties of Prudence and Loyalty
### (Violation of ERISA, 29 U.S.C. §§1104 and 1109 by All Defendants)

113. All previous averments are incorporated herein.

114. At all relevant times, the Defendants were fiduciaries of the Plans within the meaning of ERISA, 29 U.S.C. §1002(21)(A).

115. Defendants exercised discretionary authority or control with respect to management of the Plans or the disposition of the Plans' assets when they determined the rate at which to execute ADR FX transactions. Defendants determined the excessive and unauthorized markup on the ADR FX transactions, rates the Plans paid for the transactions, and thereby determined the amount of their compensation. Defendants exercised discretion in setting the ADR FX rates when they determined the markups based upon such factors as whether or not to net transactions, and ignored more favorable rates provided to other clients and in the foreign currency market for comparable trades.

116. Defendants breached their ERISA fiduciary duties of prudence and loyalty, 29 U.S.C. §1104(a)(1)(A), (B), when executing non-negotiated ADR FX trades for the Plans and/or with the Plans' assets by, *inter alia*:

28

a.  Charging the Plans (or Collective Investment Funds, and Separately Managed Accounts through which the Plans invested) excessive rates for ADR FX transactions that resulted in excessive and windfall profit for Defendants;

b.  Charging the Plans (or Collective Investment Funds, and Separately Managed Accounts through which the Plans invested) excessive rates for ADR FX transactions that were far in excess of what fully informed parties agreed to in a comparable transaction in an arm's-length bargain;

c.  Failing to disclose to the Plans, their fiduciaries, or participants that when Defendants engaged in ADR FX transactions for the Plans they set their own compensation, and charging the Plans rates different than those which parties would agree to when bargaining at arm's-length;

d.  Failing to disclose to the Plans, their fiduciaries, or participants that Defendants intended to act exclusively for their own benefit and as principal dealers when conducting ADR FX transactions;

e.  Failing to provide full and frank disclosure to the Plans, their fiduciaries, or participants of the ADR FX transaction rates and the ADR scheme;

f.  Failing to provide to and concealing from the Plans, their fiduciaries, or participants key information about the actual periodic and daily ADR FX currency pair ranges that would enable Plaintiffs to determine the reasonableness of Defendants' ADR FX transaction charges;

g.  Failing to disclose to, and concealing from the Plans, their fiduciaries, or participants information showing the more favorable markups charged by

29

Defendants and FX traders at other banks for the same services in comparable

arm's-length transactions with other clients; and

h.   Appropriating the Plans' assets for Defendants' own benefit, reducing the

Plans' assets and the retirement savings of Plans and participants individual

accounts by tens of millions of dollars.

117.   Defendants committed these breaches during each ADR FX transaction involving

assets of an ERISA Plan.

118.   As a direct and proximate result of these breaches of fiduciary duty, the Plans and

their participants suffered tens of millions of dollars of losses. For the defined benefit plans in

the Class, these losses increased the risk of non-payment of benefits to participants.  For the

defined contribution Plans and participants in the class, these losses resulted in the immediate

loss of benefits.

119.   Pursuant to ERISA, the Defendants are liable to restore all losses suffered by the

Plans caused by the Defendants' breaches of fiduciary duty and to disgorge the profits obtained

from the ADR FX scheme, and provide to the Plans all other relief available.

## COUNT II

### Engaging in Self-Interested Prohibited Transactions with Plan Assets
### (Violation of ERISA, 29 U.S.C. §1106(b) by All Defendants)

120.   All previous averments are incorporated herein.

121.   ERISA prohibits fiduciaries from engaging in certain transactions and imposes

strict liability for any losses that result. Specifically, "a fiduciary with respect to a plan shall not .

. . deal with the assets of the plan in his own interest or for his own account. . . ." 29 U.S.C.

§1106(b).

122.   The Defendants, fiduciaries of the Plans, committed prohibited transactions when they dealt with the Plans' assets in their own interest and for their own accounts in executing ADR FX transactions for the Plans. In addition, they appropriated from the Plans' assets millions of dollars in payments for themselves resulting from improperly markups of ADR FX transactions, enriching themselves at the expense of the Plans and their participants.

123.   As a direct and proximate result of these prohibited transactions, the Plans, directly or indirectly, paid tens of millions of dollars more and received millions of dollars less for ADR FX transactions prohibited by ERISA and executed by Defendants.

124.   The terms of the ADR FX transactions set by Defendants were less favorable to the Plans than terms generally available in comparable arm's-length FX transactions between unrelated parties, and the terms of the transactions were less favorable to the Plans than the terms afforded by Defendants in comparable arm's-length FX transactions involving unrelated parties.

125.   As a direct and proximate result of these prohibited transactions, the Plans and their participants suffered tens of millions of dollars of losses. For the defined benefit plans in the Class, these losses increased the risk of non-payment of future benefits to participants.  For the defined contribution plans, such as the Verizon 401(k) Plan, and Verizon 401(k) Plan participant Parker, it resulted in immediate loss to the participants' individual accounts.

126.   Pursuant to ERISA, Defendants must disgorge all amounts paid them for the Plans' ADR FX transactions, restore all losses suffered by the Plans from the prohibited transactions, and disgorge all profits earned on the amounts paid by the Plans to Defendants, and provide to the Plans all other available relief.

