UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CARL CARVER, *et al.*,

                                   Plaintiffs,

                -v-

THE BANK OF NEW YORK MELLON, *et al.*,

                                   Defendants.

15-CV-10180 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiffs initiated two actions, which were consolidated by the Court on April 12, 2016

(Dkt. No. 53), against Defendants the Bank of New York Mellon and BNY Mellon, National

Association ("Defendants" or "BNYM"), pursuant to the Employee Retirement Income Security

Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001, *et seq.*  Plaintiffs sue on behalf of seven

ERISA employee benefit plans in which they are participants or for which they serve as a

trustee.[1]  The operative First Amended Complaint ("Complaint") was filed on May 3, 2016.

(FAC ¶ 1.)

Plaintiffs claim that BNYM breached its fiduciary duty to ERISA plans that held

American Depositary Receipts ("ADRs") for which BNYM served as depositary.  Specifically,

---

[1]       Plaintiffs are Hedy L. Anselman, David Baumann, Carl Carver, Edward C. Day,
Landol D. Fletcher, Timothy R. Garrett, Robert E. Hartline, Dana Kellen, Deborah Jean Kenny,
Lisa Parker, and Daryl Watkins.  The plans are the Baker Hughes Incorporated Thrift Plan
("Baker Hughes 401(k) Plan"); the Central States, Southeast and Southwest Areas Pension Plan
("Central States Plan"); the Hospital Corporation of America 401(k) Plan ("HCA 401(k) Plan");
the Owens Corning Merged Retirement Plan ("Owens Corning Plan"); the Sheet Metal Workers'
National Pension Fund ("Sheet Metal Workers' Plan"); the Teamsters Employees Local 945
Pension Fund ("Teamsters Local 945 Plan"); and the Verizon Savings and Security Plan for Mid-
Atlantic Associates ("Verizon 401(k) Plan") (collectively, the "Plans").  (Dkt. No. 54 ("FAC")
¶ 1.)  Plaintiffs also seek to bring this action as a class action on behalf of a class of participants,
beneficiaries, and named fiduciaries of similarly situated employee benefit plans for the period
spanning January 1, 1997 to the present time.  (*Id.* ¶¶ 187-96.)

they allege that BNYM breached its duties of prudence and loyalty under 29 U.S.C. §§ 1104 and

1109 (*id.* ¶¶ 197-204); engaged in self-interested prohibited transactions in violation of 29 U.S.C.

§ 1106(b) (*id.* ¶¶ 205-11); and caused the plans to engage in party-in-interest prohibited

transactions in violation of 29 U.S.C. § 1106(a) (*id.* ¶¶ 212-18).

Currently pending before the Court is a motion to dismiss the Complaint, pursuant to

Federal Rules of Civil Procedure 12(b)(1), for lack of standing, and 12(b)(6), for failure to state a

claim.  (Dkt. No. 61.)  The Court heard oral argument on March 17, 2017.  For the reasons that

follow, the motion to dismiss is denied.

## I.     Background[2]

ERISA employee benefit plans seeking to diversify their investments may choose to enter

into overseas securities markets.  (FAC ¶ 31.)  Instead of holding foreign securities directly,

however, some ERISA plans have chosen to purchase American Depositary Receipts ("ADRs").

(*Id.* ¶ 32.)  ADRs, which were first introduced in 1927, represent a specified number of shares in

a foreign corporation.  (*Id.*)  Typically, a "depositary" bank directly purchases foreign securities

from a foreign issuer and deposits those securities in a "custodian" bank for safekeeping.  (*Id.*)

The "depositary" then issues ADRs in the United States based on those foreign securities.  (*Id.*)

ADRs are governed by deposit agreements ("DAs") and related documents and can be traded on

the domestic markets.  (*Id.*)

ADRs provide a convenient way for domestic investors to purchase foreign securities

without the hassle of foreign currency exchange ("FX") and with all the protections afforded to

domestic entities holding a United States security.  (*Id.* ¶ 33.)  In return for this convenience,

---

[2]     The following facts are taken from the Complaint and documents incorporated
therein, and are presumed true for the purpose of these motions.

banks typically charge ADR holders fees for various related services, including custody services, dividend distributions, voting shares, and conducting FX transactions.  (*Id.* ¶ 35.)

The gravamen of Plaintiffs' complaint is that BNYM breached its fiduciary duty to the ERISA plans when it conducted FX transactions.  (*Id.* ¶ 5.)  When a foreign entity issues a dividend or interest payment, for example, the payment is typically converted to U.S. Dollars ("USD") by the depositary bank and remitted to the downstream ADR holder, here the Plans. (*Id.* ¶ 37.)  Plaintiffs allege that, when converting the foreign currency to USD, BNYM selected an exchange rate at or near the worst rate for the ADR holders, increasing Defendants' profits at the expense of the Plans.  (*Id.* ¶ 5.)  Plaintiffs further allege that such dividends and interest payments "at all times belonged to the ADR Owner" and were "at all times ERISA plan assets." (*Id.* ¶ 38.)  This FX transaction methodology led Defendants to charge excessive, unauthorized, and undisclosed rates when executing ADR FX transactions, breaching their fiduciary duty to the Plans under ERISA.  (*Id.* ¶¶ 48-63; 197-204.)

