**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: BANK OF NEW YORK MELLON CORP. FOREX TRANSACTIONS LITIGATION | **12-MD-2335-LAK-JLC**<br><br>**ECF CASE** |
| IN RE: AMERICAN DEPOSITARY RECEIPT FOREIGN EXCHANGE ERISA LITIGATION | **Case No: 15-cv-10180-JPO-JLC**<br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

I.  NATURE OF THE ACTION ................................................................. 1

II.  JURISDICTION AND VENUE ........................................................... 4

III.  PARTIES ........................................................................................... 4

   A.  Plaintiffs ...................................................................................... 4

   B.  Defendants ................................................................................... 8

IV.  AMERICAN DEPOSITARY RECEIPTS AND FOREIGN CURRENCY
      TRANSACTIONS ............................................................................ 10

   A.  American Depositary Receipts .................................................... 10

   B.  How Defendants' Unlawful ADR FX Dividend Conversion
        Scheme Operated ......................................................................... 12

        1.  Dividends and Interest Payments to ERISA Holders of
             ADRs are Plan Assets ......................................................... 12

        2.  The FX Market and ADRs ................................................... 14

        3.  Defendants Exercised Discretion with Plan Assets to
             Generate Illegal Profits ...................................................... 15

        4.  Defendants Committed a Prohibited Transaction with Each
             ADR FX Dividend Conversion ............................................ 18

   C.  BNYM Has Overcharged Other Customers for FX Services and
        the Instant ADR FX Dividend Conversion Scheme Is Simply
        Another Example of a Comprehensive Course of Misconduct ......... 21

V.  FACTUAL BACKGROUND OF THE ERISA PLANS AND
     PLAINTIFFS' CLAIMS ...................................................................... 27

   A.  The Plans and ADR FX Dividend Conversions ............................ 27

   B.  The Baker Hughes Incorporated 401(k) Plan ............................... 28

   C.  The Central States Plan ............................................................... 30

   D.  The Hospital Corporation of America 401(k) Plan and The
        Hospital Corporation of America Retirement Plan......................... 33

i

E. The Owens Corning Plan ................................................................ 35

F. The Sheet Metal Workers' National Pension Fund............................. 36

G. The Teamsters Local 945 Plan......................................................... 39

H. The Verizon 401(k) Plan................................................................. 41

I. Defendants' Fiduciary Status .......................................................... 42

VI. PLAINTIFFS ARE ENTITLED TO ERISA'S FRAUD OR
CONCEALMENT LIMITATIONS PERIOD ............................................ 45

VII. CLASS ALLEGATIONS ........................................................................ 47

VIII. CLAIMS FOR RELIEF .......................................................................... 49

COUNT I ............................................................................................. 49

COUNT II ............................................................................................ 52

COUNT III ........................................................................................... 53

IX. PRAYER FOR RELIEF ........................................................................... 55

## I.    NATURE OF THE ACTION

1.      Hedy Anselman, David Baumann, Carl Carver, Dante A. Dano, Jr., Edward C. Day, Landol D. Fletcher, Timothy R. Garrett, Robert E. Hartline, Dana Kellen, Deborah Jean Kenny, Lisa Parker, and Daryl Watkins (collectively, "Plaintiffs") bring this civil enforcement action pursuant to ERISA, 29 U.S.C. §1132(a)(2) and (a)(3) against the Bank of New York Mellon and BNY Mellon, National Association on behalf of seven ERISA[1] employee benefit plans in which they are participants or for which they serve as a trustee.  Those plans are the Baker Hughes Incorporated Thrift Plan ("Baker Hughes 401(k) Plan"), the Central States, Southeast and Southwest Areas Pension Plan ("Central States Plan"), the Hospital Corporation of America 401(k) Plan ("HCA 401(k) Plan"), the Owens Corning Merged Retirement Plan ("Owens Corning Plan"), the Sheet Metal Workers' National Pension Fund ("Sheet Metal Workers' Plan"), the Teamsters Employees Local 945 Pension Fund ("Teamsters Local 945 Plan"), and the Verizon Savings and Security Plan for Mid-Atlantic Associates ("Verizon 401(k) Plan"), (collectively, "Plaintiff Plans"). The Plaintiff Plans are responsible for the retirement benefits of hundreds of thousands of Plan participants.[2] Plaintiffs also bring this action as a class action on behalf of a class (the "Class") of participants, beneficiaries, and named fiduciaries of similarly-situated employee benefit plans (collectively, the "Plans"). The class period is from

---

[1] The Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §1001, *et seq.*

[2] In 2011, the Plaintiff Plans reported the following number of participants: the Central States Plan - 411,238 participants; the Owens Corning Plan - 22,124 participants; the Sheet Metal Workers' Plan - 135,302 participants; the Verizon 401(k) Plan - 29,918 participants; the HCA 401(k) Plan – 230,316 participants; the Baker Hughes 401(k) Plan – 21,496 participants; and the Teamsters Local 945 Plan – 3,138 participants.

January 1, 1997 to the present time ("Class Period").  Plaintiffs seek to recover losses and obtain equitable relief to remedy Defendants' fiduciary breaches including their transactions prohibited by ERISA.

2.      Defendants' ERISA fiduciary duties, the "highest known to the law,"[3] required them to act prudently and solely in the interest of the Plans' participants and beneficiaries.

3.      Rather than fulfilling these duties, the Defendants enriched themselves at the expense of the retirement security of the Plans, their participants and beneficiaries, and the Class.

4.      Defendants appropriated excessive, unauthorized, and undisclosed markups[4] in the course of executing foreign currency ("FX") transactions associated with the Plans' holding of American Depositary Receipts ("ADRs") issued by Defendants. Defendants' breach of their fiduciary duty when they conducted the FX currency conversions ("ADR FX Dividend Conversions") increased their revenues and profits by millions of dollars annually at the expense of the Plans, their participants and beneficiaries, and the Class.

5.      Defendants charged excessive rates and markups on ADR FX Dividend Conversions on ADRs they issued, via the following scheme. When Defendants converted foreign dividends and interest for ADR assets of ERISA Plans into U.S. dollars, Defendants selected a transaction rate at or near the rate at which the currency traded that day that was virtually the worst for the ERISA Plans. This scheme increased Defendants' profits at the expense of their ERISA clients.

---

[3] *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982).

[4] "Markup" is commonly used in the foreign currency transactions to mean either a markup or a markdown. "Markup" will be used in the Complaint to mean either or both, as the context requires.

6.      Defendants' "spread" on ADR FX Dividend Conversions with Plaintiff was many times greater than what was charged (and disclosed) for Defendants' spreads on the same currency pair for FX transactions in which Defendants' clients negotiated the FX transaction.

7.      In 2011, the *Wall Street Journal* examined one trade of 8.1 million euros for dollars transacted by Bank of New York Mellon for a large pension fund. These FX transactions were priced by Defendants in the same way that ADR FX Dividend Conversions were priced. Defendants priced the FX transaction at 1.3610. On that day, however, euro/dollar trades occurred between the range of 1.3704 and 1.3604. Had the trade settled at the higher end of the range of the day, 1.3704, the pension fund would have received an extra $76,012. The *Wall Street Journal* analyzed more than 9,400 trades processed by Bank of New York Mellon over a decade and found that 58% of FX transactions were within 10% of day's trading range that was least favorable to the client.[5]

8.      Defendants generally kept their fictitious prices within the "range of the day," which helped prevent discovery of their acts. Defendants further concealed their breaches of duty and illegal transactions from their clients by failing to disclose the actual time of the transaction. Because currency prices change throughout the day, and Defendants never disclosed when a given FX transaction occurred, clients could not discover Defendants' improper practices and breaches of fiduciary duty. Defendants' actions ensured that the customers would not discover the excessive, unauthorized markups. Meanwhile, Defendants reaped windfall profits by selecting a rate at or near the worst rate of the day, from the customer's perspective, using a rate that was correspondingly advantageous to Defendants.

---

[5] Carrick Mollenkamp & Tom McGinty, *Inside a Battle Over Forex*, WALL STREET JOURNAL, May 23, 2011.

9.     These allegations are based on counsel's investigation which included reviewing: Internal Revenue Service Forms 5500 filed with the U.S. Department of Labor ("DOL"), filings with the U.S. Securities and Exchange Commission, documents filed in actions brought by the Department of Justice and other litigation, Defendants' publicly disseminated admissions, and other available documents. In addition, the allegations herein are based upon personal knowledge as to Plaintiffs and their own acts, and upon information and belief and the investigation of counsel as to all other matters.

## II.    JURISDICTION AND VENUE

10.     ERISA provides for exclusive federal jurisdiction over ERISA breach of fiduciary duty claims. 29 U.S.C. §1132(e)(1). The Plans are "employee benefit plans" within the meaning of ERISA, 29 U.S.C. §1002(3), and each Plaintiff is either a plan participant within the meaning of ERISA, 29 U.S.C. §1002(7), or an ERISA fiduciary within the meaning of 29 U.S.C. §1002(21). Plan participants and plan fiduciaries are authorized to bring actions such as this to obtain appropriate relief for their plans. ERISA, 29 U.S.C. §1132(a)(2) and (3).

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question) and ERISA, 29 U.S.C. §1132(e)(1).

12.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b) and ERISA, 29 U.S.C. §1132(e)(2), because some or all of the fiduciary breaches for which relief is sought occurred in this district, and the Defendants reside and may be found in this district.

## III.    PARTIES

### A.    Plaintiffs

13.     During the Class Period, Plaintiff **Hedy Anselman** was a participant in the HCA 401(k) Plan, a defined contribution plan sponsored by Hospital Corporation of America ("HCA"), and prior to that was a participant in the former HCA Retirement Plan. Anselman was

4

employed as a registered nurse by Swedish Medical Center, in Englewood, Colorado for more than 24 years. Swedish Medical Center is owned and controlled by HCA-HealthONE, LLC and HealthONE of Denver, Inc., which are Colorado-based corporate affiliates of  HCA, a major provider of hospital and health care services in the United States. Examples of Defendant-sponsored ADRs held by Anselman in her HCA 401(k) Plan account during the Class Period which paid her dividends and for which Defendants conducted ADR FX Dividend Conversions are illustrated in Appendix IV. Plaintiff Anselman resides in Englewood, Colorado.

14.     Plaintiff **David Baumann** serves as vice president of Teamsters Local 125 and as a trustee of the Teamsters Local 945 Pension Plan. Trustee Baumann was designated by his fellow plan trustees to represent the Teamsters Local 945 Plan in this litigation. Plaintiff Baumann resides in Bloomingdale, New Jersey.

15.     Plaintiff **Carl Carver** has been a participant in the Owens Corning Plan, an ERISA-covered plan during the Class Period. Carver began participating in the Plan shortly after he started working for Owens Corning in 1983. Plaintiff Carver resides in Aiken, South Carolina.

16.     Plaintiff Dante A. Dano, Jr. is, and has been since 1984, a participant in the Sheet Metal Workers' Plan, an ERISA-covered pension plan.  Since 1984, Dano has been a member of Local Union No. 137 ("Local 137") of the International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART"), which represents employees in New York City and surrounding Tri-State Area.  Dano currently serves as the Business Manager and President of Local 137.  He also serves as a Vice President of the New York State AFL-CIO, a Trustee of the Building and Construction Trades Council of Nassau and Suffolk Counties, AFL-CIO, and the Secretary Treasurer of the Production and Sign Council of SMART.  Plaintiff Dano resides in Merrick, New York.

