**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| *Carver, et al.*, |
| Plaintiffs, |
| -against- |
| *The Bank of New York Mellon, et al.*, |
| Defendants. |

No. 15-CV-10180 (JPO)(JLC)

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**
**ON THE APPLICATION OF THE STATUTE OF LIMITATIONS**

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ........................................................................................................................ 3

I.      BNYM's Motion Is Procedurally Proper. ........................................................... 3

II.     Plaintiffs Cannot Obtain the Benefit of the "Fraud or Concealment" Statute of Limitations Under ERISA Because It Is Undisputed That Neither They Nor the Plans Exercised Reasonable Diligence. ........................................................... 3

      A.     The "Fraud or Concealment" Statute of Limitations in ERISA Requires Reasonable Diligence. ............................................................... 4

      B.     The *Merck* Securities Law Standard Does Not Apply to ERISA Claims. .............. 5

      C.     Plaintiffs' Lack of Financial Sophistication Is Irrelevant Because They Stand in the Shoes of the Plans. ........................................................ 6

III.    The Facts Available to the Plans Provided Inquiry Notice of Plaintiffs' "Self-Dealing" Claims. ......................................................................................... 7

CONCLUSION .................................................................................................................... 11

# TABLE OF AUTHORITIES

CASES                                                                                           Page(s)

*Bailey* v. *Glover*,
    88 U.S. (21 Wall.) 342 (1874) ........................................................................5

*Beck* v. *Levering*,
    947 F.2d 639 (2d Cir. 1991)..........................................................................8

*Caputo* v. *Pfizer, Inc.*,
    267 F.3d 181 (2d Cir. 2001)......................................................................4, 5

*Dodds v. Cigna Securities, Inc.*,
12 F.3d 346, 350 (2d Cir. 1993) ......................................................................5

*India.Com, Inc.* v. *Dalal*,
    412 F.3d 315 (2d Cir. 2005).........................................................................8

*Janese* v. *Fay*,
    692 F.3d 221 (2d Cir. 2012).......................................................................4, 7

*Koch v. Christie's Int'l PLC*
    699 F.3d 141 (2d Cir. 2012)................................................................5, 6, 8, 9

*In re Magnesium Corp. of Am.*,
    399 B.R. 722 (S.D.N.Y. Bankr. 2009) .............................................................7

*Merck & Co.* v. *Reynolds*,
    559 U.S. 633 (2010)....................................................................................5

*Merryman* v. *J.P. Morgan Chase Bank, N.A.*,
    No. 15-cv-9188, 2016 WL 5477776 (S.D.N.Y. Sept. 29, 2016) ......................9, 10

*Pace* v. *DiGuglielmo*,
    544 U.S. 408 (2005)....................................................................................5

*Schweizer v. Trans Union Corp.*,
    136 F.3d 233 (2d Cir. 1998)..........................................................................3

*Shah* v. *Meeker*,
    435 F.3d 244 (2d Cir. 2006)..........................................................................9

STATUTES

29 U.S.C. § 1002 ...........................................................................................7

29 U.S.C. § 1104...........................................................................................7, 9

29 U.S.C. § 1106 .................................................................................................9

29 U.S.C. § 1113 .................................................................................................6

29 U.S.C. § 1132 .................................................................................................7

**OTHER SOURCES**

Black's Law Dictionary  (Rev. 4th ed. 1968) .................................................4

## PRELIMINARY STATEMENT

In opposing BNYM's[1] motion for partial summary judgment (the "Motion"), Plaintiffs do not substantively dispute *any* of the material facts on which the Motion rests:  that the Deposit Agreements and dividend announcements are publicly available; that anyone could purchase interbank FX pricing data prior to the commencement of the six-year ERISA statute of limitations; and that not a single Plaintiff, or their respective ERISA plans, so much as lifted a finger to investigate their claims.  (*See* Plaintiffs' Response to Defendants' Statement of Material Facts ¶¶ 55–70.)  That information was sufficient to put Plaintiffs on inquiry notice of their claims, and their failure to conduct any inquiry whatsoever is fatal to their effort to avoid the ordinary six-year statute of limitations under ERISA.