**COUNT III**

**Causing the Plans to Engage in Party in Interest Prohibited Transactions
(Violation of ERISA, 29 U.S.C. §1106(a) by All Defendants)**

31

127.   All previous averments are incorporated herein.

128.   ERISA prohibits fiduciaries from causing a plan to engage in certain transactions with  parties in interest, including non-fiduciary parties in interest, with respect to a plan, specifically:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> > (A) sale or exchange, or leasing, of any property between the plan and a party in interest; [or],
>
> > * * * *
>
> > (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan[.]

29 U.S.C. §1106(a)(1).

129.   Defendants and their subsidiaries and affiliates are parties in interest with respect to the Plans.[32] "The term 'party in interest' means, as to an employee benefit plan -- (A) any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian)…(B) "a person providing services to such plan…."

130.   The Defendants, as fiduciaries and through their ADR FX scheme, caused the ERISA Plans to engage in ADR FX trades with parties in interest with respect to the Plans, namely certain Defendants' affiliates and subsidiaries, which are parties in interest.[33] These trades constituted an exchange of property between the Plans and parties in interest, and are prohibited by ERISA.

---

[32] 29 U.S.C. §1002(14).

[33] 29 U.S.C. §1002(14)(G) & (H).

131.   Defendants' actions also caused the Plans to transfer plan assets to a party in interest with respect to the Plans, namely certain of Defendants' subsidiaries and affiliates, for the benefit of the party in interest. Specifically, Defendants facilitated the transfer of Plan assets in one currency to certain Defendants' subsidiaries and affiliates, and used those transferred assets for their benefit through excessive FX trading markups or markdowns changed to the ERISA Plans.

132.   As a direct and proximate result of these prohibited transactions, the Plans and their participants suffered tens of millions of dollars of losses. Moreover, for the defined benefit Plans in the Class, these losses increased the risk of non-payment of benefits to participants.  For the defined contribution Plans, such as the Verizon 401(k) Plan, and Verizon 401(k) Plan participant Parker, it resulted in immediate loss to the participants' individual accounts.

133.   Pursuant to ERISA, Defendants must disgorge all amounts paid to them for the Plans' FX transactions, restore all losses suffered by the Plans from the prohibited transactions, and disgorge all profits earned on the amounts paid by the Plans to Defendants, and provide to the Plans all other available relief.

## JURY DEMAND

134.   Plaintiffs demand a trial by a jury of six (6) persons as to all claims triable by jury.

## IX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

a.      Declare that the Defendants breached their fiduciary duties under ERISA;

b.      Declare that the Defendants have violated ERISA's prohibited transactions provisions;

     c.       Issue an order compelling a proper accounting of the ADR FX transactions in which the Plans have engaged;

     d.       Issue an order compelling Defendants to restore all losses caused to the Plans (and that will be caused to the Plans after the filing of this Complaint), including lost investment returns on money that would have been invested but for Defendants' illegal conduct;

     e.       Issue an order compelling the Defendants to disgorge all amounts paid by the Plans (and that will be paid by the Plans after the filing of this Complaint), including any profits earned by Defendants thereon;

     f.       Order surcharge, equitable restitution, and other appropriate equitable monetary relief against the Defendants;

     g.       Award such other equitable or remedial relief as may be appropriate, including the permanent removal of the Defendants from any positions of trust with respect to the Plans, including serving as an investment manager for ERISA Plan assets, and, as applicable, the appointment of independent fiduciaries to serve as custodian or trustee to the Plans;

     h.       Order that this action be certified as a class action and that a constructive trust be established for distribution to the extent required by law;

     i.       Enjoin Defendants collectively, and each of them individually, from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

     j.       Award Plaintiffs their attorneys' fees and costs pursuant to ERISA, 29 U.S.C. §1132(g) and/or the Common Fund doctrine; and

     k.       Award such other and further relief as the Court deems equitable and just.

                       Respectfully submitted,

                       MCTIGUE LAW LLP
                       BEINS, AXELROD, P.C.

Dated:  December 31, 2015

By:  /s/ Regina M. Markey
    J. Brian McTigue**
    Regina M. Markey*
    MCTIGUE LAW LLP
    4530 Wisconsin Ave, NW, Suite 300
    Washington, DC 20016
    Telephone (202) 364-6900
    Facsimile: (202) 364-9960
    bmctigue@mctiguelaw.com
    rmarkey@mctiguelaw.com

    Jonathan G. Axelrod
    (New York Bar Number: 2012029)**
    BEINS, AXELROD, P.C.
    1625 Massachusetts Ave., NW
    Washington, DC 20036
    Telephone:  (202) 328-7222
    jaxelrod@beinsaxelrod.com

    Sidney H. Kalban, Esq.
    (Southern District Bar Number SK3034)
    360 West 31st St
    New York, NY 10001
    Telephone: (212) 868-6825
    itpelaw@msn.com

    *Attorneys for Plaintiff*

  * Motion for admission *pro hac vice* filed herewith
  ** Motion for admission *pro hac vice* forthcoming

35