Plaintiffs also allege that BNYM's FX methodology constitute a self-interested prohibited transaction with plan assets under 29 U.S.C. § 1106(b) (*id.* ¶¶ 205-11), and a party-in-interest prohibited transaction under § 1106(a) (*id.* ¶¶ 212-18).  Plaintiffs further allege that they are entitled to ERISA's fraud or concealment limitations period, which allows for an action to commence within six years of the discovery of a breach in the case of fraud or concealment.  (*Id.* ¶¶ 178-86.)  They demand a trial by jury.  (*Id.* ¶ 219.)

## II.    Legal Standard

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When evaluating whether a complaint meets these requirements, courts assume that all "factual allegations contained in the complaint" are true, *Twombly*, 550 U.S. at 572 (quoting *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508 n.1 (2002)), and "draw all inferences in the light most favorable to the non-moving party[ ]," *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (citation omitted).

"[A] Rule 12(b)(6) motion must be resolved by looking only to the complaint; documents that are attached as exhibits to, incorporated by reference, or integral to the complaint; and matters of which judicial notice may be taken." *Rhee-Karn v. Burnett*, No. 13 Civ. 6132, 2014 WL 4494126, at *3 (S.D.N.Y. Sept. 12, 2014) (citing *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993)).

In resolving a 12(b)(1) motion, however, a court may refer to evidence outside the pleadings, such as affidavits. *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000). Moreover, under 12(b)(1), the Court must accept as true all the material factual allegations contained in the complaint, but is "not to draw inferences from the complaint favorable to plaintiffs.'" *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004). "Dismissal for lack of subject matter jurisdiction is proper 'when the district court lacks the statutory or constitutional power to adjudicate' a case." *Sokolowski v. Metro. Transp. Auth.*, 723 F.3d 187, 190 (2d Cir. 2013) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).

## III.   Discussion

The Court first addresses constitutional standing, as standing "is the threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Because the Court finds that Plaintiffs have standing to assert their claims in a representative or derivative capacity on behalf

of the Plans, the Court next addresses the parties' dispute as to whether ADRs held by the Plans are plan assets, as alleged by the complaint, such that BNYM owes a fiduciary duty to the Plans under ERISA.  The Court then turns to Plaintiffs' prohibited transaction claims before addressing the timeframe over which Plaintiffs claims may be asserted.  And finally, the Court addresses the propriety of Plaintiffs' jury demand.

### A.    Standing

"Standing has three elements: first, the plaintiff must have suffered an injury in fact; second, the injury must be 'fairly traceable' to the defendant's actions that the plaintiff challenges; and third, it must be likely that a decision in the plaintiff's favor would redress her injury." *Wells Fargo Bank N.A. v. Ullah*, No. 13 Civ. 0485, 2014 WL 470883, at *5 (S.D.N.Y. Feb. 6, 2014) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)).

BNYM argues that all but one of the Plaintiffs lack constitutional standing in this case. BNYM distinguishes between Plaintiffs Anselman, Carver, Day, Fletcher, Garrett, Hartline, Kellen, Kenny, Parker, and Watkins—the "Participant Plaintiffs," who are participants in either defined benefit plans[3] or defined contribution plans[4]—and Plaintiff Baumann—the "Trustee Plaintiff," who is a trustee of the Teamsters Local 945 Plan.  BNYM does not challenge the Trustee Plaintiff's Article III standing at this stage of the proceedings (Dkt. No. 62 at 30 n.22), but does challenge the standing of the Participant Plaintiffs (*id.* at 24-30).

---

[3]      Defined benefit plans are "plans in which participants receive pre-determined, fixed benefits on retirement."  (Dkt. No. 62 at 3-4.)  The Owens Corning Plan, the Sheet Metal Workers' Plan, the Central States Plan, and the Teamsters Local 945 Plan are defined benefit plans.  (*Id.* at 4.)

[4]      Defined contribution plans are "plans in which participants' post-retirement benefits vary based on the value of the assets in their individual accounts."  (Dkt. No. 62 at 4.) The HCA 401(k) Plan, the Baker Hughes 401(k) Plan, and the Verizon 401(k) Plan are defined contribution plans.  (*Id.* at 6.)

BNYM argues that the Participant Plaintiffs who are participants in defined *benefit* plans lack Article III standing because they fail to allege an individualized injury in the form of a reduction in their defined benefits, as opposed to an injury to the plan generally, that is traceable to the alleged ERISA violation and redressable by the relief sought.  (*Id.* at 25-29.)  BNYM contends that the Participant Plaintiffs who are participants in defined *contribution* plans lack Article III standing because the complained-of injury is merely a "*de minimis* individualized injury."  (Dkt. No. 62 at 30.)  Yet the Second Circuit has recently affirmed that similarly situated plaintiffs have constitutional standing when suing *on behalf of* an ERISA plan in a derivative or representative capacity, as opposed to in their individual capacity.

BNYM's argument that the Participant Plaintiffs who are participants in the defined benefit plan lack standing is based on *Fletcher v. Convergex Grp. LLC*, 164 F. Supp. 3d 588 (S.D.N.Y. 2016).  There, the district court held that "Defendants' overcharges increased the plan's deficiency by less than one hundred-thousandth of one percent," which is an injury "so minute as to be imaginary and inconsequential" and insufficient to satisfy the injury-in-fact requirement for constitutional standing as to an individual plan participant.  *Id.* at 591.