17.     Plaintiff **Edward C. Day** has been a participant in the Owens Corning Plan during the Class Period. Day began participating in the Plan shortly after he started working for Owens Corning in 1979. Plaintiff Day resides in Saluda, South Carolina.

18.     Plaintiff **Landol D. Fletcher** has been a participant in the Central States Plan, an ERISA-covered plan, during the Class Period. Fletcher began participating in the plan in approximately 1980. Plaintiff Fletcher resides in Buford, South Carolina.

19.     Plaintiff **Timothy R. Garrett** is a participant in the Baker Hughes 401(k) Plan, a defined contribution plan sponsored by Baker Hughes, Inc. Baker Hughes is a global oil drilling and processing servicing company based in Houston, Texas. Garrett has been employed by Baker Hughes for more than nine years. Examples of Defendant-sponsored ADRs held by Garrett in his Baker Hughes 401(k) Plan account during the Class Period which issued dividends to Plaintiff Garrett and for which Defendants conducted ADR FX Dividend Conversions are illustrated in Appendix IV.) Plaintiff Garrett resides in Claremore, Oklahoma.

20.     Plaintiff **Robert E. Hartline** has been a participant in the Sheet Metal Workers' Plan, an ERISA-covered plan during the Class Period. Hartline was a metalist by trade and became a member of Sheet Metal Workers Local 224 (now known as Local 24) in the 1970s. Hartline retired in 1996 and immediately started drawing his pension benefits from the plan. Plaintiff Hartline resides in Summerfield, Florida.

21.     Plaintiff **Dana Kellen** is a participant in the HCA 401(k) Plan and was a participant in the former HCA Retirement Plan. Kellen became an employee of HCA in 2003 and a participant in the HCA 401(k) Plan in 2004. Plaintiff Kellen's HCA 401(k) Plan is, and her former HCA Retirement Plan was, a defined contribution plan sponsored by HCA. Examples of Defendant-sponsored ADRs held by Kellen in her HCA 401(k) Plan account during the Class

6

Period which issued dividends and for which Defendants conducted ADR FX Dividend Conversions are illustrated in Appendix IV. Plaintiff Kellen resides in Parker, Colorado.

22.     Plaintiff **Deborah Jean Kenny** has been a participant in both the Owens Corning Plan and the Central States Plan during the Class Period. Kenny began participating in the Owens Corning Plan shortly after she started working for Owens Corning in 1973. She stopped working for Owens Corning in 2000 but remains a participant in the Owens Corning Plan. Kenny is also a participant in the Central States Plan. Kenny is currently receiving a pension from both the Owens Corning Plan and the Central States Plan. Plaintiff Kenny resides in Warrenville, South Carolina.

23.     Plaintiff **Lisa Parker** is a participant in the Verizon 401(k) Plan, an ERISA-covered plan. During the Class Period, Parker invested through her plan account in various collective trusts, partnerships, other entities, and/or separate accounts that held foreign investments, including the Morgan Stanley International Fund; Pyramis Select International Equity Commingled Pool Portfolio; Pyramis Select International Small Cap Commingled Pool; Marathon International Large Cap Equity Developed Fund; Mondrian International Large Cap Equity Emerging Markets Fund; Alliance Bernstein Emerging Markets Style Blend Equity Fund; Morgan Stanley Emerging Markets Fund; Genesis Emerging Markets Fund; The Boston Company Emerging Markets Funds; and portfolios, strategies, and Collective Investment Funds, managed by Artio International Equity Fund, Capital Guardian, McKinley Capital Management, and Mellon Capital Management Corporation (including the Passive International Equity Fund). Examples of the many Defendant-sponsored ADRs held by Parker through her Verizon 401(k) Plan account during the Class Period which paid dividends and for which Defendants conducted

7

ADR FX Dividend Conversions are illustrated in Appendix II. Plaintiff Parker is a resident of Dover, Delaware.

24.     Plaintiff **Daryl Watkins** is a participant in the Baker Hughes 401(k) Plan, a defined contribution plan sponsored by Baker Hughes, Inc., a global oil drilling and processing servicing company based in Houston, Texas. Watkins has been employed as a machinist by Baker Hughes for more than 25 years. Examples of Defendant-sponsored ADRs held by Watkins in his Baker Hughes 401(k) Plan account during the Class Period which paid dividends and for which Defendants conducted ADR FX Dividend Conversions are illustrated in Appendix IV. Plaintiff Watkins resides in Chelsea, Oklahoma.

25.     The **Plaintiff Class** is limited to participants, beneficiaries, trustees, and named fiduciaries of ERISA-covered employee benefit plans. ERISA is the governing federal law for private sector employee benefit plans sponsored by employers, plans sponsored by labor unions, and plans sponsored by both labor unions and employers. 29 U.S.C. §1003(a).

**B.     Defendants**

26.     Non-defendant **The Bank of New York Mellon Corporation** ("BNY Mellon Corp.") is the parent of Defendants The Bank of New York Mellon and BNY Mellon, N.A., which are its two principal subsidiaries and sources of income. BNY Mellon Corp. is a Delaware corporation with headquarters at One Wall Street, New York, New York, 10286. BNY Mellon Corp. is the product of the July 1, 2007 merger (the "Merger") of The Bank of New York Company, Inc. and Mellon Financial Corporation ("Mellon"). Its website claims it had $27.9 trillion under custody or administration on September 30, 2012.

27.     Defendant **The Bank of New York Mellon** ("**BNYM**" or "**BNY Mellon**"), a New York state-chartered bank, is one of two principal bank subsidiaries of BNY Mellon Corp. It was

8

formerly named "The Bank of New York". There is substantial overlap between BNY Mellon Corp. and BNYM's leadership. For instance, the BNY Mellon Corp. 2010 10-K reported that every current executive officer of BNY Mellon Corp. also served as an officer of BNYM. According to the BNY Mellon Corp. 2010 10-K, BNYM "houses [BNY Mellon Corp.'s] institutional businesses, including Asset Servicing, Issuer Services, Treasury Services, Broker-Dealer and Advisor Services, and the bank-advised business of Asset Management."

28.     Defendant **BNY Mellon, National Association** ("**BNY Mellon, N.A.**") is a nationally-chartered bank that was formerly named Mellon Bank, N.A. BNY Mellon Corp. describes BNY Mellon, N.A. as one of its two principal subsidiaries. BNY Mellon, N.A. is based in Pittsburgh, Pennsylvania.

29.     Defendants **Does 1-20** are entities or individuals whose identities are not currently known to Plaintiffs but (i) are affiliates or employees of BNY Mellon Corp. or its affiliates, and (ii) that either provided ADR FX Dividend Conversion services to the Plans pursuant to the ADR FX Dividend Conversion scheme described below during the relevant period or are successors in interest to entities that provided such services.

30.     Unless otherwise specified or indicated by context, the term "Defendants" includes the above-named Defendants and their predecessors in interest, including pre-Merger predecessors in interest.

31.     Defendants possess information regarding which particular entities affiliated with BNY Mellon Corp. were responsible for which conduct with respect to the class. Plaintiffs expect to refine their allegations in this respect subsequent to discovery.

9

### IV.   AMERICAN DEPOSITARY RECEIPTS AND FOREIGN CURRENCY TRANSACTIONS

**A.      American Depositary Receipts**

32.     In recent decades, ERISA employee benefit plans and other institutional investors have found it increasingly desirable to enter overseas securities markets and expand the global scope of their investment portfolios in search of diversification and greater returns.

33.     As an alternative to holding foreign securities, some investors such as ERISA Plans buy, sell, or hold ADRs. ADRs represent a specified number of shares in a foreign corporation. First introduced in 1927, ADRs are typically issued after the "depositary" bank purchases foreign securities from the foreign "issuer" and places those securities in a "custodian" bank for safekeeping in the same country as the foreign issuer.  The depositary bank then issues ADRs in the U.S. based on those "immobilized" foreign shares.  The ADRs are traded on American markets just like shares of U.S. stocks. The ADRs are generally issued pursuant to a prospectus, filed with the Securities and Exchange Commission on Form F-6, and are governed by deposit agreements and related documents.

34.     By investing in ADRs, U.S. investors can effectively invest overseas without having to exchange dollars for another currency to buy the foreign shares. Instead, the U.S. investor, such as the Plans, holds a U.S. security with all the protections afforded to U.S.

10

shareholders.  The ADR price closely tracks the price of the underlying foreign security in its home market.[6]

35.     Currently more than 2,000 ADRs are available representing shares of companies located in more than 70 countries.[7]

36.     Banks typically charge their ADR investors fees for providing the ADR services. These fees for providing custody services, for the distribution of dividends, for voting shares, and for conducting the ADR FX Dividend Conversions.[8]

37.     On its website, BNYM lists ADRs that it issues that are traded on the NYSE, AMEX or NASDAQ.[9]  BNYM describes itself as "the leading depositary bank."[10]

---

[6] There are four types of ADRs. Level I ADRs do not raise capital in the U.S. for the foreign issuer and are traded over the counter.  Level II ADRs do not raise capital in the U.S. for the issuer and are listed and traded on a U.S. exchange such as the NYSE, AMEX, or the NASDAQ.  Level III ADRs do raise capital in the U.S. for the issuer and are listed and traded on a U.S. exchange. Private placement ADRs are limited to large institutional investors — "Qualified Institutional Buyers" — with at least $100 million in net worth, which includes many ERISA Plans. Some ADRs are sponsored by the foreign issuer, and others are not sponsored and can only be traded on the over the counter market.

[7] U.S. Securities and Exchange Commission, "Investor Bulletin: American Depositary Receipts" (available at http://www.sec.gov/investor/alerts/adr-bulletin.pdf) ("SEC Investor Bulletin").

[8] SEC Investor Bulletin.

[9] http://www.adrbnymellon.com/dr_directory.jsp

[10] http://www.adrbnymellon.com/files/PB19836.pdf .   See also Defendant report, "BNY Mellon, The Depositary Receipt, Market Review, January 2016" at https://www.bnymellon.com/us/en/_locale-assets/pdf/newsroom/dr-market-review-january-2016.pdf .

**B.     How Defendants' Unlawful ADR FX Dividend Conversion Scheme Operated**

      1.   Dividends and Interest Payments to ERISA Holders of ADRs are Plan Assets

    38.     Foreign issuers of securities for ADRs held by custodial banks in the foreign country typically issue dividend and interest payments to shareholders. When issued, the payments are typically converted by the depositary bank into U.S. dollars for the holders of ADRs traded in the United States.

    39.     In the case of Defendants, such dividends and interest payments, whether in foreign currency or after conversion to U.S. dollars, at all times belonged to the ADR Owner. When the ADR Owner was an ERISA Plan, the dividend and interest issued were at all times ERISA plan assets.[11]

    40.     The ownership of those interest and dividend payments by the ADR Owner is also evident in a sample ADR contract, called the "Deposit Agreement," illustrated here as between Defendant Bank of New York, the foreign issuer Baidu.com, Inc., and holders of ADRs issued pursuant to the agreement. The sample Deposit Agreement is clear that the dividend and interest payments, as a component of the "deposited securities," are the property of each ADR Owner:

> The term "Deposited Securities" as of any time shall mean Shares at such time deposited or deemed to be deposited under this Deposit Agreement and any and all other securities, property and cash received by the Depositary or the Custodian

---

[11] 29 C.F.R. § 2510-3-101.

in respect thereof  and at such time held hereunder, subject as to cash to the provisions of Section 4.5.[12]

Section 4.5 of this sample Deposit Agreement, attached as Appendix I, describes the conversion of the foreign currency to U.S. dollars.[13]

41.     Plaintiffs have identified other ADR agreements involving Defendant-issued ADRs with identical language.[14] On information and belief, Plaintiffs believe and therefore allege that the BNYM deposit agreements governing the ADRs purchased by the Plans were identical or substantially similar in all material respects.