Because they cannot dispute these dispositive facts, Plaintiffs instead rely on an elaborate smokescreen.  Citing internal emails going back more than 20 years, they contend that certain BNYM employees hatched a plan to conceal how BNYM priced FX conversions for ADR investors.  Plaintiffs are right that the facts concerning this supposed scheme are hotly disputed—but they are also completely irrelevant to BNYM's Motion.  The simple premise of BNYM's Motion is this:  ***if the facts necessary to put Plaintiffs on inquiry notice of their claims were in the public domain, then by definition they were not concealed***, notwithstanding the alleged desire of certain employees to conceal them.  And if Plaintiffs were on inquiry notice and did nothing to inquire, that is the end of the matter:  they are bound by the six-year statute of limitations, and their claims predating that period must be dismissed.

Plaintiffs seek to wriggle out of this box by asserting that it would be unreasonable to expect an ordinary ERISA plan participant to figure out the process by which BNYM set FX

---

[1]   Abbreviations and capitalized terms not otherwise defined here have the same meaning as in Defendants' opening brief.

rates for ADR holders.  But that is not the right standard, on multiple levels.  *First*, in an effort to excuse their failure to conduct any diligence whatsoever, Plaintiffs ask the Court to adjudicate the Motion under the standard applicable to a securities fraud claim.  But the law in this Circuit is clear that a failure to investigate upon inquiry notice is fatal to a fraudulent concealment claim outside the securities fraud context.  *Second*, Plaintiffs are not suing on their own behalf; they are suing derivatively on behalf of their ERISA plans.  The relevant question is thus whether the *plans*—large institutional investors with professional investment advisors and investment managers that owe fiduciary duties to the plans—were on inquiry notice.  That Plaintiffs themselves are financially unsophisticated does not lengthen the statute of limitations applicable to the plans' claims; if it did, there would effectively be no limit on such derivative claims, because most ERISA plan participants are financially unsophisticated.  *Third*, Plaintiffs appear to think that the relevant question is whether they could have discerned pre-suit every fact in support of their claims that they have since learned in discovery—and even some that they still do not know.  If that were so, there would be no such thing as a statute of limitations at all. "Inquiry notice" means "storm warnings" suggesting the plans might have been injured, not knowledge of every fact that Plaintiffs might find useful.

The relevant "storm warnings" here were all—as Plaintiffs do not dispute—available to the plans.  Plaintiffs admit that "[t]he core of [their] case sounds in self-dealing" (Opp'n at 18), and thus does not turn on knowing how exactly BNYM priced ADR FX conversions, as Plaintiffs contend.  It turns simply on notice that BNYM could, and likely did, effect FX conversions for ADR holders through its own trading desk for a profit.  That BNYM could do so is plain from the language of the Deposit Agreements.  That it likely did do so is confirmed both by BNYM's disclaimer of fiduciary obligations in the Deposit Agreements and by a comparison

of the exchange rate charged for any given conversion with the interbank range of the day.  No more was necessary to provide inquiry notice that BNYM was likely earning revenue by trading for its own account:  the "core" of Plaintiffs' ERISA "self-dealing" claims.

Seeking to forestall the inevitable, Plaintiffs further contend that BNYM's Motion is "premature" because no class has been certified.  That is nonsense.  The Motion is addressed only to the Named Plaintiffs' claims, which, to the extent they are untimely, should be dismissed.

## ARGUMENT

### I.   BNYM's Motion Is Procedurally Proper.

Plaintiffs raise two procedural objections to BNYM's Motion: (1) the Motion seeks summary judgment only with respect to absent class members; and (2) the Motion is premature because it precedes class certification.  (*See* Opp'n at 13–14.)  Each is baseless.

BNYM's Motion seeks relief only with respect to the time-barred claims of the Named Plaintiffs.  Plaintiffs concede that there is no procedural bar to seeking summary judgment on the those claims before class certification.  (*Compare* BNYM Br. at 4 n.2 (citing *Schweizer* v. *Trans Union Corp.*, 136 F.3d 233 (2d Cir. 1998)), *with* Opp'n at 14 n.3 (citing same).)  And BNYM does not seek summary judgment, or any other ruling, with respect to claims of absent members of a class that does not presently exist.  On this Motion, the Named Plaintiffs' individual claims must stand or fall on their own merits, and Plaintiffs cannot avoid a ruling on those claims by reference to the potential claims of members of a class that has not been, and may never be, certified.  The impact of summary judgment on the class claims is a question for another day.