However, after briefing of BNYM's motion to dismiss was completed, *Fletcher* was vacated by Second Circuit.  (*See* Dkt. No. 77.)  On appeal in *Fletcher*, the Second Circuit issued a summary order, concluding that the defendant's alleged "breach of fiduciary duties of prudence and loyalty under ERISA, its violation of ERISA's prohibited transactions provision, and the resulting financial loss sustained by the [Plan] are sufficient to confer Article III standing on [plaintiff] in his *representative capacity* as a Plan participant."  *Fletcher v. Convergex Grp. L.L.C.*, No. 16-734-cv, 2017 WL 549025, at *1 (2d Cir. Feb. 10, 2017) (emphasis added).  In so concluding, the Second Circuit relied on *L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cty., Inc.*, 710 F.3d 57 (2d Cir. 2013), where it "reject[ed] the

6

[defendants'] argument that [plaintiffs] lack constitutional standing because they have not suffered an injury-in-fact," finding instead that plaintiffs had "asserted their claims in a *derivative capacity*, to recover for injuries to the Plan caused by the [defendants'] breach of their fiduciary duties," which "is injury-in-fact sufficient for constitutional standing." *Id.* at 67 n.5 (emphasis added).

Here, however, all Participant Plaintiffs bring this action not in their individual capacity, but "*on behalf of* seven ERISA employee benefit plans in which they are participants." (FAC ¶ 1 (footnote omitted) (emphasis added); *see also id.* ¶¶ 95, 113, 124, 132, 145, 157, 168 (alleging which Plaintiffs are bringing the present case on behalf of each of the seven Plans).) As one court put it, where claims are brought "exclusively on behalf of the plan, not for the individual and direct benefit of the plaintiffs," courts "do not require plaintiffs to demonstrate individualized injuries for purposes of Article III standing." *Banyai v. Mazur*, No. 00 Civ. 9806, 2007 WL 959066, at *5 (S.D.N.Y. Mar. 29, 2007). Where, as here, Plaintiffs are suing in their representative or derivative capacities on behalf of the Plans, Plaintiffs need not demonstrate individualized injury when they have alleged injury to the Plans caused by Defendants.

With respect to traceability and redressability, moreover, Plaintiffs have satisfied their burden at the pleading stage. Under Second Circuit law, at the pleading stage, "for purposes of satisfying Article III's causation requirement, we are concerned with something *less than the concept of proximate cause*." *Rothstein v. UBS AG*, 708 F.3d 82, 92 (2d Cir. 2013) (quoting *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 345 (2d Cir. 2009), *rev'd*, 564 U.S. 410 (2011)). At the pleading stage, "the plaintiffs' 'burden . . . of alleging that their injury is "fairly traceable" to' the challenged act 'is relatively modest.'" *Id.* (alteration in original) (quoting *Bennett v. Spear*, 520 U.S. 154, 171 (1997)). Plaintiffs have alleged that the FX scheme "increased [BNYM's] revenues and profits by millions of dollars annually at the expense of the

Plans."  (FAC ¶ 4; *see also id.* ¶ 203 ("As a direct and proximate result of these breaches of fiduciary duty, the Plans and their participants suffered tens of millions of dollars of losses.").)  Here, Plaintiffs have met that modest burden by alleging that the FX pricing methodology directly contributed to the Plans' financial losses.

To satisfy the redressability requirement, there need only be a "'likel[ihood]' that the injury 'will be redressed by a favorable decision.'"  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (alteration in original) (quoting *Lujan*, 504 U.S. at 560-61).  Here, Plaintiffs allege that "Defendants are liable to restore all losses suffered by the Plans caused by the Defendants' breaches of fiduciary duty and to disgorge the profits obtained from the ADR FX Dividend Conversion scheme."  (FAC ¶ 204).  If successful, the allegedly harmed Plans will be made whole.  This is sufficient to satisfy the requirement for redressability.

Accordingly, the Court concludes that the Participant Plaintiffs have constitutional standing sufficient to maintain the present action in a derivative or representative capacity on behalf of the Plans.

## B.    Deposited Securities as Plan Assets

Count I of the Complaint alleges a breach of the fiduciary duties of prudence and loyalty under ERISA, 29 U.S.C. § 1104(a)(1)(A) and (B).  (FAC § 201.)  BNYM moves to dismiss for failure to state a claim on the ground that the Deposited Securities[5] at issue are simply not "plan assets" within the meaning of ERISA, such that a fiduciary relationship was not formed.  (*See* Dkt. No. 62 at 12-15.)

---

[5]    The DA defines Deposited Securities as "[s]hares at such time deposited or deemed to be deposited under this Deposit Agreement and any and all other securities, property and cash received by the Depositary or the Custodian in respect thereof."  (FAC, Ex. 1 § 1.10.)