42.     Pursuant to the deposit agreements, whenever BNYM received cash distributions, BNYM was obligated to "convert such dividend or distribution as promptly as practicable into Dollars and . . . distribute as promptly as practicable the amount thus received [net of stated fees] to the Owners entitled thereto."[15]

---

[12] U.S. Securities and Exchange Commission, Form F-1 Registration Statement by Baidu.com, Inc., Exhibit 4.3, "Baidu.com, Inc. and the Bank of New York as Depositary and Owners and Beneficial Owners of American Depositary Receipts, Deposit Agreement, Dated as of , _____2005" § 1.10 (filed July 12, 2005), available at http://www.sec.gov/Archives/edgar/data/1329099/000119312505140785/dex43.htm. To the extent Defendants or any of their predecessors in interest purport to disclaim liability for breach of fiduciary duty, ERISA provides that any such agreement or instrument is void as against public policy. 29 U.S.C. §1110.

[13] Appendix I, §  4.5.

[14] *See, e.g.,* Deposit Agreement between America Movil, S.A. de C.V., the Bank of New York as Depositary, and Owners of American Depositary Receipts ("America Movil S.A. de C.V. ADR"), available at https://www.sec.gov/Archives/edgar/data/1129137/000101915505000138/movilldep.htm , § 1.1; Deposit Agreement between Diageo PLC, the Bank of New York Mellon as Depositary, and Owners and Beneficial Owners of American Depositary Shares, available at https://www.sec.gov/Archives/edgar/data/835403/000101915511000077/daigeodep.htm , § 1.10.

[15] *See, e.g.,* Appendix I, § 4.1; *see also id.* § 4.5; *see also* Deposit Agreements, *supra* note 14.

13

43.     Deposit agreements typically identify the fees, expenses, and other charges BNYM may assess to ADR owners.[16] Depositary agreements typically allow BNYM to charge "expenses" or "reasonable expenses" incurred in the conversion of foreign currency,[17] but they do not authorize BNYM to exercise unbridled discretion in the execution and pricing of ADR FX Dividend Conversions.

2.     The FX Market and ADRs

44.     When an foreign issuer whose securities underlie an ADR issues a dividend or makes an interest payment, the depositary bank converts the interest or dividend payment by conducting a FX transaction in the foreign currency market—the ADR FX Dividend Conversion—so that it can present the payment to the ADR Owner in U.S. dollars.

45.     The foreign currency market operates 24 hours a day throughout the week.  The FX market is the largest and most actively traded financial market in the world. The values of most currencies "float" against each other—that is, the values vary based on factors ranging from supply and demand to political and economic trends.[18]

46.     The FX market is actually two markets: (1) the "interbank" market in which banks trade currencies with each other (*i.e.*, the wholesale market), and (2) a parallel market in which banks interact with non-bank clients such as private U.S. pension funds (*i.e.,* the retail market).

---

[16] *See, e.g.*, Appendix I, § 5.9.

[17] *Id.* (citing § 4.5 regarding conversion of foreign currency).

[18] Global FX trading averaged $5.3 trillion per day in April 2013. Bank for International Settlements, Triennial Central Bank Survey, Foreign exchange turnover in April 2013: preliminary global results at 3 (available at https://www.bis.org/publ/rpfx13fx.pdf).

Trading in both markets is over-the-counter, meaning that it does not occur on a central exchange with records of all daily transactions and their prices.

47.    An FX "spot" transaction involves an agreement to exchange two currencies at a later date.  The exchange of currencies occurs typically two bank business days after the deal is priced at an exchange rate.[19]

48.    This Complaint involves FX spot transactions conducted by Defendants involving ERISA Plan assets in the retail FX market.

### 3.    Defendants Exercised Discretion with Plan Assets to Generate Illegal Profits

49.    During the Class Period, Defendants charged excessive, unauthorized, and undisclosed rates in the course of executing ADR FX Dividend Conversions with the Plans' holdings of Defendant-issued ADRs.

50.    Defendants' breach of their fiduciary duty when conducting the ADR FX Dividend Conversions increased their revenues and profits by millions of dollars annually at the expense of Plaintiffs, the Class, and the Plans. Defendants' parent company, BNY Mellon Corp., stated in its 2008 annual report that "foreign exchange and other trading activities revenue totaled a record $1.5 billion in 2008 compared with $786 million in 2007." This was despite the fact that 2008 was one of the worst years of the recent financial crisis.

51.    Defendants' ADR FX Dividend Conversion pricing scheme violated ERISA and reaped Defendants millions of dollars in secret profits while minimizing the risks of detection by their ERISA Plan clients and other ADR investors.

---

[19] For instance, an exception is FX transactions between the U.S. dollar and Canadian dollar for which the currencies are exchanged the next business day after the deal is priced.

52.     Over the Class Period, Defendants secretly and routinely set ADR FX Dividend Conversion rates that were worse for the ERISA Plans than rates that would have been agreed to at arm's-length for comparable transactions by Defendants or by other FX retail market providers. For more than a decade Defendants did not reveal and concealed their ADR FX Dividend Conversion pricing methodology from ERISA Plans.

53.     During the Class Period, Defendants exercised discretion and control over Plan assets when they priced ADR FX Dividend Conversions in the secret scheme. Defendants set their own compensation when they secretly priced the ADR FX Dividend Conversions for their ERISA Plan clients. For these reasons, Defendants acted as ERISA fiduciaries in pricing ADR FX Dividend Conversions.[20] Their exercise of discretion and control over Plan assets made Defendants' secret pricing scheme possible, which Defendants used to their advantage and to the disadvantage of the Plans.

54.     An ERISA fiduciary must discharge his duties with respect to a Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan. The fiduciary must act prudently and consistent with their duty of loyalty to the Plans and the Plans' participants and beneficiaries.[21] Defendants violated their ERISA fiduciary duties by pricing ADR FX Dividend Conversions in their own interest and against the ERISA Plans holding ADRs.

---

[20] 29 U.S.C. §1002(21)(a).

[21] 29 U.S.C. §1104(a)(1).

55.    ADRs are typically held by the Plan's ERISA custodian bank[22] and the Plan's trustee, and generally are reported as the Plan's ERISA assets on IRS Form 5500, which serves as the Annual Report of the Plan filed annually with the DOL and the Internal Revenue Service, U. S. Department of the Treasury ("DOT").

56.    Defendants exercised this discretion over Plan assets by systematically pricing ADRs at the rate that is at or near the worst rate for the ADR Owner. This price would reflect an excessive exchange rate to the buyer of U.S. dollars — the ADR Owner.

57.    By generally keeping the price charged to the Plans within the range of the day, Defendants ensured that their customers would not discover that the ADR FX Dividend Conversions were not being provided at the rate available in an arms-length transaction.

58.    However, sometimes Defendants actually priced ADR FX Dividend Conversions outside the range of the day, to generate even higher illegal profits. This meant Defendants priced the transaction at a rate that was not even recorded on that trading day.

59.    Another aspect of the illegal pricing scheme included Defendants secretly earning interest for their own accounts on the dividends and interest payments made by the foreign issuer to Defendants prior to transferring the payments to the ERISA Plans in U.S. dollars. Defendants earned such interest when the dividend on the underlying security for the ADR arrived at the bank a day or two earlier than usual, which is a day or two before Defendants would transfer the U.S. dollars to the ADR Owner. That currency was at all times the property of the ADR Owner. An ERISA fiduciary cannot cause a transaction that constitutes a direct or indirect lending of

---

[22] The ERISA Plan's custodian bank is distinct from the custodian bank overseas that holds the shares of the foreign company underlying the ADR issued by Defendants, the depository bank.

money or other extension of credit between the plan and a party in interest,[23] nor can a party in interest knowingly participate in such a fiduciary breach.

60.    Defendants handsomely profited off their secret ADR-FX pricing scheme at the expense of ERISA ADR Owners.

61.    When volatility in FX prices increased, such as during the 2008 financial crisis, the range of the day used in pricing ADR FX Dividend Conversions was larger, giving Defendants the opportunity to set their fictitious prices to generate even larger profits during periods of market volatility. Tellingly, BNYM's 2008 annual report noted that record FX revenues in part "reflect[] the benefit of increased market volatility."

62.    Perpetuation of Defendants' scheme and its attendant high-marginal revenue on ADR FX trades remained undetected by their clients because Defendants withheld critical information about the manner in which the trades were executed and priced from clients.

63.    Defendants intentionally did not provided ADR Owners a time stamp indicating when the ADR FX transactions occurred during the day.

64.    Defendants are in sole possession of records accurately detailing their ADR FX Dividend Conversion and the rates Defendants actually obtained when executing the FX transactions, as well as records accurately detailing when proceeds owed to ADR Owners were actually deposited and thus when they should have been priced.

    4.    <u>Defendants Committed a Prohibited Transaction with Each ADR FX Dividend Conversion</u>

---

[23] 29 U.S.C. §1106(a)(1)(B); *see also* U.S. Department of Labor, Pension & Welfare Benefit Programs, OPINION 93-14 A, May 5, 1993.

65.     Ordinarily, it would be illegal for a bank entity in Defendants' position to engage in FX transactions with their ERISA customers. In the terminology of ERISA, Defendants were a "party in interest" to the ERISA Plans because they provided FX services to the ERISA Plans. As a party in interest, Defendants cannot enter a transaction – such as an ADR FX Dividend Conversion – with those ERISA Plans because such a transaction is a  *per se* "prohibited transaction" under ERISA.[24]  Defendants can nonetheless avoid committing that *per se* violation when it enters an FX transaction with ERISA Plans if it can establish that the transaction meets an exemption to the prohibited transaction rules.[25]

66.     Specific statutory and a specific regulatory exemption to ERISA's prohibited transaction rules are available for banks that provide FX transaction services to ERISA Plans.[26] To qualify for either form of exemption, the bank, among other things, *has the burden* to establish that the terms of each FX transaction are "not less favorable" to the ERISA Plan than terms (1) generally available in comparable arm's length foreign exchange transactions between unrelated parties, and (2) afforded by the bank in comparable arm's length foreign exchange transactions between unrelated parties.[27]

---

[24] 29 U.S.C. §1106.

[25] 29 U.S.C. §1108.

[26] 63 FR 63503, U.S. Department of Labor Prohibited Transaction Exemption 98-54 (Nov. 13, 1998) (hereafter "PTE 98-54"); 29 U.S.C. §1108 (b)(18) (effective August 17, 2006). A third regulatory exemption related to FX transactions is not available to a bank unless it directly negotiates the terms of the FX transaction on the day of the transaction with an independent plan fiduciary.

[27] *See supra, note 26.*

67.     Defendants cannot establish that their ADR FX Dividend Conversions during the Class Period met either of those prohibited transaction exemptions. Defendants provided the ERISA Plans worse rates than they provided to others in comparable transactions, and worse rates than were available in the market in arms-length transactions.[28] Over the Class Period, Defendants routinely and intentionally provided ERISA Plans the worst rate of the day for ADR FX Dividend Conversions, reaping excessive profits at the expense of ERISA Plans and their participants and beneficiaries in the tens of millions of dollars. Defendants concealed from ERISA Plans that there were better comparable FX rates available from Defendants and other banks and made knowing omissions that prevented the Plans from discovering the breaches and prohibited transactions.