### II.   Plaintiffs Cannot Obtain the Benefit of the "Fraud or Concealment" Exception Under ERISA Because Neither They Nor the Plans Exercised Reasonable Diligence.

On the merits, Plaintiffs argue that they have "raised issues of material fact as to whether . . . a reasonably diligent plaintiff should have discovered the facts supporting its claims."

(Opp'n at 14.)  The thrust of their argument is that BNYM's alleged concealment excuses them from their admitted failure to do *anything* to investigate their claims.  They urge:  (1) their "lack of diligence" is "not fatal" because the ERISA statute itself requires only that the defendants "engaged in acts to hinder the discovery of a breach of fiduciary duty," without regard to Plaintiffs' diligence (*id.* at 14, 25); (2) "the pertinent inquiry is not whether the named plaintiffs undertook a diligent investigation, but . . . whether 'a hypothetical reasonably diligent plaintiff would have discovered'" the facts constituting the violation (*id.* at 17, 25); and (3) Plaintiffs were insufficiently sophisticated to discover any of their claims from the publicly available information (*id.* at 16–25).  None of these arguments excuses Plaintiffs' inaction.

### A.   The "Fraud or Concealment" Exception Requires Reasonable Diligence.

Plaintiffs concede that the "ERISA 'fraud or concealment' exception tolls the statute of limitations" only "until the plaintiff *in the exercise of reasonable diligence* discovered *or should have discovered* the alleged fraud or concealment."  (Opp'n at 25 (citing *Janese* v. *Fay*, 692 F.3d 221, 228 (2d Cir. 2012)) (emphasis added, internal quotations omitted).)  Nonetheless, Plaintiffs contend that "[w]hether the plaintiffs exercised reasonable diligence is not dispositive."  (Opp'n at 25.)  Not so.  As the Second Circuit explained in *Caputo* v. *Pfizer, Inc.*, the "fraud or concealment" provision of ERISA "incorporates . . . the 'fraudulent concealment' doctrine," which "grew from the soil of equitable estoppel."  267 F.3d 181, 188–89 (2d Cir. 2001).  That doctrine equitably tolls the running of a statute of limitations where a defendant has employed "'some trick or artifice'" to prevent a plaintiff from discovering its cause of action.  *Id.* at 190 (quoting *Black's Law Dictionary* 361 (Rev. 4th ed. 1968)).  A plaintiff that exercises *no* diligence cannot avail itself of the "fraud or concealment" exception under ERISA, however, because that provision, like the fraudulent concealment doctrine it incorporates, exists to avoid inequity where a defendant has affirmatively prevented a plaintiff from discovering its claim,

4

*despite* the plaintiff's exercise of reasonable diligence. *See, e.g.*, *Bailey* v. *Glover*, 88 U.S. (21 Wall.) 342, 348–50 (1874) (cited in *Caputo* as the source of the fraudulent concealment doctrine, *see* 267 F.3d at 189). But equity will not aid the indolent. *See, e.g.*, *Pace* v. *DiGuglielmo*, 544 U.S. 408, 419 (2005) ("Under long-established principles, petitioner's lack of diligence precludes equity's operation."). Were it otherwise, an ERISA claim would be evergreen whenever the defendant took some action in an effort to prevent discovery of the claim, no matter how ineffectual that effort was or how easily the plaintiff could have discovered the truth if it had bothered to try. Plaintiffs have put forward no evidence that either they or the plans they seek to represent exercised any diligence whatsoever. For that reason alone, their claims predating six years from the filing of the action should be dismissed.