In the Complaint, Plaintiffs allege that "Defendants acted as ERISA fiduciaries in pricing ADR FX Dividend Conversions." (*Id.* ¶ 52 (citing 29 U.S.C. § 1002(21)(A).)  Under ERISA, "a person is a fiduciary with respect to a plan to the extent (i) he . . . exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A)(i).  The question presented in this case is whether the dividends and other cash received by BNYM from foreign issuers are plan assets within the meaning of ERISA such that BNYM's exercise of control over those assets, pursuant to the DAs, makes them a fiduciary with respect to the Plans. This appears to be a question of first impression.

Plaintiffs' allegation is that "dividends and interest payments, whether in foreign currency or after conversion to U.S. dollars, at all times belonged to the ADR Owner," and "were at all times ERISA plan assets." (FAC ¶ 38; *see id.* ¶ 58.)  BNYM disagrees, arguing that any assertion that a Deposited Security is a "'plan asset' within the meaning of ERISA before it has been distributed to the ERISA plan has no legal support and is squarely contradicted by the governing agreements." (Dkt. No. 62 at 12.)

In deciding this issue, the Court must assume that all "factual allegations contained in the complaint" are true, *Twombly*, 550 U.S. at 572, but need not accept as true the legal conclusion that the Deposited Securities, as defined by the governing DAs, are ERISA plan assets, *see Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").  In this case, a representative DA—the agreement that governs the relationship among the foreign issuer, BNYM, and the ADR holders—is attached as an exhibit to the Complaint. (FAC, Ex. 1.)[6]  When a court considers a

---

[6]     The parties agree that, for purposes of the motion to dismiss stage, the terms of the DA attached to the Complaint are materially the same as those of other DAs implicated by this action. (*See* FAC ¶ 40; Dkt. No. 62 at 7 n.6.)

contract that is attached to or referenced by the complaint, it is "not constrained to accept the allegations of the complaint in respect of the construction of the [contract], although—at this stage in the proceedings—we will strive to resolve any contractual ambiguities in [Plaintiffs'] favor." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995).

ERISA offers only a limited definition of "plan asset," which is not especially helpful in the instant case. *See* 29 U.S.C. § 1002(42).[7] "However, the DOL, the agency charged with administering and enforcing Title I of ERISA, has repeatedly advised that plan assets should be identified based on 'ordinary notions of property rights.'" *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 105 (2d Cir. 2011) (citing U.S. Dep't of Labor, Advisory Op. No. 93–14A (May 5, 1993)). For example, in an advisory opinion, the DOL noted that, in the absence of a formal rule or regulation, "the assets of a plan generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law," and will "include any property, tangible or intangible, in which the plan has a beneficial ownership interest," considering "any contract or other legal instrument involving the plan, as well as the actions and representations of the parties involved." U.S. Dep't of Labor, Advisory Op. No. 93–14A (May 5, 1993). Such interpretations by the DOL "in opinion letters are 'entitled to respect' to the extent they have the 'power to persuade.'" *Faber*, 648 F.3d at 105 (quoting *Christensen v. Harris County*, 529 U.S. 576, 587 (2000)). And the Second Circuit has found "the DOL's approach of defining 'plan assets' consistent with 'ordinary notions of property rights' persuasive and entitled to *Skidmore* deference." *Id.*; *see also In re Halpin*, 566 F.3d 286, 290 n.2 (2d Cir. 2009).

---

[7]     Section 1002(42) provides that "the term 'plan assets' means plan assets as defined by such regulations as the Secretary [of Labor] may prescribe, except that under such regulations the assets of any entity shall not be treated as plan assets if, immediately after the most recent acquisition of any equity interest in the entity, less than 25 percent of the total value of each class of equity interest in the entity is held by benefit plan investors." 29 U.S.C. § 1002(42).

Applying this approach to the instant case, the Court concludes that the dividends and other cash received by BNYM from foreign issuers are plan assets because the Plans have a beneficial ownership interest in them under ordinary notions of property rights.

A careful reading of the DA confirms that BNYM, as *title* owner, holds the Deposited Securities for the Plans, which in turn have a beneficial ownership interest in the underlying Deposited Securities.  Section 2.2, for instance, notes that the "Deposited Securities shall be *held* by the Depositary."  (FAC, Ex. 1 § 2.2 (emphasis added).)  BNYM is referred to as the "holder" of the Deposited Securities again in sections 4.9 and 11, which refer to "the Depositary as the holder of the Deposited Securities."  With the exception of the obligation to hold the Deposited Securities, the DA seems to allocate all other relevant rights with respect to the Deposited Securities to the Plans.  These include the right to redeem ADRs by exchanging them for the underlying Deposited Securities, *id.* §§ 2.5–2.6; the right to receive cash distributions in USD, *id.* § 4.5; and the right to instruct BNYM regarding the voting of shares, *id.* § 4.7.  The Court concludes that these equitable rights give rise to, at least, a beneficial ownership interest in the Deposited Securities by the Plans.