68.     During the Class Period, certain non-ADR FX clients received preferential FX conversion rates and terms in the form of reduced basis point[29] markups compared to the ADR FX clients. Defendants' ADR FX Dividend Conversions were not performed at these preferential rates. Instead, Defendants routinely performed ADR FX transactions at rates that, though they were generally within the range of the day of FX prices at which the currency pair traded, provided Defendants with an excessive margin, and therefore profits, on the ADR FX Dividend Conversions.

---

[28] ADR FX was not arms-length. No ERISA Plan directed or negotiated ADR FX transactions with Defendants. Defendants unilaterally chose the ADR FX rates they charged, without involvement of the ERISA Plaintiffs.

[29] A "basis point" is one one-hundredth of a percentage point, *i.e.,* there are 100 basis points in one percent.

69.     Further, prior to August 17, 2006, Defendants were required to obtain, prior to conducting any FX transactions for an ERISA Plan, a special written permission from an independent fiduciary to the ERISA Plan, a "standing instruction", in order to meet the applicable ERISA prohibited transaction exemption.[30] Defendants did not obtain such a standing instruction from their ERISA Plan clients who held Defendant-issued ADRs.

70.     In addition, prior to August 17, 2006 Defendants were absolutely prohibited from conducting FX transactions for ERISA Plans to which they were a party in interest that were larger than $300,000. No exemption was available for such transactions from the *per se* prohibited transaction rules prior to that date.[31] On information and belief, Plaintiffs suspect that Defendants violated the prohibited transaction rules prior to that date by conducting ADR FX Dividend Conversions greater than $300,000 in value. Further discovery will allow Plaintiffs to identify such violations.

**C.     BNYM Has Overcharged Other Customers for FX Services and the Instant ADR FX Dividend Conversion Scheme Is Simply Another Example of a Comprehensive Course of Misconduct**

71.     Defendants' ADR FX Dividend Conversion scheme is part and parcel of a broader pattern of FX overcharges, concealment of dishonest conduct, and profiteering at the expense of ERISA plans. It was designed to, and did, reap hundreds of millions of dollars in profits while minimizing the risks of detection.

---

[30] PTE 98-54. A standing instruction would not have been required if the bank and an independent plan fiduciary negotiated the FX price on a daily basis for each FX transaction. ADR FX did not involve such daily negotiations.

[31] PTE 98-54.

72.    Recent litigation focused on Defendants' standing instruction (or "SI") trades, in which Defendants improperly overcharged their ERISA and non-ERISA customers. Defendants considered SI FX conversions to be the most profitable form of business because "it offers the traders a free intra-day option to time its currency execution in the marketplace knowing it does not have to get back to the customer immediately with the deal price. Business of this type allows us to take advantage of increased market volatility and wide intra-day trading ranges."[32]

73.    By generally keeping the price charged to their clients within the range of the day, Defendants ensured that their customers would not discover that the SI FX conversions were not being provided as disclosed.

74.    Defendants touted their SI FX pricing structure to clients that they priced SI FX at the high and low of the day. According to internal emails between BNYM executives, the truth was, "It's the high and low of the day, depending on which one is against you." Email from David Green to James McAuliffe, July 26, 2010, "Re: Follow-up Strategy Session – Standing Instruction Business."

75.    Defendants' FX scheme for implementing standing instruction orders required that Defendants exercise discretion in fulfilling their duties. For standing instruction trades, Defendants exercised discretion as to the time of day that the trades were executed, as well as the amount of any markup or markdown charged to the client. In relevant part, Defendants controlled and set the markups and markdowns and determined; whether they would fall within the range of the day for the currency pair; whether to net trades for buys and sells across clients; whether to minimize markups where Defendants utilized subcustodians for certain currency

---

[32] Email from BNYM Managing Director Jorge Rodriguez to Richard Mahoney, Executive Vice President of Global Markets at BNYM, Feb. 1, 2008, Re: "the negative impact of e-commerce."

pairs; and whether to provide discounts for clients with larger accounts for the same or similarly-sized trades of the same currency pairs.

76.     Perpetuation of Defendants' schemes and their attendant high-marginal revenue on non-negotiated and SI trades required withholding from clients critical information about the manner in which the trades were executed and priced.

77.     E-mails make clear that preventing clients from learning Defendants' SI FX pricing scheme was an explicit business strategy. For example, on April 11, 2008 Antonio Garcia-Meitin of BNY Mellon's Asset Servicing Global Management department sent an e-mail to others in this department titled "Transparency" that stated:

> In general transparency adversely impacts our revenue stream and any product to distribute fee information would hurt us many times over in reduced revenue. Nothing like a rock and a hard place.

78.     Another BNY Mellon officer commented on the idea of greater transparency: "I do NOT like it. Once pricing spreads are disclosed it will be a race to how quickly clients work it down to zero."

79.     For BNY Mellon, the non-negotiated FX portion of its business was referred to internally as the "highest quality, highest margin business."[33]  BNYM admits that standing instruction trading was the most profitable form of FX trading for Defendants. It stated that "A shift by custody clients from the standing instruction program to other trading options . . . may negatively impact our foreign exchange revenue."[34]

---

[33] October 15, 2009 email from Jorge Rodriguez to Richard Mahoney, "Non-negotiated FX revenue down $262MM verses [sic] 2008—Details enclosed."

[34] *See, e.g.,* BNY Mellon Corp. Form 10-Q for the quarter ended Mar. 31, 2012 (filed May 9, 2012), p. 8; BNY Mellon Corp. Form 10-Q for the quarter ended Jun. 30, 2012 (filed May 9, 2012), p. 9; BNY Mellon Corp. Form 10-Q for the quarter ended Jun. 30, 2013 (filed Nov. 8, 2013), p. 9.

80. In a recently settled set of cases, BNYM first admitted that its Global Markets FX desks knowingly charged the Bank's custodial clients unfavorable rates on FX trades done pursuant to standing instructions:

> [BNYM] assigns prices to Standing Instruction Service transactions that ***are at or near the high end*** of the range of prices reported in the interbank market ***for currency purchases*** for the relevant pricing cycle, ***and at or near the low end*** of range of prices reported in the interbank market ***for currency sales*** for the relevant pricing cycle.

*United States v. The Bank of New York Mellon Corp.*, No. 11-cv-06969 (the "DOJ Action"), Stipulation and Order of Partial Settlement and Dismissal (S.D.N.Y. Jan. 17, 2012) (emphasis added). BNYM agreed to pay $714 million to resolve the DOJ Action and other actions relating to the Bank's SI FX practices.[35]

81. In other words, as the Bank would later admit as part of a final settlement of the DOJ Action, "**the Bank gave SI clients prices that were at or near the worst interbank rates reported during the trading day or session.**"[36]

82. In the Stipulation and Order of Settlement and Dismissal entered on April 23, 2015 in the DOJ Action, BNYM admitted the following:

> Throughout the trading day or session (which could be as long as 24 hours), as each custodial client's account generated FX transactions to be executed pursuant to SIs, the Bank's practice was to aggregate those FX transactions for all SI clients and group them by currency pair. Near the end of the trading day or session, the Bank priced those SI FX trade requests it had received throughout that day or session.
>
> To determine the price for each SI FX transaction for most currencies, the Bank examined the range of reported interbank rates from the trading day or session and assigned the rate on SI trades as follows: if the client was purchasing foreign

---

[35] Plaintiffs Carver, Kenny, Day, and Parker served as named plaintiffs in one of the settled actions. *Carver et al. v. Bank of New York Mellon et al.*, No. 12-cv-09248-LAK (S.D.N.Y).

[36] *United States v. The Bank of New York Mellon and David Nichols*, No. 11-06969, Stipulation and Order of Settlement and Dismissal (S.D.N.Y. April 23, 2015), Dock. No. 150, ¶ 2(d)(i).

currency, the client received a price at or close to the highest reported interbank rate for that day or session (at or near the least favorable interbank price for the client reported during the trading day or session), and if the client was selling foreign currency, the client received a price at or close to the lowest reported interbank rate of the day or session (also at or near the least favorable interbank price for the client reported during the trading day or session).

Because SI clients received pricing at or near the high end of the reported interbank range for their currency purchases and at or near the low end of the reported interbank range for their sales, the Bank was generally buying low from, and selling high to, its own clients. The Bank recorded the difference or "spread" between the rates it gave clients and the interbank market price at the time the SI transactions were priced as "sales margin."[37]

83.     On September 24, 2015, in approving the global settlement of the civil and regulatory actions against BNYM, presiding Judge Lewis A. Kaplan called this SI FX scheme "an outrageous wrong committed by the Bank of New York Mellon."[38]

84.     With only minor differences, Defendants' ADR FX Dividend Conversion scheme operated in the same fashion as BNYM's SI FX conversion scheme. During the Class Period, in violation of ERISA, BNYM charged Plaintiffs and the Class unauthorized rates on ADR FX Dividend Conversions far in excess of the Bank's actual expenses incurred in executing ADR FX Dividend Conversions, in excess of what was available in arm's length transactions between unrelated parties, and far in excess of any charges permitted by the depositary agreements, thereby reaping improper gains at the direct expense of Plaintiffs and the Class. As described herein, the fact that ADR FX Dividend Conversions were priced in a similar manner to SI FX transactions remained hidden until only recently.

---

[37] *Id., at* ¶¶ 2(b)(i)-(iii).

[38] Tr. of Sept. 24, 2015 Hr'g at 17:16-17 in In re:  Bank of New York Mellon Corp. Forex Transactions Litig., 12 MD 2335 (LAK) (S.D.N.Y.), Dock. No. 642.

85.    On or about June 24, 2015, BNYM notified certain investment managers that it had "inadvertently" overcharged certain of its ADR holder clients for ADR FX services. At least one notice stated the following:

> The Bank of New York Mellon (BNY Mellon) is one of the Agents that sponsors American Depository Receipts (ADRs) that are available to UBS clients. Following a recent review, it was determined that BNY Mellon inadvertently charged clients fees on ADRs in which no fees were applicable and/or overcharged them. . . .

The notice was ambiguous to the extent it simply referred to "fees," and may have pertained to any number of specific fees that BNYM disclosed it would assess against ADR holders pursuant to deposit agreements, for example, "a fee of $.02 or less per American Depositary Share (or portion thereof) for any cash distribution made pursuant to the Deposit Agreement."[39] BNYM's June 2015 notice did not admit to or reference in any fashion BNYM's ongoing ADR FX Dividend Conversion scheme.

86.    Not until October 1, 2015 – just a week after Judge Kaplan called the SI FX scheme "outrageous," did BNYM reveal—for the first time—that it *employed similar pricing practices when executing ADR FX Dividend Conversions* as it employed when doing SI FX trades, when BNYM published its Pricing Disclosure on its ADR-devoted webpage. In this disclosure, BNYM publicly stated for the first time that, notwithstanding whatever language was contained in its ADR Agreements, that it made "*no representations, warranties or guarantees* as to whether the price or the pricing  methodology [it] used to price a [ADR FX Dividend Conversion] yields a *fair market price*."  Specifically, BNYM stated it consistently priced ADR FX Dividend Conversions so as to take advantage of the range of market rates available during a particular 24-hour (or in some cases longer) trading session  (regardless  of when, during that

---

[39] *See* America Mobil S.A. de C.V. ADR, *supra*, note 14.

session, the trade was actually priced), with the spreads on such trades accruing to the Bank as "revenue." In other words, on that day the Bank disclosed—for the first time—that it used the same "session range" approach to pricing ADR FX Dividend Conversions as it used for SI FX transactions.