**B.     The *Merck* Securities Law Standard Does Not Apply to ERISA Claims.**

Relying on decisions from outside this Circuit, Plaintiffs further contend that the relevant inquiry is not their own lack of diligence but whether a "hypothetical reasonably diligent plaintiff" would have discovered the facts constituting the violation, an inquiry that they claim raises disputed issues of facts. (*See* Opp'n at 17, 25.) In *this* Circuit, however, the law is clear that that is not the relevant standard. The "hypothetical reasonably diligent plaintiff" standard originates with *Merck & Co.* v. *Reynolds*, 559 U.S. 633 (2010), which addressed when a securities fraud claim accrues. In *Koch* v. *Christie's Int'l PLC*, the Second Circuit held that the *Merck* test is "a statutory exception to the injury discovery rule" that "does not apply outside the realm of the statute that it interpreted"; for other federal statutes, *Merck* does not supplant the inquiry notice doctrine derived from the common law. *Koch*, 699 F.3d 141, 150, 152 (2d Cir. 2012). Under the inquiry notice standard, when circumstances suggest an injury, "'a duty of inquiry arises, and knowledge will be imputed to the [plaintiff] who does not make such an inquiry.'" *Id.* (quoting *Dodds* v. *Cigna Securities, Inc.*, 12 F.3d 346, 350 (2d Cir. 1993)).

Critically, it is *only if* a plaintiff actually takes steps to investigate her claims that the court needs to "determine when a reasonably diligent investigation would have revealed the injury to a person of reasonable intelligence." *Koch*, 699 F.3d at 153. "[O]nce there are sufficient 'storm warnings' to trigger the duty to inquire," however, "if a plaintiff does not inquire within the limitations period, the claim will be time-barred." *Id.* That is the case here: Plaintiffs admit that neither they nor the plans they seek to represent did anything to inquire, and therefore the ordinary six-year statute of limitations under 29 U.S.C. § 1113(1) applies.

### C. Plaintiffs' Own Lack of Financial Sophistication Is Irrelevant.

Plaintiffs do not dispute that throughout the putative class period foreign Issuers have publicly announced when they will pay (and thus when BNYM will receive) dividends on the underlying shares and in what amount of the relevant foreign currency, nor that BNYM likewise has publicly announced when it will pay dividends on the associated ADRs and in what amount of USD. They do not dispute that the Deposit Agreements are publicly available. They do not dispute that the plans have or can obtain information about the ADRs they hold and the associated dividends. They do not dispute that information about the range of prices available in the interbank market for a given currency pair on a given trading day can be purchased from financial publishers such as Reuters. And they do not dispute that it is possible to discern from this information that the rates the plans received from BNYM for ADR FX tended to be less advantageous than the midpoint in the range. They contend only that such discernment is beyond the ken of "an individual ERISA plan participant or trustee." (Opp'n at 19.)

What "an individual ERISA plan participant or trustee," "hypothetical" or actual, could have figured out is not, however, a question the Court needs to decide on this Motion, because neither the participant Plaintiffs nor the trustee Plaintiff are bringing this action on their own behalf. Their standing under 29 U.S.C. § 1132 is purely derivative: they are bringing claims on

behalf of their respective plans, and any recovery would go to the plans.  *See, e.g.*, *Janese,* 692 F.3d at 224.  A party suing derivatively on behalf of an entity can bring no greater claim than the entity itself has.  *See, e.g.*, *In re Magnesium Corp. of Am.*, 399 B.R. 722, 757–60 (S.D.N.Y. Bankr. 2009) (bankruptcy trustee's derivative claims limited to those debtor entities could bring).

Under ERISA, the trustees and other plan fiduciaries have a fiduciary obligation to manage plan assets prudently.  29 U.S.C. § 1104(a)(1)(B).  If they cannot discharge that duty on their own, they must retain qualified investment professionals, often including investment managers with discretionary authority over plan investments, to assist them—as the Named Plaintiffs' plans did here.  An investment manager must be a registered investment advisor, a bank, or an insurance company that meets the requirements of ERISA.  29 U.S.C. § 1002(38).  The relevant question is thus not whether a particular participant in or trustee of a plan could have figured out on his or her own that BNYM might have been "self-dealing," to use Plaintiffs' phrase; it is whether the *plan*—including its investment managers and other investment fiduciaries—could have done so.  Plaintiffs have put forward no evidence and made no claim that those sophisticated entities could not have replicated what Plaintiffs disparagingly call "BNYM's fancy histogram" (Opp'n at 21) or otherwise determined that BNYM was likely converting the ADR FX through its own trading desk and earning a spread.