Both the Securities and Exchange Commission ("SEC") and the Second Circuit support this understanding of Deposited Securities in the ADR context.  In a notice of possible commission action and request for information and public comment, the SEC described ADRs as "represent[ing] an *ownership interest in* a specified number of *securities* that have been deposited with a depositary by the holder of such securities."  American Depositary Receipts, Release Nos. 33-6894, 56 Fed. Reg. 24420-04 at II.A (May 30, 1991) (emphasis added).  In soliciting comment on the distribution of funds, moreover, the SEC explicitly characterized the distribution process as follows:  "Generally, after deductions for fees, expenses and taxes, an unsponsored ADR holder, *as the beneficial owner of the deposited security*, is entitled to

distributions of cash, securities and other property with respect to the deposited securities . . . ."
*Id.* at III(A)(1)(e) (emphasis added).  These statements demonstrate an understanding by the SEC
that ADR holders, including the Plans, hold a beneficial ownership interest in the Deposited
Securities.  The Second Circuit's description of ADRs in *Law Debenture Trust Co. of New York
v. Maverick Tube Corp.*, 595 F.3d 458 (2d Cir. 2010), is consistent with the SEC's definition:
while an ADR holder is "not the title owner of the underlying shares," *id.* at 464 (quoting *In re
Nat'l Australia Bank Sec. Litig.*, No. 03 Civ. 6537, 2006 WL 3844465, at *1 n. 3 (S.D.N.Y. Oct.
25, 2006)), an ADR "*represents an ownership interest in a foreign deposited security*, whereas a
share of stock represents an ownership interest in a corporation," *id.* (emphasis added) (quoting
*In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 171 (S.D.N.Y. 2003)).  Given the Plans'
rights under the DAs, the Court concludes that they are, at least, beneficial owners of the
underlying Deposited Securities.

BNYM's arguments to the contrary are unavailing.  BNYM emphasizes a distinction
between the ADRs and the Deposited Securities.  BNYM concedes that the Plans are beneficial
owners of the ADRs pursuant to the DAs.  (*See, e.g.*, Dkt. No. 62 at 15 n.11 ("[T]he Plans—like
almost all equity investors—are Beneficial Owners of ADRs.").)  But BNYM argues that
"BNYM, as depositary, is the legal owner of the Deposited Securities," pursuant to the DAs,
which "do not grant [Plaintiffs] any ownership interest in the Deposited Securities."  (*Id.* at 13.)
BNYM argues, therefore, that the Deposited Securities do not become plan assets until they are
paid to the Plans.  (*Id.* at 14.)  This conclusion, however, is contrary to the rights allocated by the
DA to ADR holders, which are, at least, beneficial owners of the Deposited Securities even
though legal title to the underlying foreign-issued securities is held by BNYM.

BNYM points to § 2.2 of the DA to support its argument that "BNYM, as depositary, is
the legal owner of the Deposited Securities."  (*Id.* at 13 (citing FAC, Ex. 1 § 2.2).)  In particular,

BNYM points out that § 2.2 provides for prompt "transfer and recordation of the Shares being deposited *in the name of Depositary* or its nominee." (Dkt. No. 74 at 2.) But rather than precluding the possibility that an ADR holder is a beneficial owner of the deposited shares, this language, at most, supports a conclusion that BNYM is the owner in title. This is consistent with how some courts have described the ownership rights of the depositary with respect to the underlying securities. *See, e.g.*, *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 367 (3d Cir. 2002) ("The holder of an ADR is not the *title owner* of the underlying shares; the *title owner* of the underlying shares is either the depositary, the custodian, or their agent." (emphasis added)). This is also consistent with how Black's Law Dictionary defines "beneficial owners":

> 1. One recognized in equity as the owner of something because use and title belong to that person, even though legal title may belong to someone else; esp., one for whom property is held in trust. — Also termed *equitable owner*.
> 2. A corporate shareholder who has the power to buy or sell the shares, but who is not registered on the corporation's books as the owner.

Black's Law Dictionary (10th ed. 2014). Under the DAs, the Plans have a beneficial ownership interest in the Deposited Securities while held by the Depositary, even if legal title belongs with the Depositary during that time.

*In re Halpin*, 566 F.3d 286 (2d Cir. 2009), upon which BNYM relies, does not necessitate the conclusion that the Deposited Securities become plan assets only when remitted to Plaintiffs. (*See* Dkt. No. 62 at 14.) In *Halpin*, the Second Circuit considered whether unpaid employer contributions to an ERISA plan were plan assets. The court employed "ordinary notions of property rights" to conclude that "the unpaid amounts are debts; they are not assets held in trust for the benefit of the creditor," such that any unpaid employer contributions are not assets of the plan. *Id.* at 290. In contrast, the DAs establish not merely debtor-creditor relationships but

instead, as discussed above, define assets in which Plaintiffs have a beneficial ownership interest under ordinary notions of property rights.

BNYM further argues that the Plans have merely "a contractual right to certain cash flows from the Deposited Securities—not an ownership interest in the cash itself." (Dkt. No. 62 at 14; *see id.* at 7 (arguing that ADR holders have an "economic" interest but not an "ownership" interest in the Deposited Securities).) To make this argument, BNYM artificially isolates the dividend payments—the contractual right to certain cash flows—from the other rights of the ADR holder to the Deposited Securities established by the DAs. The full set of rights, as discussed above, includes the right to instruct BNYM with respect to the voting of shares and the right to exchange ADRs for the underlying Deposited Security itself—aspects of a relationship that extend well beyond a contractual right to mere cash flow or purely economic interest. The DAs leave to the Plans, as ADR holder, sufficient rights to justify the Court's conclusion that the Plans retain a beneficial ownership interest in the Deposited Securities that are held by BNYM.