## V.  FACTUAL BACKGROUND OF THE ERISA PLANS AND PLAINTIFFS' CLAIMS

### A.  The Plans and ADR FX Dividend Conversions

87.    There are two basic types of ERISA-covered retirement plans—defined benefit plans and defined contribution plans.[40] Defined benefit plans include traditional pension plans in which the amount of benefit a participant receives is fixed; defined contribution plans are plans in which participants hold the assets of their own individual account, such as a 401(k) plan, in which participants may contribute a portion of their earnings to the account and at retirement receive the proceeds in a lump sum or periodic payments.

88.    Defined benefit plans (and their investment managers on their behalf) regularly invest in ADRs. Similarly, defined contribution plans frequently include at least one, if not several investment options that include ADR holdings in order to increase diversification and take advantage of opportunities for higher returns. These ADR investments are made either

---

[40] There is a third type of ERISA Plan, technically known as a health and welfare benefit plan, but in common parlance known as health insurance plans, they include plans that provide death and disability benefits to their participants.

27

directly or through participation in Separately Managed Accounts or Collective Investment Funds.[41]

89.     Defendants executed ADR FX Dividend Conversions for hundreds of ADRs they issued that were held by Plaintiff Plans during the Class Period. A sample of the Defendant-issued ADRs held by the Plaintiff Plans during the Class Period is contained in Appendix II. The underlying foreign corporations paid dividends in foreign currency to the Defendants which issued the ADRs during the Class Period.  The Defendants converted the foreign currency to U.S. dollars utilizing the secret scheme described in this Consolidated Class Action Complaint. Based on this information, Defendants engaged in fiduciary violations and prohibited transactions involving plan assets of the Plaintiff Plans and the ERISA Plans in conducting those ADR FX Dividend Conversions.

**B.     The Baker Hughes Incorporated Thrift Plan**

90.     The Baker Hughes Incorporated Thrift Plan ("Baker Hughes 401(k) Plan") in which Plaintiffs Timothy R. Garrett and Daryl Watkins participated and participate is an employee pension benefit plan sponsored by Baker Hughes Incorporated of Houston, Texas. The Baker Hughes 401(k) Plan was and is a defined contribution plan that is a qualified plan under ERISA. 29 U.S.C. §1002(2)(A).

91.     The assets of the Baker Hughes 401(k) Plan are ERISA assets.

---

[41] "Separately Managed Account" refers to a professionally managed investment account offered by, for example, a broker-dealer typically for a single high net worth individual or entity in which the entity directly owns the securities in the account. "Collective Investment Funds" refers to investment vehicles, other than mutual funds governed by the Investment Company Act of 1940, that are offered for investment to more than one large institutional investor. Such funds are typically offered by banks.

92.     During the Class Period, the Baker Hughes 401(k) Plan held ADRs issued by Defendants for which Defendants conducted ADR FX Dividend Conversions. Appendix II illustrates such ADRs issued by Defendants owned by the Baker Hughes 401(k) Plan during the Class Period.

93.     During the Class Period, Defendants and their predecessors in interest executed ADR FX Dividend Conversions for these and additional Defendant-issued ADRs held in the Baker Hughes 401(k) Plan, including such ADRs held by Plaintiffs Garrett and Watkins in their Baker Hughes 401(k) Plan individual accounts.

94.     During the Class Period, Garrett and Watkins invested in investment options offered by the Baker Hughes 401(k) Plan which held Defendant-issued ADRs, including such ADRs held by the plan and/or Separately Managed Accounts and Collective Investment Funds offered by the Baker Hughes 401(k) Plan to participants.

95.     At the time that Defendants executed ADR FX Dividend Conversions for the Baker Hughes 401(k) Plan during the Class Period, they engaged in the illegal ADR FX trading practices described in this Consolidated Class Action Complaint and reaped wrongful profits for themselves at the expense of the Baker Hughes 401(k) Plan and the plan's participants and beneficiaries, including Plaintiffs Garrett and Watkins.

96.     As a direct consequence of the misconduct described in this Consolidated Class Action Complaint, the Baker Hughes 401(k) Plan and Plaintiffs Garrett and Watkins suffered financial losses and injuries in fact for which Plaintiffs Garrett and Watkins seek recovery on behalf of the Baker Hughes 401(k) Plan and all similarly situated Plans.

97.     Defendants concealed their ERISA violations and prohibited transactions from the Baker Hughes 401(k) Plan and from Plaintiffs Garrett and Watkins.

C.     **The Central States Plan**

98.     The Central States, Southeast and Southwest Areas Pension Plan ("Central States Plan") in which Plaintiffs Landol D. Fletcher and Deborah Jean Kenny participated and participate is an "employee pension benefit plan" under ERISA, 29 U.S.C. §1002(2)(A). It is a traditional defined benefit pension plan.

99.     During the Class Period Defendants or one of their predecessors in interest served as the Central States Plan's custodian and/or trustee.

100.     The Central States Plan is based in Rosemont, Illinois and provides retirement and related benefits for eligible employees of employers that are signatories to collective bargaining agreements with certain local unions of the International Brotherhood of Teamsters.

101.     The assets of the Central States Plan are the assets that Plaintiff Fletcher, Plaintiff Kenny and other plan participants and beneficiaries must look to for assurance that their vested accrued retirement benefits will be paid as required by ERISA.

102.     The Central States Plan has experienced significant underfunding in recent years. In 2004, the plan's Trustees froze or reduced certain benefits including reducing the benefit accrual rate from 2% of contributions to 1% of contributions; freezing certain early retirement benefits at their year-end 2003 levels; and eliminating retirement benefits for all employees who would seek to retire before age 57, these included benefits for which plan participants and Plaintiffs Fletcher and Kenny had been eligible.

103.     In 2005, the plan sought relief from the Internal Revenue Service in the form of a request for 10-year amortization of the plan's unfunded liabilities, which are long-term pension obligations that the Plan lacked assets to pay.

104.    In each of the plan years for the Central States Plan between 2008 and 2014, the plan's actuary has certified the plan's funding status was "critical", also referred to as being in the "red zone". "Critical" is the worst plan funding status possible under the varying funding status categories under the Pension Protection Act of 2006, Pub. L. 109–280, 120 Stat. 780. A crucial input used to determine "funding" status is the value of the plan's funding, which requires valuation of the plan's assets.

105.    In 2008, the Central States Plan was unable to meet its amortization schedule, so it sought further relief from the IRS of its minimum funding percentage requirement. The IRS neither granted nor denied the request to lessen minimum funding requirements.

106.    The Central States Plan trustees were required by ERISA to adopt a "rehabilitation plan" in 2008. While the Central States rehabilitation plan expects to forestall insolvency until 2021 or later, there is no reasonable prospect that Central States' vested benefits will ever be fully funded. The Central States rehabilitation plan states that the "rehabilitation plan . . . is expected to last indefinitely."

107.    In the Central States fund's plan year ending December 31, 2011, the plan again failed to meet its amortization schedule. The plan did not seek or receive further relief from the IRS.

108.    The 2014 Annual Funding Notice states that on January 1, 2014 the plan was 48.4% funded.  Based on its Forms 5500 filed for years 1998 through 2015, the Central States Plan has never been fully funded.

109.    On October 1, 2015, the Central States Plan notified participants that it had sought approval from the DOT of a "rescue plan" to reduce accrued and vested pension benefits substantially. The DOT extended the comment period until February 1, 2016. If DOT approves

31

the "rescue plan", all plan participants will vote to approve the "rescue plan", but the government can override the negative vote and approve the "rescue plan".  If the "rescue plan" is implemented, Plaintiff Fletcher's projected monthly benefit will be reduced from $3,700.88 to $2,665.15. If the "rescue plan" is not implemented and the plan is taken over by the Pension Benefit Guaranty Corporation, which insures private pension benefits, Fletcher's monthly benefit will be reduced to $1,144.00.  A true and correct copy of the October 1, 2015 mailing to Fletcher is attached hereto as Appendix III. Plaintiff Kenny received a similar letter.

110.    In other words, the Central States Plan does not expect to fully pay benefits to plan participants such as Fletcher and Kenny.

111.    The Central States Plan held ADRs issued by Defendants during the Class Period for which Defendants conducted ADR FX Dividend Conversions (*see* Appendix II).

112.    The wrongful conduct of Defendants and their predecessors in interest as described herein included executing ADR FX Dividend Conversions for ADRs held by the Central States Plan, the Central States Plan's accounts, and/or Separately Managed Accounts and Collective Investment Funds which held assets of the Central States Plan.

113.    At the time that Defendants executed ADR FX Dividend Conversions for the Central States Plan during the Class Period, they engaged in the illegal ADR FX trading practices described in this Consolidated Class Action Complaint and reaped wrongful profits for themselves at the expense of the Central States Plan, and the plan's participants and beneficiaries, including Plaintiffs Fletcher and Kenny.

114.    As a direct consequence of the misconduct described in this Consolidated Class Action Complaint, the Central States Plan suffered financial losses and injury in fact for which Fletcher and Kenny seek recovery on behalf of the plan and all similarly situated Plans.

115.     As a result of these financial losses suffered by the Central States Plan, Fletcher and Kenny suffered an injury in fact.

116.     The losses due to the illegal manipulation of ADR FX Dividend Conversion rates as described in this Consolidated Class Action Complaint contributed to and increased the risk that Fletcher and Kenny will receive no or diminished benefits through the plan.

117.     Defendants concealed their fiduciary violations and prohibited transactions from the Central States Plan and Plaintiffs Fletcher and Kenny.

**D.      The Hospital Corporation of America 401(k) Plan and The Hospital Corporation of America Retirement Plan**

118.     The Hospital Corporation of America 401(k) Plan ("HCA 401(k) Plan") and the former Hospital Corporation of America Retirement Plan ("HCA Retirement Plan") in which Plaintiffs Hedy Anselman and Dana Kellen were and are participants are qualified plans under ERISA. 29 U.S.C. §1002(2)(A). The assets of the HCA Retirement Plan were transferred to the HCA 401(k) Plan in April 2008. Both HCA plans are defined contribution plans.

119.     The assets of the Health Corporation of America 401(k) Plan and the HCA Master Trust are and were ERISA assets.

120.     During the Class Period, the HCA Inc. Master Retirement Trust ("HCA Master Trust") managed the combined investment assets of several employee pension benefit plans sponsored by entities that were owned or controlled by Health Corporation of America, Inc. of Nashville, Tennessee, including the HCA 401(k) Plan and the HCA Retirement Plan.

121.     During the Class Period, the HCA Retirement Plan and HCA 401(k) Plan held ADRs issued by Defendants for which Defendants conducted ADR FX Dividend Conversions). Appendix II illustrates such ADRs issued by Defendants owned by the HCA Master Trust during the Class Period.

33

122.    During the Class Period, Defendants and their predecessors in interest executed ADR FX Dividend Conversions for these and hundreds of additional ADRs held in the HCA Retirement Plan, the HCA 401(k) Plan, and the HCA Master Trust, and/or Separately Managed Accounts and Collective Investment Funds which held assets of the HCA 401(k) Plan, including for ADRs owned by Plaintiffs Kellen and Anselman through their HCA 401(k) Plan individual accounts.

123.    During the Class Period, Kellen and Anselman invested in investment options offered by the HCA Retirement Plan and HCA 401(k) Plan that held Defendant-issued ADRs, including such ADRs held by the plan and/or Separately Managed Accounts and Collective Investment Funds which held assets of the Verizon 401(k) Plan.

124.    At the time that Defendants executed ADR FX Dividend Conversions for the HCA Master Trust during the Class Period, they engaged in the illegal ADR FX trading practices described in this Consolidated Class Action Complaint and reaped wrongful profits for themselves at the expense of the HCA 401(k) Plan, the HCA Master Trust, and Plaintiffs Kellen and Anselman.