## III.   The Facts Available to the Plans Provided Inquiry Notice.

Plaintiffs protest that BNYM has "reduc[ed] Plaintiffs' case to a claim over 'excessive fees'" rather than one that at its "core . . . sounds in self-dealing."  (Opp'n at 17–18.)  They then purport to identify details about their claims that they contend "no reasonably diligent plaintiff could have discovered."  (*Id.* at 18; *see id.* at 1824.)  But the relevant test is not whether Plaintiffs could have discerned pre-suit every fact that they might eventually seek to use to prove up their claims.  Rather, a discovery accrual rule like that imposed by the "fraud or concealment"

exception under ERISA turns on "discovery of the injury, not discovery of the other elements of a claim." *Koch*, 699 F.3d at 149.

Little was needed to discover the injuries alleged in the Complaint.  If BNYM as Depositary is a fiduciary to the plans holding its ADRs, as Plaintiffs contend (and BNYM disputes), then simply converting ADR FX in-house breached ERISA's party-in-interest prohibitions (*see* BNYM Br. at 21); receiving any compensation whatsoever—even significantly less than a third party would charge—breached ERISA's self-dealing prohibitions (*see id.* at 23); and either of these breaches would additionally constitute a violation of BNYM's purported fiduciary duties, *see Beck* v. *Levering*, 947 F.2d 639, 641 (2d Cir. 1991).  As shown in BNYM's moving papers (BNYM Br. at 20–24), and as Plaintiffs make no serious effort to dispute, it is plain on the face of the publicly available Deposit Agreements that it was probable BNYM would itself convert ADR FX and receive compensation for that service.

Section 4.5 of the Deposit Agreements, titled "Conversion of Foreign Currency," provides that "the Depositary *shall convert or cause to be converted*, by sale or in any other manner that it may determine," any foreign currency received in connection with ADR cash distributions.  (Compl., App'x I, § 4.5.)  There is no rational construction of the words "shall convert"—especially when contrasted with the phrase "or cause to be converted"—other than that the Bank itself may execute ADR FX, and Plaintiffs suggest none.  *See India.Com, Inc.* v. *Dalal*, 412 F.3d 315, 323 (2d Cir. 2005) ("[e]ffect and meaning must be given to every term of the contract") (quotations and citations omitted).   Moreover, Section 5.3 of the Deposit Agreements expressly disclaims any fiduciary duties to ADR holders, making clear that BNYM did not accept any obligation *not* to "self-deal."  (Compl., App'x I, § 5.3.)  Plaintiffs also suggest no rational basis to assume that BNYM would convert ADR FX unless it were compensated for

8

doing so by taking a spread, consistent with universal practice in the FX markets. The Deposit Agreements alone thus make clear it was at least probable that BNYM would engage in precisely the conduct that, under Plaintiffs' theory, gives rise to each of the causes of action in the Complaint. *See Shah* v. *Meeker*, 435 F.3d 244, 249 (2d Cir. 2006).

Plaintiffs protest that a "single 17-word phrase" in the Deposit Agreements was insufficient to put them on inquiry notice because it showed only that BNYM *might* convert currency in-house, not that it *did*. (*See* Opp'n at 24.) But certainty is not the standard. BNYM's contractual right to perform the FX conversions in-house, coupled with its disclaimer of any fiduciary obligations and its incentive to earn revenue by doing so, were more than sufficient "storm clouds" to trigger a duty to investigate. Because Plaintiffs have offered no evidence that they or their plans took any steps to investigate their claims despite such notice, their claims pre-dating the six-year statute of limitations should be dismissed. *See Koch*, 699 F.3d at 153.