Finally, BNYM's argument that recognizing Deposited Securities as plan assets would create unwitting fiduciaries out of depositary banks is unavailing.[8] BNYM asserts it has "no practical way of discovering" the identities of the ADR holders, such that it cannot know when it must act as a fiduciary (in cases where the ADR holder is an ERISA plan) and when it need not. (Dkt. No. 62 at 19.) Yet there is no knowledge requirement under ERISA for the creation of a fiduciary relationship. *See* 29 U.S.C. § 1002(21); *McLemore v. Regions Bank*, 682 F.3d 414, 423 (6th Cir. 2012) ("Section 1002(21)(A)(i) directs us to focus on the extent of [the Bank's] control over plan assets, rather than on what [the Bank] knew or should have known."). So long as an

---

[8]   BNYM's reliance on a DOL preamble in the plan asset regulation relating to the exemption of publicly offered securities from plan asset treatment is unavailing. (*See* Dkt. No. 62 at 21.) That the DOL has created specific exceptions from plan asset treatment for certain classes of securities only underscores the absence of such an exception here.

entity "exercises any authority or control respecting management or disposition of [an ERISA plan's] assets," a fiduciary relationship exists.  29 U.S.C. § 1002(21)(A)(i).

For these reasons, considering the DA and under ordinary notions of property rights, "draw[ing] all inferences in the light most favorable to the non-moving party[ ]," the Court concludes that the Plans hold a beneficial ownership interest in the underlying Deposited Securities held by BNYM,[9] such that those Deposited Securities are properly considered assets of the Plans.  *In re NYSE Specialists Sec. Litig.*, 503 F.3d at 95 (citation omitted).  Accordingly, BNYM's motion to dismiss Count I of the Complaint is denied.

### C.  Prohibited Transactions

Plaintiff's second and third causes of action allege that BNYM engaged in prohibited transactions under 29 U.S.C. § 1106(b) and (a), respectively.  (*See* FAC ¶¶ 205-18.)  BNYM argues that Counts II and III each fail because the identities of the ADR holders were unknown to BNYM, and §§ 1106(a) and (b) both require that the bank knows or should know the facts that make the transaction prohibited.

29 U.S.C. § 1106(b) states that "[a] fiduciary with respect to a plan shall not—(1) deal with the assets of the plan in his own interest or his own account."  Plaintiffs allege that BNYM's FX pricing scheme was just such a self-interested transaction.  (FAC ¶ 64-69.)  BNYM argues that Plaintiffs are precluded from pursuing their claims under 29 U.S.C. § 1106(b) because "the Plans anonymously acquired their ADRs on securities exchanges."  (Dkt. No. 62 at 22.)  BNYM relies on a statement in the legislative history of ERISA, which explains that "a

---

[9]    Plaintiffs rely on the DOL look-through rule as an alternative way of demonstrating that the Deposited Securities are plan assets.  (Dkt. No. 72 at 13-14.)  Because the Court concludes that ordinary notions of property rights support Plaintiffs' position that they have a beneficial ownership interest in the Deposited Securities, however, it does not address this alternative argument.  The Court does not, therefore, render any conclusions as to the applicability of either the publicly offered security exception or the operating company exception.

transaction will not be a prohibited transaction . . . if the transaction is an ordinary 'blind' purchase or sale of securities through an exchange where neither buyer nor seller . . . knows the identity of the other party involved."  H.R. Rep. No. 93-1280, at 307 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5038, 5087.  The DOL has relied on this language and confirmed that such "blind transactions" executed in an anonymous exchange do not constitute prohibited transactions.  *See* DOL, Advisory Opinion No. 2004-05A, 2004 WL 1293908, at *3 (May 24, 2004); DOL, Advisory Opinion No. 92-23A, 1992 WL 314117, at *2 (Oct. 27, 1992).  However, a transaction is not considered "'blind' if, prior to the execution of such transaction, the plan fiduciary responsible for the plan's engagement in the transaction knew, or had reason to know, the identity of the counterparty to such transaction."  Advisory Opinion No. 2004-05A, 2004 WL 1293908, at *4.

     29 U.S.C. § 1106(a) similarly provides:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he *knows or should know* that such transaction constitutes a direct or indirect –
>> (A) sale or exchange, or leasing, of any property between the plan and a *party in interest*; [or], . . .
>> (D) transfer to, or use by or for the benefit of, a *party in interest*, of any assets of the plan[.]

29 U.S.C. § 1106(a) (emphases added).  The term "party in interest" means "any fiduciary" or "a person providing services to such plan," such as BNYM.  29 U.S.C. § 1002(14)(a)–(b).  (*See* FAC ¶¶ 66, 215.)  Section 1106(a) explicitly requires that the fiduciary "knows or should know" the facts that would make the transaction prohibited.  *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 242 (2000).  BNYM argues that "it has no knowledge or means of knowing the downstream purchasers of ADRs (or their ERISA status)."  (Dkt. No. 62 at 24.)