125.    As a direct consequence of the misconduct described in this Consolidated Class Action Complaint, the HCA 401(k) Plan, the HCA Master Trust, and Plaintiffs Kellen and Anselman suffered financial losses and injuries in fact for which Kellen and Anselman seek recovery on behalf of the plans and all similarly situated Plans.

126.    Defendants concealed their fiduciary violations and prohibited transactions from the HCA Master Trust, the HCA 401(k) Plan, the HCA Retirement Plan, and Plaintiffs Kellen and Anselman.

### E. The Owens Corning Plan

127. The Owens Corning Merged Retirement Plan ("Owens Corning Plan") in which Plaintiff s Carl Carver, Edward Day, and Deborah Kenny participate is an "employee pension benefit plan" under ERISA, 29 U.S.C. §1002(2)(A). It is a traditional defined benefit pension plan.

128. The assets of the Owens Corning Plan are the assets that Carver, Day, Kenny and other plan participants and beneficiaries must look to for assurance that their vested accrued retirement benefits will be paid as required by ERISA.

129. Based on its Forms 5500 filed for years 1998 through 2014, the latest report available, the Owens Corning Plan has never been one hundred percent funded. At the end of 2014 it was 97.96% funded.

130. The Owens Corning Plan held ADRs issued by Defendants during the Class Period for which Defendants conducted ADR FX Dividend Conversions (*see* Appendix II).

131. The wrongful conduct of Defendants and their predecessors in interest as described herein included executing ADR FX Dividend Conversions for ADRs held by the Owens Corning Plan, the Owens Corning Plan's accounts, and/or Separately Managed Accounts and Collective Investment Funds which held assets of the Owens Corning Plan.

132. At the time that Defendants executed ADR FX Dividend Conversions for the Owens Corning Plan during the Class Period, they engaged in the illegal ADR FX trading practices described in this Consolidated Class Action Complaint and reaped wrongful profits for themselves at the expense of the Owens Corning Plan, and the plan's participants and beneficiaries, including Plaintiffs Carver, Day, and Kenny.

133.    As a direct consequence of the misconduct described in this Consolidated Class Action Complaint, the Owens Corning Plan suffered financial losses and injury in fact for which Plaintiffs Carver, Day and Kenny seek recovery on behalf of the plan and all similarly situated Plans.

134.    As a result of these financial losses suffered by the Owens Corning Plan, Plaintiffs Carver, Day and Kenny suffered injury in fact.

135.    The losses due to the illegal manipulation of ADR FX Dividend Conversion rates as described in this Consolidated Class Action Complaint contributed to and increased the risk that Plaintiffs Carver, Day and Kenny will receive no or diminished pension benefits through the plan.

136.    Defendants concealed their fiduciary violations and prohibited transactions from the Owens Corning Plan and Plaintiffs Carver, Day, and Kenny.

**F.    The Sheet Metal Workers' National Pension Fund**

137.    The Sheet Metal Workers' National Pension Fund ("Sheet Metal Workers' Plan") is an "employee pension benefit plan" under ERISA, 29 U.S.C. § 1002(2)(A). It is also a traditional defined benefit pension plan.

138.    During the Class Period, Defendants or one of their predecessors in interest served and serve as the Sheet Metal Workers' Plan's custodian and/or trustee.

139.    Some assets of the Sheet Metal Workers' Plan are managed by Thornburg Investment Management Inc. and Harding Loevner, LP, described in the plan's Forms 5500 filed with the DOL as affiliates of Defendants.

140.   The assets of the Sheet Metal Workers' Plan are the assets that Plaintiffs Hartline and Dano and other plan participants and beneficiaries must look to for assurance that their vested accrued retirement benefits will be paid as required by ERISA.

141.   The Sheet Metal Workers' Plan has been underfunded during the Class Period. The annual reports filed on Form 5500 with the DOL for years 2009 through 2014 indicate that the plan had had insufficient assets to pay projected benefits. The amount by which the Sheet Metal Workers' Plan was funded and the plan's funding status, certified by the plan's actuary, were as follows:

| Year | Funding Percentage | Funding Status |
|------|--------------------|----------------|
| 2009 | 48.9% | Critical |
| 2010 | 58.7% | Critical |
| 2011 | 57.8% | Critical |
| 2012 | 56.8% | Critical |
| 2013 | 57.4% | Critical |
| 2014 | 59.1% | Endangered |
| 2015 | 59.3% | Endangered |

142.   As explained above, funding status of "critical" (also called the "red zone") is the worst plan status possible under the Pension Protection Act of 2006. As required by law, the Sheet Metal Workers' Plan Trustees adopted a Rehabilitation Plan to address the plan's severe underfunding. Under the Rehabilitation Plan, the Sheet Metal Workers' Plan permanently reduced benefits, including "permanent benefit adjustments" in the form of reduced benefit accruals; abolishing post-retirement benefit increases and subsidized early retirement benefits for certain participants; and eliminating disability benefits, the 60-certain payment feature, and the

37

reversion (pop up) feature for joint and survivor benefits for certain participants. *See* 2013

Schedule R Attachment to the Plan's 2013 Form 5500 – Summary of Rehabilitation Plan and

Schedules filed with the U.S. Department of Labor. Even after these benefit cuts, the Sheet Metal

Workers' Plan was classified as "Endangered" in 2014, the second-worst rating possible.

143.    The Sheet Metal Workers' Plan held ADRs issued by Defendants during the Class

Period for which Defendants conducted ADR FX Dividend Conversions (*see* Appendix II).

144.    The wrongful conduct of Defendants and their predecessors in interest as described

herein included executing ADR FX Dividend Conversions for ADRs held by the Sheet Metal

Workers'  Plan, the Sheet Metal Workers' Plan's accounts, and/or Separately Managed Accounts

and Collective Investment Funds which held assets of the Sheet Metal Workers' Plan.

145.     At the time that Defendants executed ADR FX Dividend Conversions for the

Sheet Metal Workers' National Plan during the Class Period, they engaged in the illegal ADR

FX trading practices described in this Consolidated Class Action Complaint and wrongfully

reaped profits for themselves at the expense of the Sheet Metal Workers' Plan, and the plan's

participants and beneficiaries, including Plaintiffs Hartline and Dano.

146.    As a direct consequence of the misconduct described in this Consolidated Class

Action Complaint, the Sheet Metal Workers' Plan suffered financial losses and injury in fact for

which Plaintiffs Hartline and Dano seeks recovery on behalf of the plan and all similarly situated

Plans.

147.    As a result of these financial losses and injury suffered by the Sheet Metal

Workers' Plan, Plaintiffs Hartline and Dano suffered injury in fact.

148.     The losses due to the illegal manipulation of ADR FX Dividend Conversion rates

as described in this Consolidated Class Action Complaint contributed to and increased the risk

38

that Plaintiffs Hartline and Dano will receive no or diminished pension benefits through the Sheet Metal Workers' Plan.

149.    Defendants concealed their fiduciary violations and prohibited transactions from the Sheet Metal Workers' Plan and Plaintiffs Hartline and Dano.

**G.     The Teamsters Local 945 Plan**

150.     The Teamsters Employees Local 945 Pension Fund ("Teamsters Local 945 Plan") for which Plaintiff David Baumann serves as a trustee is an "employee pension benefit plan" under ERISA, 29 U.S.C. §1002(2)(A). It is a traditional defined benefit pension plan.

151.    The Teamsters Local 945 Plan is based in Wayne, New Jersey and provides retirement and related benefits for eligible employees of employers that are and have been signatories to collective bargaining agreements with Local 125 and the former Local 945 of the International Brotherhood of Teamsters.

152.    The assets of the Teamsters Local 945 Plan are the assets that Teamsters members who are plan participants and their family members who are beneficiaries of the Plan must look to for assurance that their vested accrued retirement benefits will be paid as required by ERISA.

153.    In each of the years between 2009 and 2014, the Central States Plan's actuary has certified the plan's funding status was "critical", also referred to as being in the "red zone". "Critical" is the worst plan funding status possible under the varying funding status categories of the Pension Protection Act of 2006.

154.    The Teamsters Local 945 Plan trustees were required by ERISA to adopt a "rehabilitation plan" in 2009, according to its 2014 Form 5500 filed with the DOL. That filing also states that the plan is projected to have a funding deficiency years into the future. Plan

benefits began being reduced in 2009, including a 50 percent reduction in participants' benefit accrual rate, due to a deficit in assets to pay future benefits,.

155.    The Teamsters Local 945 Plan held ADRs issued by Defendants during the Class Period for which Defendants conducted ADR FX Dividend Conversions (*see* Appendix II).

156.    The wrongful conduct of Defendants and their predecessors in interest as described herein included executing ADR FX Dividend Conversions for ADRs owned by the Teamsters Local 945 Plan, including Separately Managed Accounts and Collective Investment Funds holding assets of the Teamsters Local 945 Plan.

157.    At the time that Defendants executed ADR FX Dividend Conversions for the Teamsters Local 945 Plan during the Class Period, they engaged in the illegal ADR FX trading practices described in this Consolidated Class Action Complaint and reaped wrongful profits for themselves at the expense of the Teamsters Local 945 Plan and the plan's participants and beneficiaries.

158.    As a direct consequence of the misconduct described in this Consolidated Class Action Complaint, the Teamsters Local 945 Plan suffered financial losses and injury in fact for which Plaintiff Trustee David Baumann seek recovery on behalf of the plan and all similarly situated Plans.

159.    As a result of these financial losses suffered by the Teamsters Local 945 Plan, its plan participants and beneficiaries suffered injury in fact.

160.    The losses due to the illegal manipulation of ADR FX Dividend Conversion rates as described in this Consolidated Class Action Complaint contributed to and increased the risk that Teamsters Local 945 Plan participants and beneficiaries will receive no or diminished pension benefits through the plan.

161.    Defendants concealed their fiduciary violations and prohibited transactions from the Teamsters Local 945 Plan and its trustees.

**H.    The Verizon 401(k) Plan**

162.    The Verizon Savings and Security Plan for Mid-Atlantic Associates (the "Verizon 401(k) Plan") in which Plaintiff Lisa Parker participated and participates is an "employee pension benefit plan" under ERISA, 29 U.S.C. §1002(2)(A). It is a defined contribution pension plan.

163.    The assets of the Verizon 401(k) Plan are ERISA assets.

164.    During the Class Period, the Verizon 401(k) Plan held its assets in two master trusts, the Bell Atlantic Master Trust and the Verizon Savings Master Trust.

165.    During the Class Period, the Verizon 401(k) Plan held ADRs issued by Defendants for which Defendants conducted ADR FX Dividend Conversions. Appendix II illustrates such ADRs issued by Defendants which were held by the Bell Atlantic Master Savings Trust and Verizon Master Savings Trust during the Class Period.

166.    During the Class Period, Defendants and their predecessors in interest executed ADR FX Dividend Conversions for these and additional Defendant-issued ADRs held in the Verizon 401(k) Plan, the Verizon 401(k) Plan's accounts, and/or Separately Managed Accounts and Collective Investment Funds which held assets of the Verizon 401(k) Plan, including for such ADRs held by Plaintiff Parker in her Verizon 401(k) Plan individual account.

167.    During the Class Period, Parker invested in investment options offered by the Verizon 401(k) Plan that held Defendant-issued ADRs, including such ADRs held by the plan and/or Separately Managed Accounts and Collective Investment Funds which held assets of the Verizon 401(k) Plan.