Nonetheless, Plaintiffs devote the greater part of their opposition to urging the difficulty of figuring out exactly how much profit BNYM was taking and exactly by what process it was taking it. (*See* Opp'n at 18–24.) Those details are irrelevant to this Motion. On Plaintiffs' theory, if BNYM converted ADR FX internally and made any profit at all, no matter how modest, it engaged in prohibited transactions and breached its fiduciary duties under Sections 404 and 406 of ERISA. (*See id.* at 18 (quoting 29 U.S.C. §§ 1104, 1106(b).) Those facts alone, according to Plaintiffs, complete the offense, and no further details are required. But in any case Plaintiffs' excuses are meritless. To address a few:

- Plaintiffs complain the data BNYM used to generate a histogram akin to that found sufficient by Judge Caproni in *Merryman* v. *J.P. Morgan Chase Bank, N.A.*, No. 15-cv-9188, 2016 WL 5477776, at *11 (S.D.N.Y. Sept. 29, 2016), is "expensive"; they admit that "'[f]ree data' exists, but is likely not of comparable quality." (Opp'n at 19.) But Plaintiffs did not need the *best* data, nor is it a valid defense that better data cost money. BNYM cannot have concealed that which the plans could acquire. In any case, free data

did exist and would have shown the same trend. To illustrate, BNYM prepared a histogram using free data from the *Wall Street Journal*. (*See* Reply Declaration of Alexander ("Sasha") Aganin (Mar. 19, 2018) ("Aganin Reply Decl.") ¶¶ 4–8 & Ex. A.)

- Plaintiffs complain that a plaintiff would not know "what time period to use to compare its FX rate." (Opp'n at 19.) But they do not dispute that the date when BNYM receives the currency is publicly announced, and Plaintiffs still do not know "the date or time at which the FX conversions were executed" (*id.* at 20) because BNYM does not keep that information, yet they were able to file this action. Using the date BNYM receives the local currency shows the same trend. (*See* Aganin Reply Decl. ¶ 7 & Ex. A.)

- Plaintiffs criticize BNYM's "fancy histogram" for taking into account too many data points. (Opp'n at 19, 20–21.) But the same point could readily be established with far fewer. BNYM's free-data-only histogram illustrates the point by looking only at the dividends received by one ERISA plan fund, Baker Hughes International Equity Fund, for two years prior to the beginning of the six-year limitations period. It shows that BNYM's pricing was worse than the midpoint of the interbank range 93% of the time. (Aganin Reply Decl. ¶ 9.)

Finally, Plaintiffs seek to distinguish Judge Caproni's decision in *Merryman* on the grounds that it was decided on a motion to dismiss; *Merryman* sounded in contract only; BNYM affirmatively concealed information; and BNYM is simply asking the Court for belated reconsideration of its motion to dismiss ruling. (Opp'n at 21–22.) Those are distinctions without a difference. That Judge Caproni's decision was on a motion to dismiss cuts the other way; here the Court is not limited to the pleadings, but has before it a fully developed record of undisputed facts showing that the plans had access to the information needed to discover Plaintiffs' claims yet failed to investigate. The bar for discovering Plaintiffs' ERISA claims is no higher than for the *Merryman* contract claims; in either case, the Deposit Agreements, dividend announcements, and interbank market pricing data are all that is needed. Concealment was also alleged in *Merryman*; as here, what was dispositive was not what was allegedly concealed but what was *not* concealed. Finally, BNYM does not ask the Court to reconsider the sufficiency of Plaintiffs' pleading, but to consider for the first time the undisputed facts now in the record.

10

## CONCLUSION

For the foregoing reasons and those stated in BNYM's opening brief, Defendants respectfully request that the Court grant its Motion.

Dated: New York, New York
March 19, 2018

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

By:/s/ Elizabeth M. Sacksteder
Elizabeth M. Sacksteder
William A. Clareman
Amy L. Barton
Jeremy A. Benjamin

1285 Avenue of the Americas
New York, New York 10019-6064
Tel:  (212) 373-3000
Fax:  (212) 757-3990
esacksteder@paulweiss.com
wclareman@paulweiss.com
abarton@paulweiss.com
jbenjamin@paulweiss.com

*Attorneys for Defendants The Bank of New
York Mellon and BNY Mellon, N.A.*

11