     Here, Plaintiffs argue that "discovery will support their position that the custodial and sales business, as well as the depositary side of the Bank, knew or should have known it was

holding ADRs for both custodial and non-custodial ERISA clients" (Dkt. No. 72 at 17), and allege that BNYM is in "sole possession of records accurately detailing their ADR FX Dividend Conversion" (FAC ¶ 63). "[D]raw[ing] all inferences in the light most favorable to the non-moving party[ ]," the Court cannot determine at this stage whether the transactions in question were "blind transactions" within the meaning of the DOL's interpretative opinions or whether BNYM knew or should have known that it was transacting with ERISA plans. *In re NYSE Specialists Sec. Litig.*, 503 F.3d at 95 (citation omitted). The motion to dismiss Counts II and III of the Complaint is therefore denied.

### D.    Timeframe of Claims

In the Complaint, Plaintiffs allege a period of liability dating back to January 1, 1997. (FAC ¶ 1.) BNYM seeks to invoke ERISA's three-year statute of limitations to bar all of Plaintiffs' claims for ADR-related cash distributions arising more than three years before this suit was filed. (Dkt. No. 62 at 31 (citing 29 U.S.C. § 1113).) BNYM also argues that, even if Plaintiffs lacked actual knowledge, ERISA's six-year statute of repose is applicable. (Dkt. No. 62 at 32 n.23 (citing 29 U.S.C. § 1113).)

Plaintiffs argue that the entire alleged period of liability is appropriate considering BNYM's active concealment of its breaches of fiduciary duty. (Dkt. No. 72 at 29-33.) They contend that any applicable statute of limitations or repose should toll from the date of discovery of the breach, which was October 1, 2015, as discussed below. (FAC ¶¶ 85, 180.)

Under ERISA, Plaintiffs must bring suit within three years after the earliest date on which they had actual knowledge of the breach or violation. The Second Circuit has held that a plaintiff has "actual knowledge of the breach or violation . . . when he has knowledge of all material facts necessary to understand that an ERISA fiduciary has breached his or her duty or otherwise violated the Act." *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 193 (2d Cir. 2001).

29 U.S.C. § 1113 further provides that, "in the case of fraud or concealment, such action may be commenced not later than six years *after the date of discovery* of such breach or violation." 29 U.S.C. § 1113 (emphasis added). This six-year period begins when "the plaintiff discovers, or should with reasonable diligence have discovered, the breach." *Janese v. Fay*, 692 F.3d 221, 228 (2d Cir. 2012). To qualify for tolling of the statute of limitations under the fraud or concealment exception, 29 U.S.C. § 1113, Plaintiffs must "show (1) that defendants engaged in a course of conduct designed to conceal their alleged wrongdoing and that (2) [Plaintiffs] were not on actual or constructive notice of that evidence, despite (3) their exercise of due diligence." *Koch v. Dwyer*, No. 98 Civ. 5519, 2000 WL 1458803, at *3 (S.D.N.Y. Sept. 29, 2000) (alteration in original) (quoting *Schaefer v. Ark. Med. Soc.*, 853 F.2d 1487, 1491-92 (8th Cir. 1988) (internal quotation mark omitted)).

Plaintiffs allege that "Defendants intentionally engaged in specific acts to conceal the scheme." (FAC ¶ 182.) For instance, when pricing ADR FX Distributions, BNYM would intentionally keep the price within the range of the day, so as not to create a red flag that would indicate to ADR owners that manipulation had occurred. (FAC ¶ 182.) BNYM would then strategically price a few small ADR FX transactions at an exchange rate falling within the day's mid-range, making discovery of the scheme even more difficult. (*Id.*) Indeed, in a related litigation, BNYM has stipulated that it "generally did not disclose its SI FX pricing methodology," and that it "was aware that many clients did not fully understand the Bank's pricing methodology." *United States v. The Bank of N.Y. Mellon Corp.*, No. 11 Civ. 6969 (S.D.N.Y. Apr. 23, 2015), Dkt. No. 150. Moreover, Plaintiffs rely on a number of emails from BNYM employees that strongly support its allegation that BNYM actively concealed the alleged breach. (FAC ¶¶ 184-85.)

Furthermore, there is no reason to believe that Plaintiffs had actual or constructive notice of the evidence underlying BNYM's FX pricing methodology, even with the exercise of due diligence. *See Koch*, 2000 WL 1458803, at *3. BNYM argues that, because a 2011 article in the Wall Street Journal, relying on public information, was able to uncover the methodology, Plaintiffs, too, should have had all the facts necessary to constitute their claim as of that date. (Dkt. No. 62 at 32.) But this article discusses "Standing Instruction" ("SI") FX transactions, not ADR FX transactions. BNYM has argued to this Court that its FX transaction methodology for ADR dividends "is unrelated to the SI program, and is a wholly different business within the Bank," and concerns "different contracts, different customers, different transactions, and different businesses." (Dkt. No. 8 at 2.) BNYM provides no compelling reason why a 2011 article on an admittedly distinct pricing scheme would alert Plaintiffs to the facts underlying the claims in the Complaint in this action.

It was not until October 1, 2015, that BNYM revealed its methodology for pricing ADR-related FX transactions. (FAC ¶ 85.) Plaintiffs argue that it was this disclosure that provided them with the facts necessary to discover the breach (Dkt. No. 72 at 32), and allege that no Plaintiff was aware of the scheme more than three years prior to filing the Complaint (FAC ¶ 180). Under 29 U.S.C. § 1113, Plaintiffs have adequately pleaded their qualification for tolling of the statute of limitations under the fraud or concealment exception.