168.   At the time that Defendants executed ADR FX Dividend Conversions for the Verizon 401(k) Plan during the Class Period, they engaged in the illegal ADR FX trading practices described in this Consolidated Class Action Complaint and reaped wrongful profits for themselves at the expense of the Bell Atlantic Master Trust, the Verizon Savings Master Trust, the Verizon 401(k) Plan, and the plan's participants and beneficiaries, including Plaintiff Parker.

169.   As a direct consequence of the misconduct alleged herein, the Bell Atlantic Master Trust, the Verizon Savings Master Trust, the Verizon 401(k) Plan and Plaintiff Parker suffered financial losses and an injury in fact, for which Parker seeks recovery on behalf of the Verizon 401(k) Plan and all similarly situated Plans.

170.   Defendants concealed their fiduciary violations and prohibited transactions from the Bell Atlantic Master Trust, the Verizon Savings Master Trust, the Verizon 401(k) Plan and Plaintiff Parker.

## I.   Defendants' Fiduciary Status

171.   Every ERISA plan must have one or more named fiduciaries to administer and manage the plan. ERISA treats as fiduciaries, not only persons explicitly named as fiduciaries, but any other person or entity which in fact performs fiduciary functions. Specifically, under ERISA a person is a fiduciary "to the extent … he exercises any discretionary authority or discretionary control respecting management of such plan or *exercises any authority or control respecting management or disposition of its assets*…."[42] Thus, a person and an entity is an ERISA fiduciary if it exercises discretionary authority or control in managing the plan, or, if it exercises any authority or control (discretionary or not) respecting management or disposition of

---

[42] 29 U.S.C. §1002(21)(A)(i) (emphasis added).

plan assets. Under ERISA, one can be a fiduciary whether or not one would qualify as an agent under the common law.

172.   An ERISA fiduciary is required to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and … for the exclusive purpose of … providing benefits to participants and beneficiaries and … defraying the reasonable expenses of administering the plan …."[43] In common parlance, ERISA fiduciaries owe the duty of loyalty and of prudence.

173.   Defendants and their predecessors in interest are/were fiduciaries under ERISA to the extent they exercise or exercised any authority or control respecting management or disposition of the Plans' assets. In addition, Defendants and their predecessors in interest are/were fiduciaries under ERISA to the extent they exercise or exercised any discretionary authority or discretionary control respecting administration or management of the Plans.

174.   Defendants and their predecessors in interest are/were fiduciaries under ERISA to the extent they hold/held positions of trust, such as, for example, fiduciary, custodian, trustee, administrator roles for the Plan and other similarly-situated ERISA plans.

175.   Here, Defendants and their predecessors in interest exercised discretionary authority and control over and management of the Plans' assets because, through the ADR FX Dividend Conversion scheme described herein, they determined the ADR FX Dividend Conversion rates the ERISA Plans would pay to Defendants — FX rates at or near the worst rate of the day for the Plans. The Defendants' ADR group employees instructed Defendants' FX traders to charge these worst rates to the Plans, and deliberately hid this pricing from the Plans.

---

[43] 29 U.S.C. §1104(a)(1)(A)(i), (ii).

Through the scheme, Defendants exercised discretion to set their own markups and compensation out of Plan assets, violating ERISA's duties of prudence and loyalty, and ERISA's prohibited transaction rules. Defendants' essentially picked the pockets of American workers as their retirement savings passed through Defendants' "hands."

176.   At all times, regardless of any self-serving language that may appear in documents drafted by Defendants, Defendants were required to comply with the general fiduciary responsibility provisions of ERISA § 404, 29 U.S.C. § 1104, which require, among other things, that a fiduciary discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan. Furthermore, Defendants at all times were required to act prudently and consistent with their duty of loyalty to the Plans and the Plans' participants and beneficiaries.

177.   To the extent Defendants or any of their predecessors in interest purport to disclaim liability for breach of fiduciary duty pursuant to any agreement (written or oral), ERISA provides that any such agreement is void as against public policy.[44]

178.   Defendants did not disclose the ADR FX Dividend Conversion scheme as alleged herein to the Plans, intentionally concealing their scheme and making knowing omissions that would have allowed the Plans to discover the scheme. Indeed, Defendants intentionally concealed their scheme and intentionally omitted disclosures that would have allowed the Plans to discover the scheme. As a result, any agreements between Defendants and the Plans regarding ADR FX Dividend Conversion services were not arm's length transactions.

---

[44] 29 U.S.C. § 1110.

44

## VI.   PLAINTIFFS ARE ENTITLED TO ERISA'S FRAUD OR CONCEALMENT LIMITATIONS PERIOD

179.   ERISA's statute of limitations provision for fiduciary breach claims provides that "in the case of fraud or concealment, [an] action may be commenced not later than six years after the date of discovery of such breach or violation."[45]

180.   Defendants' ADR FX Dividend Conversion scheme, as described above, involved intentional concealment sufficient to satisfy ERISA's fraud or concealment limitations period.

181.   No named Plaintiff in this action were aware of this scheme more than three years prior to filing this complaint.[46]

182.   As discussed above, Defendants' general FX pricing scheme was an explicit business strategy.

183.   Defendants intentionally engaged in specific acts to conceal the scheme and made intentional omissions to the same end. For instance, though Defendants would price the vast percentage of ADR FX Dividend Conversions at or near the worse rate of the day for the ADR Owner, Defendants would intentionally and typically keep the price within the range of the day, so as not to create a red flag that would indicate to ADR Owners that a manipulation occurred. Defendants would then strategically price a few smaller ADR FX Dividend Conversions at an exchange rate falling within the day's mid-range.  This would make it more difficult for victimized ERISA Plans to learn of the ADR FX Dividend Conversion scheme. Because the mid-range ADR FX Dividend Conversion rates were smaller transactions, this strategy would

---

[45]  29 U.S.C. §1113.

[46] Defendants' unlawful ADR FX practices came to light to the counsel of Carver, Day, Kenny and Parker on July 12, 2013. Other Plaintiffs learned of the ADR FX scheme after that time. The first complaint in this matter was filed December 31, 2015. Docket No. 1.

45

only minimally reduce Defendants' illegal profit, while enhancing concealment, a bargain well worth the slight cost to Defendants. Other particular instances or evidence of concealment, or Defendants' intentional policy of concealment, include those cited herein.

184.   Defendants' deceptive conduct extended to virtually all of their clients who used their FX services "standing instructions" FX services, the division of Defendants that conducted the ADR FX Dividend Conversions.

185.   For instance, emails make clear that preventing clients from learning Defendants' pricing scheme was an explicit business strategy. On April 11, 2008 Antonio Garcia-Meitin of BNYM's Asset Servicing Global Management department sent an email on Defendants' standing instruction FX program, to others in this department titled "Transparency" stating:

> In general **transparency adversely impacts our revenue stream and any product to distribute fee information would hurt us** many times over in reduced revenue. Nothing like a rock and a hard place.

(Emphasis added.)  Another BNYM officer commented on the proposal for greater transparency in the FX program: "I do NOT like it. Once pricing spreads are disclosed it will be a race to how quickly clients work it down to zero."

186.   The concealment is evident in a letter from a BNYM employee to the Florida Attorney General, a redacted copy of which was obtained through an open records act request by the *Wall Street Journal* and made public in an article published on December 28, 2011. The author, who during the Class Period had worked closely with Jorge Rodriguez, Managing Director of BNYM, and Richard Mahoney, Executive Vice President of BNYM Global Markets, which oversaw the bank's FX operations, said:

> I was also trained in committing fraud using various strategies [] to the bank's corporate foreign exchange clients....*I can tell you firsthand and without any hesitation that the fraud is prevalent throughout BNY Mellon's Foreign Exchange Group.* I can also share with you that top management was aware of the

fraud the entire time....BNY Mellon's foreign exchange group was very small. I was only 1 of 3 people in the entire bank who focused exclusively on the corporate client segment. *We used the same systems and fraudulent strategies on the corporate clients as was used on the pension fund clients.*

(Emphasis added.)

187.    Plaintiffs expect to uncover further evidence of Defendants' knowing concealment and omissions in discovery.

## VII.   CLASS ALLEGATIONS

188.    **Class Definition**. Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) on behalf of the following class:

> All participants, beneficiaries, trustees and named fiduciaries of ERISA Plans, where such ERISA Plans held Plan assets in the form of ADRs issued by Defendants (or their affiliates or predecessors in interest) and for whom Defendants provided foreign currency exchange transactional services (including foreign currency transactional services provided to the Plans and Collective Investment Funds, Separately Managed Accounts, and other investment entities that held Plans' assets) related to those ADRs, at any time from January 1, 1997 to the present. (Excluded from the class are any officers, directors, affiliates, legal representatives, heirs, successors, subsidiaries, and/or assigns of the Defendants or any of their respective predecessors in interest or any entity in which any Defendant or any of their respective predecessors in interest have a controlling interest.)

189.    Class treatment is appropriate in this case because it would promote judicial economy by adjudicating Plaintiffs' ERISA fiduciary breach and prohibited transaction claims with respect to all class members.

190.    **Numerosity**. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff and can only be ascertained through appropriate discovery, Plaintiffs believes that hundreds of ERISA with hundreds of thousands of participants throughout the United States sustained losses because of Defendants' unlawful ADR FX Dividend Conversion scheme.

191.   **Commonality.** The claims of Plaintiffs and all Class members originate from the same misconduct, breach of duties, and violations of ERISA perpetrated by Defendants with regard to their ADR FX Dividend Conversion scheme. The questions of law and fact common to the Class include, but are not limited to:

a.   Whether Defendants breached their fiduciary duties of prudence and loyalty to Class members by using an ADR FX Dividend Conversion scheme to improperly markup ADR FX Dividend Conversions they transacted for the Plaintiffs, the Plans, and the Class;

b.   Whether Defendants' self-dealing ADR FX Dividend Conversions constituted transactions prohibited by ERISA;

c.   Whether Defendants are ERISA fiduciaries;

d.   Whether Defendants' fiduciary breaches caused losses to the Plaintiffs, the Plans, and the Class; and

e.   Whether Defendants' prohibited transactions caused losses to Plaintiffs, the Plans, and the Class.

192.   **Typicality.** Plaintiffs' claims on behalf of the Plaintiff Plans are not only typical of, but the same as, claims that would be brought with respect to other Plans. Individual cases would require each class member to prove the same claims based upon the same conduct of the Defendants, using the same legal theories, and would be seeking the same relief.

193.   **Adequacy.** Plaintiffs will fairly and adequately protect the interests of class members. Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class. Plaintiffs will vigorously protect the interests of absent class members.

194.   Plaintiffs have retained counsel who are competent and have extensive experience in class action, ERISA litigation and FX transactions. Plaintiffs' counsel include the firms of McTigue Law LLP; Ciresi Conlin LLP; Beins Axelrod, PC; and Keller Rohrback LLP.

195.   **Rule 23(b)(1)(A) & (B) Requirements.** Class action status is warranted under Federal Rule of Civil Procedure 23(b)(1)(A) because prosecution of separate actions by Class members would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B), because prosecution of separate actions by class members would create a risk of adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

196.   **Rule 23(b)(2) Requirements.** Certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other equitable relief with respect to the Class as a whole. No plan-by-plan inquiry would be required to determine whether Defendants' breached their fiduciary duties.

197.   **Rule 23(b)(3) Requirements.** In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to Class members predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

### VIII.   CLAIMS FOR RELIEF

### COUNT I

**Breach of Duties of Prudence and Loyalty**
**(Violation of ERISA, 29 U.S.C. §§1104 and 1109 by All Defendants)**

49

198.   All previous averments are incorporated herein.

199.   At all relevant times when the Defendants conducted ADR FX Dividend Conversions, they were fiduciaries of the Plans within the meaning of ERISA, 29 U.S.C. §1002(21)(A).