Finally, BNYM argues that Plaintiffs cannot maintain its claim for transactions after the October 1, 2015, disclosure, because "BNYM exercises no discretionary authority or control over plan assets when it charges the Plans consistently with the objective criteria it has made public, to which the Plans have agreed by buying their ADRs in the open market or continuing to hold them." (Dkt. No. 62 at 33.) But BNYM's disclosure of its fiduciary breach does not extinguish its fiduciary duties to Plaintiffs. Any "agreement or instrument which purports to

relieve a fiduciary from responsibility or liability for any reasonability, obligation or duty" under ERISA is "void as against public policy." 29 U.S.C. § 1110(a). Indeed, if "[s]ection 1110(a) prohibits *agreements* that diminish the statutory obligations of a fiduciary," then a *unilateral* disclosure of the details of an ongoing breach is certainly insufficient to relieve BNYM of its fiduciary responsibilities under ERISA. *Leavitt v. Nw. Bell Tel. Co.*, 921 F.2d 160, 161 (8th Cir. 1990). Accordingly, Plaintiffs' claims are not time barred.

### E.    Jury Demand

In the First Amended Complaint, Plaintiffs demand a jury trial. (FAC ¶ 219.) BNYM moves to strike Plaintiffs' demand for a jury trial, arguing that no right to a jury exists under ERISA claims that sound in equity. (Dkt. No. 62 at 33-34.)

ERISA does not expressly provide the right to a jury trial. Accordingly, if Plaintiffs have a right to a jury trial, it must flow from the Seventh Amendment, which provides: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ." U.S. Const. amend. VII. The Supreme Court has consistently interpreted the phrase "suits at common law" to refer to suits in which only *legal* rights and remedies were at issue, as opposed to *equitable* rights and remedies. *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989).

"In the past, courts have held that no jury trial right exists under ERISA because claims under ERISA are equitable in nature." *Healthcare Strategies, Inc. v. ING Life Ins. & Annuity Co.*, No. 11 Civ. 282, 2012 WL 162361, at *5 (D. Conn. Jan. 19, 2012). However, in *Great-West Life & Annuity Insurance Co.*, 534 U.S. 204 (2002), the Supreme Court analyzed an ERISA claim under 29 U.S.C. § 1332(a)(3) and concluded that not all actions for restitution under ERISA are equitable in nature. It held that "'restitution is a legal remedy when ordered in a case at law and an equitable remedy . . . when ordered in an equity case,' and whether it is legal or

equitable depends on 'the basis for [the plaintiff's] claim' and the nature of the underlying remedies sought." 534 U.S. at 213 (alterations in original) (quoting *Reich v. Continental Cas. Co.*, 33 F.3d 754, 756 (7th Cir. 1994)). The "key factor" in determining whether "restitution" is legal or equitable "is whether a claimant was seeking restitution from a defendant's general funds, in which case the claim was legal, or whether a claimant was seeking to recover money that could be traced to a particular fund held by a defendant, in which case the claim was equitable." *Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Gerber Life Ins. Co.*, 771 F.3d 150, 155 (2d Cir. 2014). Here, Plaintiffs are seeking restitution from BNYM's general funds, which would tend to support a finding that the case is legal in nature and, in turn, that a jury trial is available.

However, in *Great–West*, unlike the instant action, there was no claim for breach of fiduciary duty as the fiduciary itself was the plaintiff, suing a beneficiary. More recently, in *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011), the Court explained that "[e]quity courts possessed the power to provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's *breach of duty*, or to prevent the trustee's unjust enrichment." *Id.* at 441 (emphasis added). Such "monetary remedy against a trustee, sometimes called a 'surcharge,' was 'exclusively equitable.'" *Id.* (quoting *Princess Lida of Thurn and Taxis v. Thompson*, 305 U.S. 456, 464 (1939)). "The surcharge remedy extend[s] to a breach of trust committed by a fiduciary encompassing *any* violation of a duty imposed upon that fiduciary." *Id.* (emphasis added). Here, Plaintiffs seek relief based precisely on a breach of fiduciary duties committed by BNYM, an alleged fiduciary, which is equitable in nature—indeed, "surcharge" is among Plaintiffs' requested remedies. (FAC at 55.) In *CIGNA*, moreover, the Court found "critical" the fact that the defendant "is analogous to a trustee." *CIGNA*, 563 U.S. at 441. Here, Plaintiffs

expressly allege that BNYM was a fiduciary of the Plans "for which they served as custodian or trustee."  (FAC ¶¶ 198-99).

The Court concludes that the remedy sought by Plaintiffs for Defendants' alleged breach of fiduciary duty is equitable in nature.  Defendants' motion to strike Plaintiffs' demand for a jury trial is therefore granted.

## IV.    Conclusion

For the foregoing reasons, the motion to dismiss is DENIED.  Defendants' motion to strike the jury demand is GRANTED.  BNYM shall file its answer to Plaintiffs' Complaint by April 21, 2017.

The Clerk of Court is directed to close the motion at Docket Number 61.

SO ORDERED.


Dated: March 31, 2017
        New York, New York

_____
          J. PAUL OETKEN
     United States District Judge