200.   Defendants were also fiduciaries to Plans for which they served as custodian or trustee, to the extent of Defendants' duties and conduct as such.

201.   Defendants exercised discretionary authority or control with respect to management of the Plans or the disposition of the Plans' assets when they determined the rate at which to execute ADR FX Dividend Conversions. Defendants determined the excessive and unauthorized markup on the ADR FX Dividend Conversion rates the Plans paid for the transactions, and thereby determined the amount of their compensation. Defendants exercised discretion in setting the ADR FX Dividend Conversion rates when they determined the markups based upon such factors as whether or not to net transactions, and ignored more favorable rates provided to other clients and in the foreign currency market for comparable trades.

202.   Defendants breached their ERISA fiduciary duties of prudence and loyalty, 29 U.S.C. §1104(a)(1)(A), (B), when executing non-negotiated ADR FX Dividend Conversions for the Plans and/or with the Plans' assets by, *inter alia*:

    a. Charging the Plans (or Collective Investment Funds, and Separately Managed Accounts through which the Plans invested) excessive rates for ADR FX Dividend Conversions that resulted in excessive and windfall profit for Defendants;

    b. Charging the Plans (or Collective Investment Funds, and Separately Managed Accounts through which the Plans invested) excessive rates for ADR FX

50

Dividend Conversions that were far in excess of what fully informed parties agreed to in a comparable transaction in an arm's-length bargain;

c. Failing to disclose to the Plans, their fiduciaries, or participants that when Defendants engaged in ADR FX Dividend Conversions for the Plans they set their own compensation, and charging the Plans rates different than those which parties would agree to when bargaining at arm's-length;

d. Failing to disclose to the Plans, their fiduciaries, or participants that Defendants intended to act exclusively for their own benefit and as principal dealers when conducting ADR FX Dividend Conversions;

e. Failing to provide full and frank disclosure to the Plans, their fiduciaries, or participants of the ADR FX Dividend Conversion rates and the ADR scheme;

f. Failing to provide to and concealing from the Plans, their fiduciaries, or participants key information about the actual periodic and daily ADR FX currency pair ranges that would enable Plaintiffs to determine the reasonableness of Defendants' ADR FX Dividend Conversion charges;

g. Failing to disclose to, and concealing from the Plans, their fiduciaries, or participants information showing the more favorable markups charged by Defendants and FX traders at other banks for the same services in comparable arm's-length transactions with other clients; and

h. Appropriating the Plans' assets for Defendants' own benefit, reducing the Plans' assets and the retirement savings of Plans and participants individual accounts by tens of millions of dollars.

203.   Defendants committed these breaches during each ADR FX Dividend Conversion involving assets of an ERISA Plan.

204.   As a direct and proximate result of these breaches of fiduciary duty, the Plans and their participants suffered tens of millions of dollars of losses. For the defined benefit plans in the Class, these losses increased the risk of non-payment of benefits to participants. For the defined contribution Plans and participants in the Class, these losses resulted in the immediate loss of benefits.

205.   Pursuant to ERISA, the Defendants are liable to restore all losses suffered by the Plans caused by the Defendants' breaches of fiduciary duty and to disgorge the profits obtained from the ADR FX Dividend Conversion scheme, and provide to the Plans all other relief available.

## COUNT II

### Engaging in Self-Interested Prohibited Transactions with Plan Assets
### (Violation of ERISA, 29 U.S.C. §1106(b) by All Defendants)

206.   All previous averments are incorporated herein.

207.   ERISA prohibits fiduciaries from engaging in certain transactions and imposes strict liability for any losses that result. Specifically, "a fiduciary with respect to a plan shall not . . . deal with the assets of the plan in his own interest or for his own account. . . ." 29 U.S.C. §1106(b).

208.   The Defendants, fiduciaries of the Plans, committed prohibited transactions when they dealt with the Plans' assets in their own interest and for their own accounts in executing ADR FX Dividend Conversions for the Plans. In addition, they appropriated from the Plans' assets millions of dollars in payments for themselves resulting from improperly markups of ADR

FX Dividend Conversions, enriching themselves at the expense of the Plans and their participants.

209.   As a direct and proximate result of these prohibited transactions, the Plans, directly or indirectly, paid tens of millions of dollars more and received millions of dollars less for ADR FX Dividend Conversions prohibited by ERISA and executed by Defendants.

210.   The terms of the ADR FX Dividend Conversions set by Defendants were less favorable to the Plans than terms generally available in comparable arm's-length FX transactions between unrelated parties, and the terms of the transactions were less favorable to the Plans than the terms afforded by Defendants in comparable arm's-length FX transactions involving unrelated parties.

211.   As a direct and proximate result of these prohibited transactions, the Plans and their participants and beneficiaries suffered tens of millions of dollars of losses. For the defined benefit plans in the Class, these losses increased the risk of non-payment of future benefits to participants. For the defined contribution plans, Defendants' illegal ADR FX Dividend Conversion scheme resulted in immediate loss to the participants' individual accounts.

212.   Pursuant to ERISA, Defendants must disgorge all amounts paid them for the Plans' ADR FX Dividend Conversions, restore all losses suffered by the Plans from the prohibited transactions, and disgorge all profits earned on the amounts paid by the Plans to Defendants, and provide to the Plans all other available relief.

### COUNT III

**Causing the Plans to Engage in Party in Interest Prohibited Transactions
(Violation of ERISA, 29 U.S.C. §1106(a) by All Defendants)**

213.   All previous averments are incorporated herein.

214.   ERISA prohibits fiduciaries from causing a plan to engage in certain transactions with parties in interest, including non-fiduciary parties in interest, with respect to a plan, specifically:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
>> (A) sale or exchange, or leasing, of any property between the plan and a party in interest; [or],
>>
>> * * * *
>>
>> (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan[.]

29 U.S.C. §1106(a)(1).

215.   Defendants and their subsidiaries and affiliates are parties in interest with respect to the Plans.[47] "The term 'party in interest' means, as to an employee benefit plan -- (A) any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian)…(B) "a person providing services to such plan.…"

216.   The Defendants, as fiduciaries and through their ADR FX Dividend Conversion scheme, caused the ERISA Plans to engage in ADR FX Dividend Conversions with parties in interest with respect to the Plans, namely certain Defendants' affiliates and subsidiaries, which are parties in interest.[48] These trades constituted an exchange of property between the Plans and parties in interest, and are prohibited by ERISA.

217.   Defendants' actions also caused the Plans to transfer plan assets to a party in interest with respect to the Plans, namely certain of Defendants' subsidiaries and affiliates, for

---

[47] 29 U.S.C. §1002(14).

[48] 29 U.S.C. §1002(14)(G) & (H).

the benefit of the party in interest. Specifically, Defendants facilitated the transfer of ERISA plan assets in one currency to certain Defendants' subsidiaries and affiliates, and used those transferred assets for their benefit through excessive FX trading markups or markdowns changed to the ERISA Plans.

218.    As a direct and proximate result of these prohibited transactions, the Plans and their participants suffered tens of millions of dollars of losses. Moreover, for the defined benefit Plans in the Class, these losses increased the risk of non-payment of benefits to participants.  For the defined contribution Plans, Defendants' ADR FX Dividend Conversion scheme resulted in immediate loss to the participants' individual accounts.

219.    Pursuant to ERISA, Defendants must disgorge all amounts paid to them for the Plans' FX transactions, restore all losses suffered by the Plans from the prohibited transactions, and disgorge all profits earned on the amounts paid by the Plans to Defendants, and provide to the Plans all other available relief.

## JURY DEMAND

220.    Plaintiffs demand a trial by a jury of six (6) persons as to all claims triable by jury.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

a.        Declare that the Defendants breached their fiduciary duties under ERISA;

b.        Declare that the Defendants have violated ERISA's prohibited transactions provisions;

c.        Issue an order compelling a proper accounting of the ADR FX Dividend Conversions in which the Plans have engaged;

   d. Issue an order compelling Defendants to restore all losses caused to the Plans (and that will be caused to the Plans after the filing of this Complaint), including lost investment returns on money that would have been invested but for Defendants' illegal conduct;

   e. Issue an order compelling the Defendants to disgorge all amounts paid by the Plans (and that will be paid by the Plans after the filing of this Complaint), including any profits earned by Defendants thereon;

   f. Order surcharge, equitable restitution, and other appropriate equitable monetary relief against the Defendants;

   g. Award such other equitable or remedial relief as may be appropriate, including the permanent removal of the Defendants from any positions of trust with respect to the Plans, including serving as an investment manager for ERISA Plan assets, and, as applicable, the appointment of independent fiduciaries to serve as custodian or trustee to the Plans;

   h. Order that this action be certified as a class action and that a constructive trust be established for distribution to the extent required by law;

   i. Enjoin Defendants collectively, and each of them individually, from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

   j. Award Plaintiffs their attorneys' fees and costs pursuant to ERISA, 29 U.S.C. §1132(g) and/or the Common Fund doctrine; and

   k. Award such other and further relief as the Court deems equitable and just.


Dated:  June 8, 2017      Respectfully submitted,


        By:   /s/ J. Brian McTigue
         J. Brian McTigue
         Regina M. Markey

MCTIGUE LAW LLP
4530 Wisconsin Ave, NW, Suite 300
Washington, DC 20016
Telephone (202) 364-6900
Facsimile: (202) 364-9960
bmctigue@mctiguelaw.com
rmarkey@mctiguelaw.com

   *-and-*

Michael V. Ciresi
Jan M. Conlin
Barry M. Landy
Michael A. Sacchet
CIRESI CONLIN LLP
225 South 6th Street, Suite 4600
Minneapolis, MN 55402
Telephone: (612) 361-8200
Facsimile: (612) 361-8242
mvc@ciresiconlin.com
jmc@ciresiconlin.com
bml@ciresiconlin.com
mas@ciresiconlin.com

*Interim Lead Counsel*


Jonathan G. Axelrod
(New York Bar Number: 2012029)
BEINS, AXELROD, P.C.
1030 15th Street N.W.,  Suite 700 East
Washington, DC 20005
Telephone:  (202) 328-7222
jaxelrod@beinsaxelrod.com

   *-and-*

Sidney H. Kalban, Esq.
(Southern District Bar Number SK3034)
360 West 31st St
New York, NY 10001
Telephone: (212) 868-6825
itpelaw@msn.com

*Counsel for Plaintiffs Hedy Anselman, David*

57

*Baumann, Carl Carver, Dante Dano, Jr.,*
*Edward C. Day, Landol D. Fletcher, Timothy*
*R. Garrett, Dana Kellen, Deborah Jean Kenny,*
*Lisa Parker, and Daryl Watkins*

David S. Preminger
1140 Avenue of the Americas, 9th Floor New
York, NY 10036
Telephone:  (646) 380-6690
Facsimile:  (646) 380-6692
dpreminger@kellerrohrback.com

Lynn Lincoln Sarko
T. David Copley
Elizabeth A. Leland
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-8986
lsarko@kellerrohrback.com
dcopley@kellerrohrback.com
bleland@kellerrohrback.com

*Counsel for Plaintiff Robert E. Hartline*

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below, the foregoing was filed electronically with the Court and served by operation of the Court's ECF notification system upon all counsel of record.

Washington, DC
June 8, 2016

\s\ J. Brian McTigue

J. Brian McTigue

4812-3872-4682, v. 1

59